```
                                                                    1

 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF ILLINOIS

 3                       EASTERN DIVISION

 4

 5   SEAN PAUL REYES,              )
             Plaintiff,            )
 6        vs.                      )    No. 22 CV 7339
     RICHARD VOLANTI, DETECTIVE    )
 7   MONACO, OFFICER GHILONI,      )
     RUTH SIABA Green,             )
 8   individually, and the CITY    )
     OF BERWYN, a municipal        )
 9   corporation,                  )
             Defendants.           )
10

11           The deposition of SEAN PAUL REYES called

12    for examination pursuant to Notice and the Rules

13    of Civil Procedure for the United States

14    District Courts pertaining to the taking of

15    depositions, taken before Jamye Giamarusti, a

16    Certified Shorthand Reporter, within and for the

17    County of Cook and State of Illinois, at 111

18    North Wabash, Suite 908, Chicago, Illinois, on

19    November 8, 2023, at the hour of 2:00 p.m.

20

21

22

23    Reported by:  Jamye Giamarusti, CSR

24    License No.:  084-004183
```

EXHIBIT A

**Sean Paul Reyes**

10

1   no.
2       Q.   Okay.  And it's my understanding that
3   you live in New York; is that correct?
4       A.   That's correct.
5       Q.   Okay.  And so what caused you to travel
6   to the city of Berwyn in November of 2021?
7       A.   So my company works off of tips.  So
8   from my viewership, I received a tip that the
9   city of Berwyn had some signage on their door
10  that prevented people from exercising their
11  First Amendment right to record the government
12  officials in the course of their duty, and I
13  went there to investigate that.
14      Q.   And who did you receive that tip from?
15      A.   I don't recall.
16      Q.   Where would you have received that tip?
17      A.   I believe it was an e-mail.
18      Q.   And so that would be something that
19  your counsel would be able to produce to me?
20      A.   If I still have it, yes.
21      Q.   And what would be the reason that you
22  would not still have it?
23      A.   I've run out of storage and things go
24  automatically.  This happened two years ago, and

EXHIBIT A

Sean Paul Reyes

20

```
 1    taxes for either of those municipalities --
 2         A.    No --
 3         Q.    -- units of government?  Excuse me.
 4         A.    No, ma'am.  I do not.
 5         Q.    Okay.  And you stated that this Long
 6    Island Audit is your primary source of income,
 7    correct?
 8         A.    That's correct.
 9         Q.    Okay.  And how much money do you make
10    off of your Long Island Audit then?
11         MR. KULIS:  Objection; parameters.
12         MS. GRANDFIELD:  Objection what?
13         MR. KULIS:  Parameters.
14              When?  I mean, this year, last year,
15    2021?
16         MS. GRANDFIELD:  Okay.  Sure.  I can limit
17    it.
18    BY MS. GRANDFIELD:
19         Q.    How much income did you make off of
20    Long Island Audit in 2020?
21         A.    In 2020, I believe the company made --
22    how much money did I receive personally, ma'am,
23    or how much money did my company bring in?
24         Q.    I can ask it in two parts.
```

EXHIBIT A

**Sean Paul Reyes**

21

```
 1            How much money did the company bring in
 2    in 2020?
 3         A.   I would have to refer to my tax
 4    documents.  But, to the best of my knowledge,
 5    the year 2020, I would say --
 6         MR. KULIS:  Don't guess if you don't know.
 7         THE WITNESS:  I don't recall.  I don't know
 8    exactly how much I made in 2020.  I would have
 9    to refer to my tax documents.
10    BY MS. GRANDFIELD:
11         Q.   Okay.  So you can produce those then?
12         MR. KULIS:  The company is not a party, so
13    it's kind of irrelevant how much the company
14    makes.  How much he makes may be relevant.
15         MS. GRANDFIELD:  I would ask that they be
16    produced.
17    BY MS. GRANDFIELD:
18         Q.   Okay.  Now, with respect to yourself,
19    how much did you make in 2020?
20         A.   Again, I would have to refer to my tax
21    documents.
22         Q.   Could you tell me if it was more or
23    less than $1 million?
24         A.   Less than $1 million.
```

EXHIBIT A

**Sean Paul Reyes**

22

```
 1        Q.    More or less than $500,000?
 2        A.    Less than $500,000.
 3        Q.    More or less than $250,000?
 4        A.    Less than $250,000.
 5        Q.    Okay.  We can keep going this way, or
 6   is there any sort of approximation that you can
 7   provide me that you believe without referring to
 8   your tax documents?
 9        A.    I was told by counsel not to give an
10   answer unless I knew it.  I don't know it.  And
11   I need to refer to my tax documents for an exact
12   answer.
13        MR. KULIS:  You can give her a range, if you
14   have an idea.
15        THE WITNESS:  I believe, in 2020, between 50
16   and $100,000.
17   BY MS. GRANDFIELD:
18        Q.    And same question with respect to 2021.
19        A.    Again, I would have to refer to my tax
20   documents.
21        Q.    Okay.  Would the range of 50 to 100K be
22   about the same range, or would it have differed?
23        A.    It would have differed.  It went up.
24        Q.    It went up.  Okay.
```

EXHIBIT A

**Sean Paul Reyes**

23

```
 1          And do you know if it went up to more
 2    or less than 250K?
 3          A.   I would say it was less.  Again, I
 4    would have to refer for an exact number.  But I
 5    would say it was up to 200.  It was between 100
 6    and $200,000.
 7          Q.   Okay.  Do you know why it went up?
 8          A.   Well, the way my company works, ma'am,
 9    is that it's -- it's like any other news media
10    company.  So, the more people that watch you --
11    for example, CNN runs off of news
12    advertisements, MSNBC.  My company also runs off
13    of news advertisements.
14          So, the more people that are watching
15    my content and are receiving the content means
16    the more ad revenue money that I receive.  So, I
17    would assume that the reason why it went up is
18    because my viewership went up on my company.
19          Q.   Do you also sell merchandise in
20    relation to your company?
21          A.   I do.
22          Q.   And do you know if you sold more
23    merchandise in 2021?
24          A.   Than 2020?
```

EXHIBIT A

**Sean Paul Reyes**

24

1  Q. Yes. Because, you know, you were
2  saying it went up, so --
3  A. Yeah. I would assume so, ma'am.
4  Q. Okay. And because both of 2020 and
5  2021 were years of the pandemic, was there any
6  significant change in your income in 2021
7  versus, say, prepandemic, 2018 or 2019.
8  A. Prepandemic, I was not -- Long Island
9  Audit did not exist.
10 Q. Oh. Well, that's the question I should
11 have asked to begin with. Sorry.
12 A. Yeah.
13 Q. How long have you had Long Island Audit
14 as a company?
15 A. Since 2020.
16 Q. Oh, okay. And prior to 2020, did you
17 do something else for employment?
18 A. I was a logistics director.
19 Q. And where were you a logistics director
20 at?
21 A. At Pretty Woman.
22 Q. And where is that at?
23 A. Holtsville.
24 Q. Where is that?

EXHIBIT A

Sean Paul Reyes

25

1     A. New York.
2     Q. And how long did you do that for?
3     A. I would say around four years.
4     Q. And what was the reason you stopped
5 doing that?
6     A. I was furloughed because of the
7 pandemic.
8     Q. And other than the case that we're on
9 here today, have you filed any other lawsuits
10 against units of local government related to
11 your First Amendment rights?
12     A. I have.
13     Q. What other lawsuits have you filed?
14     A. I've filed a lawsuit against Danbury
15 Connecticut, City of Danbury. I've also filed a
16 lawsuit against the City of New York. And I
17 believe that's all the lawsuits that I have
18 filed currently.
19     Q. And are both of those lawsuits still
20 pending, or have they reached a conclusion?
21     A. They're both still pending. Actually,
22 the Danbury lawsuit was dismissed for a
23 technical error.
24     Q. And when you say dismissed for a

EXHIBIT A

Sean Paul Reyes

65

```
 1    was an officer, a different officer that I
 2    guess, you know, works in processing.  And he
 3    was telling me that -- I asked him what the
 4    charge was, and he told me felony eavesdropping.
 5            And then I said, What's -- it was
 6    taking, you know, a long time.  I don't know
 7    typically what's the process in Berwyn.
 8            But he said, "Well, they're trying to
 9    figure out what they're trying to charge you
10    with."  And, eventually, I guess they settled on
11    disorderly conduct.  Because they said -- I
12    remember it was a big question at the time
13    because it was -- if I was being charged with a
14    felony, I would have to stay overnight.  If
15    you're being charged with something else, it's
16    different.
17            So he was like, "You're probably going
18    to be here overnight.  You're being charged with
19    a felony."  It was a felony eavesdropping
20    statute that was on the sign.
21            I was like, "Okay."
22            And eventually -- they kept going back
23    and forth, and eventually they just wrote a
24    simple misdemeanor warrant, a misdemeanor charge
```

EXHIBIT A

Sean Paul Reyes

66

1 for me, and I was released.
2     I think I was in the cell -- every
3 minute of the cell feels like an eternity.  It's
4 a horrible experience.  I think it was around
5 four to six hours.  Around there.  I'm not
6 exactly sure.
7     Q.  Was there anyone else in there with
8 you?
9     A.  No, ma'am.  I was in the cell by
10 myself.
11     Q.  And were the handcuffs taken off at
12 some point?
13     A.  They were taken off when I was being
14 put in the cell, ma'am.
15     Q.  Okay.  And did you have to post any
16 form of bond or anything like that?
17     A.  I believe I did.  It was $100 bond.
18     Q.  Okay.  And other than that, was there
19 any sort of bond posting or anything else that
20 you had to do?
21     A.  Just the $100.
22     Q.  Okay.  And at some point, you retained
23 a criminal defense attorney in relation to the
24 misdemeanor?

EXHIBIT A

Sean Paul Reyes

67

1  A. That's correct, ma'am.
2  Q. And how much did you pay that criminal
3  defense attorney?
4  A. His name is Jim Jenks, and he saw the
5  video and reached -- he saw the video and saw
6  what was happening, and he offered to take the
7  case pro bono.
8  Q. Okay. And what is your understanding
9  of what pro bono is?
10 A. My understanding is that he does the
11 work for free for me, without charging me.
12 Q. Do you have any sort of agreement or
13 understanding with Mr. Jenks that he would be
14 entitled to a share of any compensation you
15 would receive in relation to this lawsuit?
16 A. No.
17 Q. Okay. What is your understanding as to
18 what happened with the misdemeanor case that was
19 filed against you?
20 A. So we had multiple court dates. Again,
21 I'm not sure -- I can definitely -- I'm sure you
22 have access to that information.
23      There was multiple court dates to go
24 back and forth from New York to Berwyn to Cook

EXHIBIT A

**Sean Paul Reyes**

68

1   County courthouse.  Excuse me.  A lot of it was
2   done via Zoom.
3       Q.   I was just going to say.  That was my
4   confusion.
5       A.   No.  It was done via Zoom.  Thankfully.
6   It was done via Zoom.
7            So, the way it just -- you know, like
8   all court cases, it just all takes time.  And it
9   went through the process.  We were ready to go
10  to trial.  I believe they made an offer of some
11  sort to me, probation or something, suspended
12  sentence.  I don't recall.  But I refused that,
13  and we were ready to go to trial.
14           On the day of trial, the mayor was
15  there, Mayor Robert Lovero; Ruth Siaba Green,
16  the city administrator; everybody was there.
17  The state's attorney's office, the judge.
18           I had made a petition to the Court to
19  record -- well, a third-party actually made a
20  petition to the Court to record the proceedings,
21  the trial.  And the judge -- the state attorney,
22  supervising state attorney objected vehemently.
23  He was very upset by this request.  He did not
24  want to be recorded, didn't want these

EXHIBIT A

**Sean Paul Reyes**

71

1   your attorney.  Do you recall that?
2        A.   Yes, ma'am.
3        Q.   And that motion was denied; is that
4   correct?
5        A.   Right.
6        Q.   And other than Danbury, Connecticut, I
7   believe, if I recall correctly, have there been
8   any other instances where you have -- I can
9   already tell this is a terrible question.
10            Other than the City of Berwyn charging
11  you with a misdemeanor and Danbury, Connecticut,
12  have there been any other instances where you've
13  been charged with a crime in relation to your
14  Long Island Audit activities?
15       A.   That's correct.
16       Q.   Those are the only ones?
17       A.   No.  There's been other instances.
18       Q.   Okay.  What are the other instances?
19       A.   So I mentioned previously the Harford
20  County, Maryland incident.  Also, there was
21  Waterbury, Connecticut.
22       Q.   And in Hartford County, what --
23       A.   Harford.  No T.
24       Q.   Oh, Harford County.

EXHIBIT A

Sean Paul Reyes

72

| | | |
|---|---|---|
| 1 | | What were you charged with there? |
| 2 | A. | I already told you all this. |
| 3 | | But hindering, ma'am. |
| 4 | Q. | And what happened with that charge? |
| 5 | A. | Again, it was dismissed because of a |
| 6 | diversion. | |
| 7 | Q. | I thought you told me that in relation |
| 8 | to Danbury. | |
| 9 | A. | No, no.  Harford.  If you want to check |
| 10 | your notes.  Harford County, Maryland. | |
| 11 | Q. | Okay.  So what happened in relation to |
| 12 | Danbury, then? | |
| 13 | A. | Danbury, there was -- you asked me if |
| 14 | there was any federal lawsuits that I filed. | |
| 15 | And I told you I did file a federal lawsuit in | |
| 16 | Danbury, and it was dismissed for a technical | |
| 17 | error. | |
| 18 | Q. | Okay.  So Danbury, you didn't have any |
| 19 | criminal charges? | |
| 20 | A. | I did. |
| 21 | Q. | What happened to the criminal charges |
| 22 | in Danbury? | |
| 23 | A. | They were -- the criminal charges were |
| 24 | dropped by the state's attorney. | |

EXHIBIT A

Case: 1:22-cv-07339 Document #: 57-1 Filed: 03/06/24 Page 15 of 20 PageID #:137

**Sean Paul Reyes**

74

1   criminally charged in relation --
2       A.   Oh, Hagerstown, Maryland.
3       Q.   Okay.  And what were the charges in
4   Hagerstown?
5       A.   Failure to obey, criminal trespass.
6       Q.   And what happened with respect to those
7   charges?
8       A.   The state's attorney declined to
9   prosecute those charges, and they were
10  dismissed.
11      Q.   And was that before or after your
12  attorney reached out to them?
13      A.   That was before, ma'am.
14      Q.   Okay.  And then Baltimore County,
15  Maryland, was -- okay.
16           Other than that, any other places that
17  you've been criminally charged?
18      A.   New York City.
19      Q.   Okay.
20      A.   It's unfortunately a little longer of a
21  list.  New York City, ma'am.
22      Q.   Okay.  And what --
23      A.   61st Precinct.
24      Q.   See, there's a precinct.

EXHIBIT A

Sean Paul Reyes

75

```
 1              And what were you charged with there?
 2        A.    I was charged with criminal trespassing
 3   and simple trespass.
 4        Q.    Okay.  And what happened with those
 5   charges?
 6        A.    Dismissed.
 7        Q.    Do you have any recollection as to when
 8   that was?
 9        A.    That was -- the 61st Precinct, I
10   believe, was April of this year.
11        Q.    Okay.  Any other places?
12        A.    75th Precinct of the NYPD.
13        MR. KULIS:  What precinct?
14        THE WITNESS:  75th, sir.
15   BY MS. GRANDFIELD:
16        Q.    Okay.  And what were the charges there?
17        A.    Obstructing governmental
18   administration, criminal trespass, simple
19   trespass.
20        Q.    And what happened with those charges?
21        A.    We are currently awaiting the judge's
22   motion on a motion to dismiss in that case.
23        Q.    Are you representing yourself in that
24   matter, or do you have an attorney representing
```

EXHIBIT A

Sean Paul Reyes

76

1 you?
2     A.   I have an attorney.
3     Q.   And when were those charges filed, if
4 you know?
5     A.   I believe June.
6     Q.   Of this year?
7     A.   Of this year, yeah.
8     Q.   Other than all these that we've
9 discussed, any other criminal charges?
10     A.   Nassau County, New York.
11     Q.   New York. Okay. I was hoping for you
12 it was the Bahamas.
13         And what were the charges there?
14     A.   Criminal trespass, third degree, two
15 times.
16     Q.   And what happened to those charges?
17     A.   Those charges are still pending.
18     Q.   And do you know when that was filed?
19     A.   August.
20     Q.   Of this year?
21     A.   Of this year.
22     Q.   Okay. Anywhere else?
23     A.   No, ma'am. I believe that's all.
24     Q.   Okay. Going back to your social media,

EXHIBIT A

Sean Paul Reyes

91

1 Q. Your criminal trial, you had to appear
2 in person?
3 A. That's correct.
4 Q. It wasn't via Zoom?
5 A. No, ma'am.
6 Q. And where did you appear for that?
7 A. Cook County. The Maywood Courthouse.
8 Q. And do you recall the name of the judge
9 that you appeared before?
10 A. I do not. It was an African American
11 male judge.
12 Q. Okay. At any time did you participate
13 in hearings or statuses related to your criminal
14 case that were via Zoom?
15 A. Yes, ma'am.
16 Q. And was there an instance that you --
17 that someone other than the county recorded
18 those proceedings?
19 A. Yes, ma'am.
20 Q. And who was that?
21 A. I don't know.
22 Q. Why do you have knowledge of it?
23 A. Because I received them.
24 Q. And who did you receive them from?

EXHIBIT A

Sean Paul Reyes

92

```
 1        A.    From another -- I believe I received it
 2   from an anonymous e-mail, a Proton e-mail
 3   address.
 4        Q.    What's a Proton e-mail address?
 5        A.    It's just like a Gmail, but it's called
 6   Proton.  I believe so.
 7        Q.    And what did you do with that
 8   recording?
 9        A.    I disseminated it to the public.
10        Q.    Okay.  And at the beginning of Cook
11   County Zoom hearings, there is usually a warning
12   that says that you're not to record those
13   proceedings yourself or otherwise disseminate
14   them.  Do you recall that occurring?
15        A.    I don't recall that specific warning,
16   no.
17        Q.    Okay.  And when you say you
18   disseminated it, what do you mean you
19   disseminated it?
20        A.    Published it.
21        Q.    Okay.  Where did you publish it at?
22        A.    YouTube, Facebook, social media.
23        Q.    At some point, did someone tell you or
24   request that you take that down?
```

EXHIBIT A

**Sean Paul Reyes**

93

```
1         A.    Not that I recall.
2         Q.    Is it still up on your website?
3         A.    I believe so.  I'll have to check.
4         Q.    Okay.  So you're not aware of the fact
5    that you are not allowed to record certain
6    proceedings in Cook County?
7         A.    No.
8         Q.    Okay.  You're not allowed to record
9    Cook County Zoom recordings.
10                    (WHEREUPON, Exhibit No. 1 was
11                     marked for identification.)
12   BY MS. GRANDFIELD:
13        Q.    I'm going to show you what I will have
14   marked as Exhibit 1.
15              Do you recognize this document?
16        A.    Yes.
17        Q.    Okay.  And it says:  Effective date
18   August 16th.
19              And what is this document, just for the
20   record?
21        A.    A letter of intent to sue.
22        Q.    Okay.  And on this document, it says:
23   Effective date August 16th, 2022.
24              Do you see that?
```

EXHIBIT A