# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SEAN PAUL REYES, )
                                   )
Plaintiff, )
                                   )
v. )
                                   )     Case No. 22 CV 07339
RICHARD VOLANTI, DETECTIVE )
MONACO, OFFICER GHILONI, RUTH )
SIABA [GREEN][1], individually, and the )
CITY OF BERWYN, )
a municipal corporation, )
                                   )
Defendants. )

## ANSWER TO COMPLAINT

NOW COMES the Defendants, VOLANTI, MONACO, GHILONI, SIABA

GREEN, and the CITY by and through their attorney Cynthia S. Grandfield of Del

Galdo Law Group, LLC and in answering provides:

## COUNT I – FALSE ARREST/SEIZURE

1. This action is brought pursuant to the laws of the United States Constitution,

specifically, 42 U.S.C. §1983 and §1988, and the laws of the State of Illinois, to

redress deprivations of the civil rights of the Plaintiff, SEAN PAUL REYES

accomplished by acts and/or omissions of the Defendants, RICHARD VOLANTI,

DETECTIVE MONACO, OFFICER GHILONI, and RUTH SIABA [GREEN],

---

[1] Throughout the course of the complaint, Reyes interchanges "Ruth Siaba" with "Ruth Siaba Green." As her name is "Ruth Siaba Green," the "Green" is reflected in brackets for the sake of consistency and clarity.

individually, and the CITY OF BERWYN, a municipal corporation, committed under color of law.

*Answer:  Defendants admit that the Plaintiff brings causes of action pursuant to these laws but deny that any violation occurred.  Defendants deny each and every remaining allegation contained in Paragraph 1.*

2.  This Court has jurisdiction pursuant to 28 U.S.C. 1331 and 1343 as this matter involves issues of federal law.

*Answer:  Defendants admit the allegations contained in Paragraph 2.*

3.  The Plaintiff, SEAN PAUL REYES, is a resident of the State of Illinois.

*Answer:  Defendants deny the allegations contained in Paragraph 3.*

4.  The Defendants, RICHARD VOLANTI, DETECTIVE MONACO, OFFICER GHILONI, and RUTH SIABA [GREEN] individually, were at all times relevant to the allegations of the Complaint, duly appointed Berwyn police officers and were acting within their scope of employment and under color of law.

*Answer:  Defendants admit that Volanti, Monaco and Ghiloni were duly appointed Berwyn police officers.  Defendants admit that they were acting within the scope of their employment. Defendants deny that Ruth Siaba Green is a Berwyn police officer and each and every remaining allegation contained in Paragraph 4.*

5.  On or about November 2021, the Plaintiff, SEAN PAUL REYES, was lawfully in the Berwyn City Hall.

*Answer:  Defendants deny the allegations contained in Paragraph 5.*

6.  The Plaintiff filmed some of the activities in City Hall.

*Answer: Defendants admit that Plaintiff was video recording on his cell phone while in City Hall. Defendants deny each and every remaining allegation contained in Paragraph 6.*

7. Plaintiff SEAN PAUL REYES was not committing a crime or breaking any laws.

*Answer: Defendants deny the allegations contained in Paragraph 7.*

8. One of the Defendants seized the plaintiff restricting his movement and taking him into custody.

*Answer: Defendants deny the allegations contained in Paragraph 8.*

9. The plaintiff was not free to go.

*Answer: Defendants deny the allegations contained in Paragraph 9.*

10. The Defendants, after a period of time, escorted the plaintiff outside the building.

*Answer: Defendants admit that Plaintiff was escorted out of the building. Defendants deny each and every remaining allegation.*

11. The Plaintiff attempted to film GHILONI but his phone was forced out of his hands by one of the officers and confiscated.

*Answer: Defendants admit that Plaintiff's phone was taken. Defendants deny each and every remaining allegation contained in Paragraph 11.*

12. There were no facts to support any probable cause that Plaintiff was committing any crime.

*Answer: Defendants deny the allegations contained in Paragraph 12.*

3

13. The plaintiff was arrested and charged with disorderly conduct.

*Answer: Defendants admit the allegations contained in Paragraph 13.*

14. The Defendants' actions constituted an unlawful seizure and arrest.

*Answer: Defendants deny the allegations contained in Paragraph 14.*

15. The actions of the Defendants were intentional, willful, and wanton.

*Answer: Defendants deny the allegations contained in Paragraph 15.*

16. As a result of the Defendants' actions, the plaintiff was seized and handcuffed.

*Answer: Defendants deny the allegations contained in Paragraph 16.*

17. The actions of the Defendants constituted a violation of the Plaintiff SEAN PAUL REYES's Fourth Amendment rights as protected by 42 U.S.C. § 1983.

*Answer: Defendants deny the allegations contained in Paragraph 17.*

18. As a result of the actions of the Defendants, the Plaintiff, SEAN PAUL REYES, suffered fear, anxiety, pain and suffering, emotional distress, and money damages.

*Answer: Defendants deny the allegations contained in Paragraph 18.*

## COUNT II – CONSPIRACY

1-18. The Plaintiff hereby realleges and incorporates his allegations of paragraphs 1-18 of Count I as his respective allegations of paragraphs 1-18 of Count II as though fully set forth herein.

*Answer: Defendants refer Plaintiff to the answers to those paragraphs as if fully restated here.*

4

19. The Defendant Ruth Siaba [Green] was the City Administrator of Berwyn.

*Answer:  Defendants admit the allegations contained in Paragraph 19.*

20. During the time he was handcuffed and in custody, the defendants got Ruth Siaba Green, the city administrator to sign a criminal complaint.

*Answer:  Defendants admit that Ruth Siaba Green signed a criminal complaint against Plaintiff.  Defendants deny each and every remaining allegation contained in Paragraph 20.*

21. The Defendants did not have probable cause to have the plaintiff arrested or charged.

*Answer:  Defendants deny the allegations contained in Paragraph 21.*

22. The defendants conspired to have Sean Paul Reyes criminally arrested and charged.

*Answer:  Defendants deny the allegations contained in Paragraph 22.*

23. The actions of the arrest constituted a violation of the Plaintiff's Fourth Amendment rights.

*Answer:  Defendants deny the allegations contained in Paragraph 23.*

24. The actions of the Defendants were intentional, willful, and wanton.

*Answer:  Defendants deny the allegations contained in Paragraph 24.*

25. The actions of the Defendants constituted a violation of the Plaintiff's Fourth Amendment rights as protected by 42 U.S.C. § 1983.

*Answer:  Defendants deny the allegations contained in Paragraph 25.*

26.  As a result of the actions of the Defendants, RICHARD VOLANTI,

DETECTIVE MONACO, OFFICER GHILONI, and RUTH SIABA [GREEN],

individually, the Plaintiff, SEAN PAUL REYES, suffered fear, anxiety, pain and

suffering, emotional distress, and money damages.

*Answer:  Defendants deny the allegations contained in Paragraph 26.*

## COUNT III – MALICIOUS PROSECUTION

1-26. The Plaintiff hereby realleges and incorporates his allegations of

paragraphs 1-26 of Count II as his respective allegations of paragraphs 1-26 of

Count III as though fully set forth herein.

*Answer:   Defendants refer the Plaintiff to its answers to those paragraphs as if fully*

*state here.*

27. The defendant proceeded with prosecution of their charges knowing they

were false.

*Answer:  Defendants deny the allegations contained in Paragraph 27.*

28. The Plaintiff retained counsel for his defense.

*Answer:  Defendants admit the allegations contained in Paragraph 28.*

29. The charges were ultimately dismissed in his favor.

*Answer:  Defendants admit that the charges were stricken on leave with leave to*

*reinstate by the State's Attorney.  Defendants deny each and every remaining*

*allegation contained in Paragraph 29.*

## COUNT IV – CITY OF BERWYN/INDEMNIFICATION

1-29. Plaintiff hereby realleges and incorporates his allegations of paragraphs 1-29

of Count I-III as his respective allegations of paragraph 1-29 of Count I-III as his

respective allegations of paragraph 1-29 of Count IV as though fully set forth herein.

*Answer: Defendants refer Plaintiff to their answers to those Paragraphs as if fully restated here.*

30. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

*Answer: Defendants admit the allegations contained in Paragraph 30.*

31. Defendants, RICHARD VOLANTI, DETECTIVE MONACO, OFFICER GHILONI, and RUTH SIABA [GREEN] are or where employees of the CITY OF BERWYN and acted within the scope of their employment in committing the misconduct described herein.

*Answer: Defendants deny the allegations contained in Paragraph 31.*

## AFFIRMATIVE DEFENSES

1. With respect to Counts I and II against the individual defendants VOLANTI, MONACO, GHILONI, and SIABA GREEN, they are each entitled to qualified immunity in that it was not clearly established at the time what constituted probable cause for disorderly conduct in the context of repeated non-consensual cell phone video recording at the time of arrest.

2. With respect to Count III, the individual defendants VOLANTI, MONACO, GHILONI, and SIABA GREEN are not liable for any of their acts in responding to Plaintiff's conduct as the decision as to if to charge Plaintiff and what to charge him

with was an exercise of discretion and/or a determination of policy within the meaning of 745 ILCS 10/2-201.

3.  With respect to Count IV, the City is not liable for any act for which the individual defendant officers are not liable pursuant to 745 ILCS 10/2-109.

Respectfully submitted,
Defendants

By: */s/ Cynthia S. Grandfield*

Cynthia S. Grandfield (ARDC No. 6277559)
Sean M. Sullivan
DEL GALDO LAW GROUP, LLC
grandfield@dlglawgroup.com
1441 S. Harlem Avenue
Berwyn, Illinois 60402
(708) 222-7000 (t)

# Exhibit 2

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------

Sean Paul Reyes,

    Plaintiff,

    vs.        Case Number 1:22-cv-07339

Richard Volanti, Detective Monaco,
Officer Ghiloni, and Ruth Siaba
Individually, the City of Berwyn,
a Municipal Corporation,

    Defendants.

-----------------------------------------------

Deposition of Richard James Volanti
Tuesday
April 9, 2024
-at-
Gregory E. Kulis and Associates, Ltd.
134 North LaSalle Street
Suite 444
Chicago, Illinois 60602

## Page 2

```
 1              APPEARANCES
 2
 3      For the Plaintiff:
 4
 5      Gregory E. Kulis
 6      Gregory E. Kulis and Associates, Ltd.
 7      134 North LaSalle Street
 8      Suite 444
 9      Chicago, Illinois 60602
10
11      For the Defendants:
12
13      Cynthia Grandfield
14      Del Galdo Law Group, LLC
15      1441 South Harlem Avenue
16      Berwyn, Illinois 60402
17
18      Also present:
19
20      Sean Paul Reyes
21      Ruth Siaba Green
22      Robert Monaco
23
24
25
```

## Page 3

```
 1              EXAMINATION INDEX
 2
 3  DIRECT      CROSS     REDIRECT    RECROSS
 4  5           --        --          --
 5
 6              EXHIBIT INDEX
 7
 8  EXHIBIT               PAGE NUMBER
 9  1 -                   53
10  2 -                   55
11  3 -                   38
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1          THE RECORDER:  Good morning.  We are now on
 2  the record on Tuesday, April 9th, 2024.  The time is
 3  11:29 a.m.  We are located at Gregory E. Kulis and
 4  Associates, Ltd., 134 North LaSalle Street, Suite 444,
 5  Chicago, Illinois 60602, for a video-recorded
 6  deposition in the matter of Sean Paul Reyes v. Richard
 7  Volanti, et -- et al., Case No. 1:22-cv-07339, in the
 8  United States District Court for the Northern District
 9  of Illinois, Eastern Division.          0:00:37
10          This deposition is being recorded by In
11  Demand Court Reporting, located at 216 South Jefferson
12  Street, Chicago, Illinois 60661, on behalf of the
13  Plaintiff and being taken at the instance of the
14  Plaintiff.  The witness today is Richard James Volanti.    0:00:52
15          Mr. Volanti, my name is Matthew Schulte.  I'm
16  a notary public and the video recording device operator
17  for this deposition.  At this time, would you please
18  raise your right hand for the oath?        0:01:02
19          (Witness sworn.)
20          THE RECORDER:  Thank you.
21          Would the attorneys please state their --
22  their appearances for the record?         0:01:12
23          MR. KULIS:  Gregory Kulis, K-U-L-I-S, for the
24  Plaintiff.
25          MS. GRANDFIELD:  Cynthia Grandfield for the
```

1 (Pages 1 to 4)

## Page 5

1    Defendant.                                      0:01:17
2         THE RECORDER:  Also present are Plaintiff,
3    Sean Paul Reyes, and Co-Defendants Ruth Siaba Green and
4    Robert Monaco.  Monaco.  Excuse me.
5         That completes the required information, and
6    we can proceed.                                 0:01:26
7              DIRECT EXAMINATION
8    BY MR. KULIS:
9         Q.  Sir, will you please state your full name and
10   spell your last name for the record?
11        A.  Richard James Volanti.  V like Victor,
12   O-L-A-N-T-I.                                     0:01:36
13        Q.  Okay.  Detective Volanti, let me ask you.
14   Have you ever given a deposition before?
15        A.  Yes.
16        Q.  Approximately how many times?           0:01:42
17        A.  One.
18        Q.  What type of matter was it?
19        A.  I'm -- I'm -- I'm not sure.  It was a long
20   time ago.  I was a witness for a -- a case at work.  A
21   --                                              0:01:52
22        Q.  Okay.
23        A.  -- civil case.
24        Q.  Let me go over a few -- a few things.  And --
25   and I know you heard my instructions with Ms. Green,

## Page 6

1    but let me go over a few ground rules so you and I are
2    on the same page.                               0:02:02
3         This is my opportunity to ask you some
4    questions regarding my -- some allegations that my
5    client has made against you and other individuals of
6    the City of Berwyn.  I'm here to trick you.  I'm not
7    here to corner you.  All I want to know is the -- your
8    version of the facts.  What you recall, what you saw,
9    what you did, what action you took.             0:02:19
10        If at any time I ask you a question you don't
11   understand and want me to repeat it, I'd be happy
12   to do so.  All you have to do is say, Greg, Counsel,
13   Mr. Kulis, whatever you want to call me, I'm not sure
14   what you mean, could you repeat that, could you
15   rephrase that, and I'd be happy to accommodate you.
16   Okay?                                           0:02:31
17        A.  Okay.
18        Q.  If you answer the question, I will assume
19   that you understood the question.
20        Is that fair?                              0:02:35
21        A.  Yes.
22        Q.  If I ask -- ask a question that calls for a
23   "yes" or "no" answer, you must voice your answer "yes"
24   or "no," because the court reporter, though this is
25   also being video -- videoed -- but the court reporter

## Page 7

1    can't take, a -- a shrug of the shoulders, "uh-huh."  0:02:48
2         We have to hear "yes" or "no."  Okay?
3         A.  Yes.
4         Q.  You understand that this is a federal
5    deposition, and this is as if you were on the witness
6    stand.  You understand that.
7         Correct?                                   0:02:58
8         A.  I do.
9         Q.  And you've testified in courts before.
10        Correct?
11        A.  I have.
12        Q.  And you understand that once you take the
13   witness stand, you cannot discuss your testimony with
14   anyone.
15        Correct?                                   0:03:05
16        A.  Yes.
17        Q.  Okay.  If you need to take a break, I'd be
18   happy to accommodate you.  However, if there's a
19   question pending, you must answer that question.  0:03:15
20        MR. KULIS:  Thanks, Tyler.
21   BY MR. KULIS:
22        Q.  You must answer that question, and then we
23   can take a break.  Okay?                        0:03:30
24        A.  Yes.
25        Q.  All right.  Let me ask you, Detective.  What,

## Page 8

1    if anything, did you review to prepare yourself for
2    this deposition?                                0:03:38
3         A.  The report.
4         Q.  Anything else?
5         A.  No.
6         Q.  Did you review any video?              0:03:46
7         A.  Review any video?  I did not.
8         Q.  Let me ask you.  Going into, briefly, your
9    background.  Where were you raised?  Or born?   0:04:04
10        A.  I was born in Chicago.
11        Q.  Where'd you go to high school?
12        A.  Morton West.                           0:04:08
13        Q.  And what year'd you graduate from Morton
14   West?
15        A.  1985.
16        Q.  And upon graduation, what did you do?   0:04:20
17        A.  I had some odd jobs, went to school.
18        Q.  Where'd you go to school after that?
19        A.  I first went to Morton College.        0:04:31
20        Q.  Did you get any degree from Morton College?
21        A.  Associate's.
22        Q.  What year was that?
23        A.  Oh, I don't know.  '90s.               0:04:42
24        Q.  Okay.  What about employment?  You've been a
25   police officer for how long?

## Page 9

| | | |
|---|---|---|
| 1 | A. Twenty-six years. | 0:04:51 |
| 2 | Q. What year did you get on the job with -- | |
| 3 | A. '98. | |
| 4 | Q. Prior to joining the Berwyn Police | |
| 5 | Department, what did you do? | 0:05:00 |
| 6 | A. I worked in a warehouse. I worked at the | |
| 7 | hospital. | |
| 8 | THE RECORDER: Really quick. Could I have | |
| 9 | you move the mic upon maybe, like, another button. You | |
| 10 | should be fine. Perfect. | 0:05:11 |
| 11 | THE WITNESS: Is that good? | |
| 12 | BY MR. KULIS: | |
| 13 | Q. Since you've been -- I'm sorry. Currently | |
| 14 | you're -- what rank do you hold? | 0:05:20 |
| 15 | A. Sergeant. | |
| 16 | Q. Are you a detective? | |
| 17 | A. No. I'm a sergeant. | 0:05:24 |
| 18 | Q. Oh, I'm sorry. In what division? | |
| 19 | A. I'm in court services now. | |
| 20 | Q. So when you first became a Berwyn police | |
| 21 | officer, I take it you were a patrol officer? | 0:05:39 |
| 22 | A. Patrolman. | |
| 23 | Q. How long? | |
| 24 | A. Maybe four, five years. | |
| 25 | Q. Then what happened? | 0:05:45 |

## Page 10

| | | |
|---|---|---|
| 1 | A. Then I went to TAC, and then I went to | |
| 2 | juvenile detective. | |
| 3 | Q. When'd you become a detective? | |
| 4 | A. Oh. | |
| 5 | Q. Approximately. I'm not holding you to the | |
| 6 | exact date. | 0:05:57 |
| 7 | A. It was mid 2000s. | |
| 8 | Q. And how long were you a detective? | |
| 9 | A. I was detective for a couple years. Then I | |
| 10 | went back to patrol for a couple years. Then I went | |
| 11 | back to being a detective. | 0:06:14 |
| 12 | Q. And when did you become a sergeant? | |
| 13 | A. 2021. | |
| 14 | Q. The year of this incident? | |
| 15 | A. Yes. | |
| 16 | Q. You sergeant before or after this incident? | 0:06:33 |
| 17 | A. Oh, right before. | |
| 18 | Q. Since you've been employed as an officer with | |
| 19 | the Berwyn Police Department, have you ever been sued? | |
| 20 | A. Have I been sued? No. | 0:06:51 |
| 21 | Q. Since you've been a police officer, has there | |
| 22 | anyone -- has anyone filed a citizen's complaint | |
| 23 | against you? | |
| 24 | A. It wasn't brought to my attention. No. | 0:07:04 |
| 25 | Q. Since you've been a Berwyn police officer, | |

## Page 11

| | | |
|---|---|---|
| 1 | have you ever been disciplined? | |
| 2 | A. No. | |
| 3 | Q. Drawing your attention -- I can't remember | |
| 4 | dates again -- November 8th, 2021. You were employed | |
| 5 | as a Berwyn police officer. | |
| 6 | Correct? | 0:07:33 |
| 7 | A. Correct. | |
| 8 | Q. And what -- what role were you holding on | |
| 9 | that day? | |
| 10 | A. Patrol sergeant. | 0:07:39 |
| 11 | Q. And tell me what a patrol sergeant does in | |
| 12 | Berwyn. | |
| 13 | A. They do police duties. They supervise other | |
| 14 | officers. And some admin work. Setting schedules. | 0:07:57 |
| 15 | Q. Who was the chief on that day? | |
| 16 | A. Chief was Chief Cimaglia. | |
| 17 | Q. Is the chief still there? | 0:08:05 |
| 18 | A. Yes. | |
| 19 | Q. And there came a point in time that you | |
| 20 | became aware of the fact -- I'm -- I'm sorry -- became | |
| 21 | aware of an individual named Sean Paul Reyes? | 0:08:23 |
| 22 | A. Yes. | |
| 23 | Q. And how did you learn -- | |
| 24 | MS. GRANDFIELD: Sorry. | |
| 25 | MR. KULIS: Bless you. | |

## Page 12

| | | |
|---|---|---|
| 1 | MS. GRANDFIELD: Sorry. | 0:08:27 |
| 2 | BY MR. KULIS: | |
| 3 | Q. And how did you learn of Mr. Reyes? | |
| 4 | A. I was dispatched to City Hall regarding an | |
| 5 | incident. | 0:08:37 |
| 6 | Q. And when you were dispatched, what were you | |
| 7 | told? | |
| 8 | A. It was minimal. That somebody was at the | |
| 9 | City, I believe videotaping. Not leaving. | 0:08:50 |
| 10 | Q. At the time you -- you were dispatched, | |
| 11 | approximately what time was that? | |
| 12 | A. I don't know. I want to say mid-morning | |
| 13 | maybe. | 0:09:03 |
| 14 | Q. And who informed you of this matter? | |
| 15 | A. I -- I -- I think it was just one of the | |
| 16 | radio operators. I'm not sure. | 0:09:12 |
| 17 | Q. Okay. Were you aware of the fact that it was | |
| 18 | legal or illegal to film in City Hall? | |
| 19 | A. It was -- | |
| 20 | MS. GRANDFIELD: I'm going to just object to | |
| 21 | lack of foundation, incomplete -- | 0:09:20 |
| 22 | MR. KULIS: What -- | |
| 23 | MS. GRANDFIELD: -- hypothetical. | |
| 24 | BY MR. KULIS: | |
| 25 | Q. Go ahead. You get to answer. | 0:09:25 |

3 (Pages 9 to 12)

## Page 13

1     A.  Oh.
2         MS. GRANDFIELD:  Yes --
3         THE WITNESS:  Oh, I -- yeah.
4     BY MR. KULIS:
5         **Q.  Most objections are raised for the record.**
6     **But you still have to answer them.**          **0:09:31**
7         MS. GRANDFIELD:  I -- I -- I did try to
8     explain the difference between this and court, but it's
9     confusing.  Yeah.
10        MR. KULIS:  Okay.
11        THE WITNESS:  Yeah.  At time -- I -- I --    0:09:36
12        MR. KULIS:  We got nobody in robes to say
13    who's right or wrong, so --
14        MS. GRANDFIELD:  Yeah.  Right.
15        THE WITNESS:  I'm used --
16        MR. KULIS:  So.
17        THE WITNESS:  -- to someone saying --        0:09:41
18        MR. KULIS:  Yeah.
19        THE WITNESS:  You know.
20    BY MR. KULIS:
21        **Q.  No.  So it's just for the record.**
22        A.  At that time, it -- in my eyes, it was
23    unclear.                                        0:09:48
24        **Q.  Okay.  And why -- why did you think it -- in**
25    **your eyes it was unclear?**

## Page 14

1         A.  Because I -- I -- I believe there was a law
2     saying that they couldn't at one time, and it was
3     changed.  It was -- it was just --              0:10:04
4         **Q.  So I take it you were not at City Hall when**
5     **you were dispatched.**
6         **Correct?**
7         A.  No.  I was somewhere else in the city.   0:10:16
8         **Q.  Okay.**
9         A.  Yeah.
10        **Q.  So then you drove over?**
11        A.  Yeah.
12        **Q.  Were you in uniform or plainclothes?**   **0:10:21**
13        A.  I was in uniform.
14        **Q.  Okay.  And when you arrived, what did you**
15    **find?**
16        A.  There -- there was an issue with somebody
17    videotaping.                                    0:10:34
18        **Q.  Okay.  And that was Mr. Reyes.**
19        **Correct?**
20        A.  So -- yeah, later --
21        **Q.  Okay.**
22        A.  -- we determined it was Mr. Reyes.       0:10:40
23        **Q.  When you arrived, where was Mr. Reyes?**
24        A.  I believe he was on the first floor.
25        **Q.  And who was he with?**                  **0:10:52**

## Page 15

1         A.  I -- I -- I believe he may have been with
2     Officer Ghiloni and Monaco at that time.  I'm --
3         **Q.  Ghiloni --**
4         A.  -- not sure.                            0:11:02
5         **Q.  -- and who?**
6         A.  Monaco.
7         **Q.  Was he in custody?**
8         A.  Was he in custody?  No.                 0:11:10
9         **Q.  Was he filming?**
10        A.  He was filming.
11        **Q.  And when you walked -- this would've been in**
12    **the first floor of City Hall --**             **0:11:20**
13        A.  First --
14        **Q.  -- correct?**
15        A.  -- floor of City Hall.  Yeah.
16        **Q.  And when you walked in, what did you see?**  **0:11:24**
17        A.  Just daily business.
18        **Q.  Okay.  So people were doing --**
19        A.  People walking in and out, at the windows.  0:11:32
20        **Q.  Okay.  And where was Mr. Reyes and Ghiloni**
21    **and Monaco?**
22        A.  I -- I -- I believe they were just -- as soon
23    as you walk up the stairs, there's like a information
24    desk.  I believe they were somewhere around there.  0:11:44
25        **Q.  Were the -- was -- was Ghiloni and Monaco**

## Page 16

1     with Mr. Reyes?
2         A.  I -- I -- I don't remember.  I think -- I
3     think they were on the first floor.  Yeah.     0:11:54
4         **Q.  Okay.  So when you walked in, what did you**
5     **do?**
6         A.  I didn't talk to Mr. Reyes at that point.  I
7     believe I walked upstairs.  Trying to find out what was
8     going on.                                       0:12:07
9         I -- I have a brief conversation with Ruth
10    about what he was doing, and saying he came up to the
11    second floor, walking around, which is unusual for a
12    typical business day, because all our business is done
13    on the first floor.                             0:12:20
14        Short conversations.  Who he was alarming and
15    disturbing?  I had a brief conversation with her.  I
16    believe it was Shannon.  She was highly upset, saying
17    that, you know, an incident happened on the floor.  0:12:37
18        It -- it makes her uncomfortable.  She was
19    shaking.  So I talked to a few people.  And then I
20    believe I went to talk to Mr. -- well, the subject on
21    the first floor.                                0:12:49
22        **Q.  Which you ultimately learned was Mr. Reyes.**
23        A.  Yes.
24        **Q.  Yeah, you didn't know when --**         **0:12:52**
25        A.  I didn't --

4 (Pages 13 to 16)

## Page 17

1    Q.  -- you first approached --
2    A.  -- know at the time.
3    Q.  Okay.  And when you spoke -- when you went up
4    and spoke to Mr. Reyes, was Ghiloni and -- and Monaco
5    there?                              0:13:15
6    A.  I believe they were there.
7    Q.  Okay.  And what did -- what did you -- did
8    you talk to them first before talked to Reyes?  Or --   0:13:24
9    A.  I'm -- I -- I'm not sure what the order was.
10   Q.  Okay.  So what was said at that point between
11   --                                  0:13:29
12   A.  So I -- I just asked him for his name.  He
13   said he didn't have to tell me.  I asked him what his
14   business was there, and he said he's a -- I believe a
15   freelance reporter or something.              0:13:39
16        I asked him, well, was it a paper?  Which --
17   which -- you know, who was he working for?  What were
18   his credentials?  He said he didn't have them, he
19   didn't need them.  And then I asked him his business.   0:13:53
20   Q.  You asked him what?
21   A.  What he was doing.
22   Q.  Okay.  And what did he tell you?        0:13:58
23   A.  Well, he -- he wanted to make a FOIA request.
24   Q.  Did he make a FOIA request?
25   A.  I -- I didn't know how one was made.  So I

## Page 18

1    asked an employee what the procedure is, making a FOIA.
2    I showed him, after I found out how to do it, there is
3    the window, and I'm not sure if he ever did it or not.   0:14:18
4    Q.  Did he tell you what he wanted to make a FOIA
5    request for?
6    A.  No.  I -- I don't -- I don't remember if --
7    Q.  No --
8    A.  -- he said it.                    0:14:26
9    Q.  -- it -- I don't know what I ate for dinner
10   two days --
11   A.  Yeah.
12   Q.  -- ago.  So I don't --
13   A.  I -- I don't think he --            0:14:29
14   Q.  If there are --
15   A.  -- I'm not --
16   Q.  -- certain things you don't remember --
17   A.  No.  I --                        0:14:31
18   Q.  -- don't guess.
19   A.  I -- I don't --
20   Q.  Okay?
21   A.  -- remember.
22   Q.  If you're guessing, tell me you're guessing.
23   Okay?                               0:14:35
24   A.  I'm not guessing.  And I don't remember.
25   Q.  Okay.  So at that point, you explained to him

## Page 19

1    how to make a FOIA request?                0:14:44
2    A.  I believe I -- I think I directed him you
3    have to go to this window and talk to the -- talk to
4    the employee to make the request.
5    Q.  What occurred then?                0:14:53
6    A.  And then we may have had a short
7    conversation.  Asked him if his business was done, if
8    he could leave, and let's go outside.  And then we
9    walked outside.                       0:15:06
10   Q.  And what -- he was not acting in any type of
11   aggressive manner toward you.
12   Correct?
13   A.  Not -- not to me.                  0:15:23
14   Q.  Did you see him act in any aggressive manner
15   toward anyone else?
16   A.  Not when I was speaking with him.
17   Q.  Was his voice raised or -- at all?        0:15:32
18   A.  No.
19   Q.  Was he swearing or using any type of foul --
20   A.  Not --
21   Q.  -- language?
22   A.  -- to me.                        0:15:38
23   Q.  Okay.  Did anyone tell you that he had raised
24   his voice or used foul language?
25   A.  No.  Not that I recall.              0:15:44

## Page 20

1    Q.  Did anyone tell you that he threatened him --
2    them in any fashion?
3    A.  If he actually threatened them?
4    Q.  Correct.                         0:15:51
5    A.  No.
6    Q.  Okay.  But you -- you did speak to -- prior
7    to this conversation with Mr. Reyes, you'd spoken to
8    Ms. Green.
9    Correct?                            0:16:02
10   A.  Yeah.
11   Q.  Ms. Siaba Green.  Right?
12   A.  Yeah.
13   Q.  And she said that -- what did she tell you
14   regarding --                         0:16:09
15   A.  She said --
16   Q.  -- the filming?
17   A.  -- she received calls from employees or
18   clerks.  I don't know what terminology she used.  That
19   they were feeling uncomfortable and they were feeling
20   nervous, alarmed, because of his actions once she want
21   -- well, talking to people, and then once he went up to
22   the second floor.                     0:16:25
23   Q.  Okay.  Are the -- now there's video cameras
24   in City Hall.
25   Correct?  Are there?

Page 21

1    A.  I don't know.                              0:16:33
2    Q.  Okay.  I'm just wondering if there are.
3    A.  I don't know.
4    Q.  Okay.  Are there video cameras on the first
5    floor, do you know?                            0:16:39
6    A.  I don't know.
7    Q.  Okay.  When -- did -- and you asked Mr. Reyes
8    to -- if he was finished, if we can exit the building
9    -- if you can exit --                          0:16:52
10   A.  Yeah --
11   Q.  -- the building?
12   A.  -- if we could discuss this outside or exit
13   the building or let's walk downstairs.  I don't know
14   what terminology I used.                        0:16:59
15   Q.  And --
16       THE RECORDER:  Really quick.  Just like
17   before, you wouldn't mind just waiting a -- a second
18   or two for the end of the question, in case there's an
19   objection or --                                0:17:06
20       THE WITNESS:  Okay.
21       THE RECORDER:  Thank you.
22   BY MR. KULIS:
23   Q.  Did -- when you asked him to step outside,
24   did he step outside?                           0:17:12
25   A.  Yes.

Page 22

1    Q.  Okay.  He didn't object or -- or resist in
2    any fashion?
3    A.  No.
4    Q.  And when he was filming, was he holding his
5    -- was he holding a camera?  Was he holding his phone?
6    Was he -- what was he holding?  Do you know?    0:17:31
7    A.  I don't remember.  I don't know if he had it
8    stuck to his chest or if he had one in his hand.  I --
9    I'm -- I'm not sure.
10   Q.  Okay.  When you exited the the City Hall,
11   what occurred when -- I'm sorry.
12       When you exited City Hall, did Ghiloni and
13   Monaco also come with you?                      0:17:54
14   A.  They were outside.
15   Q.  They were already outside?
16   A.  I don't know if they walked in front of me or
17   behind me, but --                              0:18:00
18   Q.  So the three of you -- I'm -- I'm sorry
19   the four of you walked outside?
20   A.  We -- we all walked outside.
21   Q.  Okay.  And what occurred when you got
22   outside?                                        0:18:09
23   A.  We had a short conversation again.
24   Q.  Okay.  And who spoke and what was said?     0:18:15
25   A.  I spoke with Mr. Reyes.  It was about him

Page 23

1    having a right to videotape.  And then he -- then we
2    looked at the -- there's a placard stating the statute
3    on -- on the -- on the door, walking in.        0:18:32
4        And just -- and talked about that.  He said
5    he had his rights.  I was trying to read the statute so
6    I could fully understand.  Still wasn't sure.   0:18:41
7    Q.  Did -- when you pointed out the statute to
8    him, did he inform you that it was inapplicable or
9    invalid?
10   A.  He may have.  Well, people tell me a lot of
11   stuff.                                          0:18:54
12   Q.  But in this case, he was referring to a -- a
13   -- a sign that said it is illegal pursuant to a statute
14   to film in the building.
15   Correct?                                        0:19:07
16   A.  A -- a -- there -- there was a sign posted.
17   Q.  Yeah.
18   A.  If -- if that's what you're talking about.   0:19:13
19   Q.  Yes.
20   A.  Yeah.
21   Q.  And it said it was illegal to -- to film
22   within --
23   A.  I don't know exactly what it said.  But it --
24   it was some words.                              0:19:20
25   Q.  Okay.

Page 24

1    A.  I'm --
2    Q.  And did you know if that sign, at that point
3    in time as you stood there -- you're law enforcement.
4    Correct?                                        0:19:28
5    A.  Mm-hmm.
6    Q.  And would it be fair to say that as law
7    enforcement, you're supposed to know the law?
8    Correct?                                        0:19:33
9    A.  Yes.
10   Q.  And did you know if that statute that you
11   cited was valid or not?
12   A.  On the one, I'm -- at that time, because -- I
13   don't know if you needed permission from the entity to
14   walk in.  Because laws kept changing about if you could
15   videotape and what you could videotape --       0:19:52
16   Q.  Mm-hmm.
17   A.  -- but I don't know what he was videotaping
18   up there, if -- if he was videotaping private areas in
19   offices or that.  So at that point, it was a little
20   confusing.                                      0:20:04
21   Q.  Okay.  Did -- what occurred at the -- do you
22   recall anything else he said to you regarding the --
23   the statute?
24   A.  No.                                         0:20:15
25   Q.  Do you recall anything else he said regarding

6 (Pages 21 to 24)

## Page 25

1   his right to film in a public building?
2       A.  He probably said he had the right to film.
3       Q.  Okay.                          0:20:21
4       A.  I'm assuming he said that.  Because that's --
5   he said that before.
6       Q.  Okay.  And what was your response to that
7   statement?                          0:20:28
8       A.  I don't even know if I answered.
9       Q.  Okay.  So what did -- did you hear Ghiloni or
10  Monaco say anything?                 0:20:34
11      A.  Did I?  I did not.
12      Q.  So they were just standing there?
13      A.  Yeah.
14      Q.  Okay.
15      A.  As far as I saw.               0:20:40
16      Q.  What occurred then?
17      A.  I believe I walked away.  I came back.  There
18  may have been another short conversation.  I'm not
19  sure.  And he was placed in custody and transported to
20  the PD.                             0:20:58
21      Q.  You said you walked away.  Why'd you walk
22  away?
23      A.  Use the phone.
24      Q.  Who'd you call?                0:21:04
25          MS. GRANDFIELD:  I'm -- I'm just going to

## Page 26

1   object to the extent it calls for attorney-client
2   information.
3           MR. KULIS:  Well, I didn't -- I didn't -- I
4   just asked who he called.            0:21:13
5           THE WITNESS:  One I -- one call was to the
6   watch commander to see if he was coming over there.
7   BY MR. KULIS:
8       Q.  Okay.  And who's --           0:21:17
9       A.  Yeah.
10      Q.  -- the watch commander?
11      A.  It was -- at that time, it was Acting Watch
12  Commander Tom Tate.
13      Q.  I'm sorry?                    0:21:22
14      A.  Tom Tate.
15      Q.  Okay.  And what did you say to Mr. --
16      A.  I said --
17      Q.  -- Officer Tate?              0:21:29
18      A.  -- hey, you coming over here.  He said no.
19  I'm, like, okay.
20      Q.  Okay.
21      A.  Thank you.
22      Q.  Any other conversations you had with anyone?  0:21:37
23      A.  No.  On the phone, you mean?
24      Q.  Yes.
25      A.  No, I'm -- I -- I don't know.  I walked away.

## Page 27

1   I jumped on the phone.               0:21:46
2       Q.  Did you call --
3       A.  I may have called my wife, because I was
4   supposed to get the kids.  Or --
5       Q.  Okay.                        0:21:51
6       A.  I was running late.  We had something to
7   do that night, just making sure, but I'm not sure.
8       Q.  Okay.  And I don't -- I'm not worried about
9   that conversation.                  0:21:59
10      A.  Yeah.
11      Q.  Because that's the real boss.
12      A.  Yeah.
13      Q.  So did you contact the chief?   0:22:05
14      A.  Did I contact the chief?  I did not.
15      Q.  Who was the deputy chief at that point?  0:22:09
16      A.  I don't know.
17          MS. GRANDFIELD:  Yeah.  Was it --
18  BY MR. KULIS:
19      Q.  If you don't know, that's okay.  0:22:18
20          MS. GRANDFIELD:  Yeah.
21          THE WITNESS:  I don't know --
22  BY MR. KULIS:
23      Q.  Did you --
24      A.  -- because there were -- we had a few.  They
25  were switching.                     0:22:23

## Page 28

1       Q.  Did you reach out to any other police
2   personnel?
3       A.  I may have talked to one to see if he was
4   coming.  And he --                  0:22:30
5       Q.  To who?
6       A.  -- said no.
7       Q.  Fellows, maybe.
8       A.  Okay.  Yeah.
9       Q.  Why -- why were you asking if they were going
10  to come over?                       0:22:36
11      A.  Because I needed a little guidance.  I was --
12  just became a supervisor.
13      Q.  Okay.  Did you reach out to the -- Mr.
14  Bertuca, who was the city attorney?   0:22:48
15      A.  No.  I don't even have his phone number.
16      Q.  Okay.  So after you finished the
17  conversations on the phone, then you came back --  0:23:00
18          MS. GRANDFIELD:  Yeah, I -- I'm sorry.
19          Mr. Reyes, do you need a break?   0:23:02
20          MR. REYES:  No.  I'm okay.  Thank you.
21          MS. GRANDFIELD:  Okay.
22  BY MR. KULIS:
23      Q.  After you finished your conversations on the
24  phone, you said you came back and you placed Mr. Reyes
25  under arrest?                       0:23:11

## Page 29

1    A.  Yeah.

2    Q.  And what did you place him under arrest for?

3    A.  Disorderly conduct.

4    Q.  And at that point when you placed him under

5    arrest, is -- was that the -- did you inform him that

6    you were charging him with disorderly conduct?    0:23:26

7    A.  I don't know if I told him what he was being

8    charged with.

9    Q.  But as you -- as you sit here -- well, not --

10   let me rephrase that.

11        When you placed him under arrest on November

12   8th, 2021, at that moment what were you placing him

13   under arrest for?                    0:23:40

14   A.  He was brought in -- it was investigation.

15   One for disorderly conduct and one was the videotaping.

16   Q.  So the videotaping would be a violation of

17   the -- the placard, right, the sign?            0:24:00

18   A.  Yeah.

19   Q.  Okay.  And disorderly.  Tell me how Mr.

20   Reyes, in your eyes, was disorderly.            0:24:12

21   A.  I -- I don't know if I have an opinion with

22   this.  Because my -- he can't be disorderly to me.

23   Q.  I understand that.  But you placed -- okay.

24   So who was he disorderly to?  I understand        0:24:26

25   A.  Employee --

## Page 30

1    Q.  -- the law.  You --

2    A.  Yeah.

3    Q.  -- cannot be disorderly to a police officer.

4    A.  Right.                        0:24:29

5    Q.  I do understand that.  I've been doing this

6    for a long time.  But I -- what --

7    A.  Employees.                    0:24:34

8    Q.  Okay.  So what employees was he disorderly

9    to?

10   A.  One was Shannon.  Was it Shannon?  Yeah,

11   Shannon.                        0:24:47

12   Q.  And how was he disorderly to Shannon?

13   A.  She was alarmed and disorderly with the

14   videotaping.  I believe she asked him to stop and she

15   was freaking out.                    0:24:58

16   Q.  Okay.  But other than videotaping City Hall

17   and videotaping Shannon, is there any actions that you

18   are aware of that would -- that --            0:25:10

19   A.  Well, him walking to the second floor, which

20   is uncommon.

21   Q.  Okay.

22   A.  So.

23        MS. GRANDFIELD:  Mr. Reyes, do you need to

24   take a break?                    0:25:19

25        MR. REYES:  No, ma'am.  I'm --

## Page 31

1        MS. GRANDFIELD:  Then what is with the facial

2    expressions?

3        MR. REYES:  I had to cover my face because I

4    was going to sneeze.                0:25:23

5        MS. GRANDFIELD:  Okay.

6        MR. KULIS:  And Cynthia, I'd ask that you not

7    kind of --

8        MS. GRANDFIELD:  Well, he's over -- he's over

9    there where it looks he's, like, smirking --        0:25:35

10       MR. KULIS:  I didn't make a --

11       MS. GRANDFIELD:  -- and laughing --

12       MR. KULIS:  -- Cynthia --

13       MS. GRANDFIELD:  -- so I just --

14       MR. KULIS:  I understand.  You want me to

15   comment on how people have made facial expressions

16   here?  I'm not.                    0:25:44

17        And there's three -- you've got three clients

18   here.  So if there's an issue, you want to take a break

19   and you and I can discuss it.  But I'd ask that you not

20   interrupt me to talk about my client's --        0:25:56

21       MS. GRANDFIELD:  Well, I'd ask --

22       MR. KULIS:  -- sitting there, listening.

23       MS. GRANDFIELD:  -- that your client not

24   smirk or laugh or do anything that is --        0:26:01

25       MR. REYES:  You're making --

## Page 32

1        MS. GRANDFIELD:  -- disruptive.

2        MR. KULIS:  And I'd ask that some of your

3    clients don't make -- roll their eyes or make any other

4    expressions.  But I -- I'm not going to put that on the

5    record.                        0:26:09

6        MS. GRANDFIELD:  Mm-hmm.  Well --

7        MR. KULIS:  Okay?  And you have --

8        MS. GRANDFIELD:  -- continue --

9        MR. KULIS:  -- three people sitting here.    0:26:13

10       MS. GRANDFIELD:  Continue.

11       MR. KULIS:  Thank you.

12   BY MR. KULIS:

13   Q.  I'm sorry.  Sergeant, so walking to the

14   second floor is disorderly conduct?            0:26:25

15   A.  No, it's not.

16   Q.  Okay.  Well, and -- and other than Shannon

17   being filmed and -- and uncomfortable about being

18   filmed, is there anything else that you are aware of

19   that he did to her?                0:26:41

20   A.  To Shannon?

21   Q.  Yes.

22   A.  Not that I'm aware of.

23   Q.  Okay.  And was there any other employee of

24   Berwyn that you felt that he was disorderly to?    0:26:53

25   A.  Ruth advised me that some of the clerks

www.InDemandReporting.com                    (773) 239-6008

## Page 33

1    contacted her, saying that they were alarmed, disturbed
2    because of -- from his behavior.
3        Q.   And what was his behavior -- behavior that
4    you --                              0:27:05
5        A.   I don't know --
6        Q.   -- were aware --
7        A.   -- if that was clearly expressed to me.  But
8    being on the second floor, looking in offices, trying
9    to peek in offices behind doors.           0:27:12
10       Q.   Who told you he was peeking into offices
11   behind doors?
12       A.   I believe Ruth said he was looking in an
13   office or trying to peek in her office.  Or look in her
14   office.                             0:27:24
15       Q.   And you thought that was disorderly?
16       A.   I don't know if I have an opinion on
17   disorderly and what other people think are -- is
18   disordered to them.                 0:27:39
19       Q.   Okay.  But prior to -- prior to you placing
20   him under arrest --
21       A.   Mm-hmm.
22       Q.   -- nobody asked you place him under arrest
23   because he's been disorderly to me, did they?  0:27:50
24       A.   No, I asked Ruth if she would want him
25   arrested and sign complaints.

## Page 34

1        Q.   So you had a conversation with her --    0:27:57
2        A.   I don't know that was prior or after.  I'm
3    not sure.
4        Q.   Well, that's what I'm asking you.
5             Do you have a conversation with her prior to
6    arresting him?                      0:28:06
7        A.   I believe so.  Well, yeah, I went up there to
8    ask what was going on before --
9        Q.   Did she tell --
10       A.   -- he was --
11       Q.   -- you she wanted --
12       A.   -- placed in --
13       Q.   -- him arrested?               0:28:13
14       A.   I asked what the situation was and if she
15   would want him arrested.
16       Q.   So before you actually placed Mr. Reyes under
17   arrest, Ruth Siaba Green said that she wanted him
18   arrested?                           0:28:34
19       A.   She would sign complaints, I believe.  For
20   him being disorderly.
21       Q.   So if that was the case then, why did you
22   come downstairs and break away and call other officers
23   for assistance?                     0:28:55
24       So it must've been after.
25       Q.   Huh?

## Page 35

1        A.   It must've been after he was placed in
2    custody.                            0:29:01
3        Q.   What occurred after he was placed?
4        A.   The conversation.
5        Q.   Okay.  So I've heard both answers now.    0:29:09
6        A.   Yeah.
7        Q.   I've heard at --
8        A.   I'm trying --
9        Q.   -- one point --
10       A.   -- to remember how it went.  Give --
11       Q.   Let me --
12       A.   -- me a second.                0:29:12
13       Q.   -- finish my question.
14       A.   Okay.
15       Q.   I know you want to tell your story.
16       A.   I don't.                      0:29:17
17       Q.   So --
18            MS. GRANDFIELD:  Okay.  That was legitimately
19   funny.
20   BY MR. KULIS:
21       Q.   So I -- so my question to you was, did you
22   have a conversation before you actually -- with Ms. --
23   well, I'm -- let me rephrase that.        0:29:32
24            Did Ms. Green tell you -- Ms. Siaba Green,
25   did she tell you that she wanted him arrested before

## Page 36

1    you actually placed him under arrest?  Or did you place
2    him under arrest and then she said he want -- she
3    wanted --                           0:29:47
4        A.   A man --
5        Q.   -- him arrested?
6        A.   -- went upstairs to get a quick synopsis of
7    what was going on.  He went downstairs.  So I was told
8    he was videotaping and being disorderly.     0:30:01
9             So I may have went back downstairs, placed
10   him under arrest, and then she signed, or I asked her.
11       Q.   Okay.  You heard her testify earlier today --  0:30:11
12       A.   Yeah.
13       Q.   -- correct?
14       A.   Yeah.
15       Q.   And she said that she found out later that
16   day that he was arrested.             0:30:17
17       A.   Yeah, I don't know if she knows the
18   procedures.  She knows she -- he was taken in.
19       Q.   Okay.
20       A.   So.  She may have signed the complaints after
21   he was taken in.                     0:30:27
22       Q.   How did she know he was taken in?  Do you
23   know?
24       A.   I don't know.  You gotta ask her.     0:30:33
25       Q.   Did you tell her you were going to take him

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com          (773) 239-6008

## Page 37

1  in?
2      A.  I don't recall that.
3      Q.  So as we sit -- now it is your testimony -- I
4  mean -- strike that.                           0:30:47
5          Would it fair to -- you've just changed your
6  testimony.  Initially you said you spoke to her and she
7  wanted him arrested.  And now you're telling me after
8  you placed him under -- in custody --          0:30:58
9      A.  At -- at --
10     Q.  -- she -- you had a conversation with her and
11 she said she would sign complaints.
12     A.  At -- at some point, she said she would be
13 willing to sign complaints.            0:31:05
14     Q.  I understand that.  My question is, when did
15 that occur?
16     A.  Okay.  Let me see.  May have been after.  0:31:34
17     Q.  So when you placed him under arrest, because
18 you said you were -- you told him he was under --
19     A.  Mm-hmm.
20     Q.  -- under arrest, what -- what were you
21 arresting him for?                     0:31:49
22     A.  For investigation with the videotaping and
23 being disorderly.  And the DC.
24     Q.  And what?
25     A.  And the disorderly conduct.  The DC.  0:31:57

## Page 38

1      Q.  So after you placed him under arrest, did you
2  put him in handcuffs?
3      A.  Yes.
4      Q.  And then you transported him?        0:32:14
5      A.  I did not.  Somebody did.
6      Q.  Okay.  Did you follow them to the station?  0:32:20
7      A.  I did not.
8      Q.  Where'd you go?
9      A.  Well, I went back to the station.  I didn't
10 actually follow the --                 0:32:27
11     Q.  Yeah, I --
12     A.  -- car.
13     Q.  Yeah.
14     A.  I --
15     Q.  You went back to the --
16     A.  I went --
17     Q.  -- station.
18     A.  -- back to the station.            0:32:30
19     Q.  So when did you have this conversation with
20 Ms. Green regarding --
21     A.  So I -- I typed up the complaints and went
22 back and the complaints were signed.  Later in the day.  0:32:42
23     Q.  I'm going to show you what is marked as
24 Volanti Exhibit 3.  Tendering a copy to Counsel.  0:33:33
25     (Exhibit No. 3 marked for identification.)

## Page 39

1  BY MR. KULIS:
2      Q.  Volanti Exhibit 3 is Bates stamped COB 1
3  through COB 11.  Okay?
4      A.  Yeah.                           0:33:49
5      Q.  Okay.
6      A.  Yes.
7      Q.  Let me go through these.  The first page, COB
8  1.  That purports to be Official Sworn Police Report of
9  the Berwyn Police Department, Incident 21-10215.
10         Correct?                        0:34:05
11     A.  Are -- are you talking about the front page?
12     Q.  Yes.
13     A.  Yeah.
14     Q.  And who prepared that?  Do you know?  0:34:10
15     A.  I did.
16     Q.  And what -- tell me what this is.
17     A.  It's our incident report.           0:34:17
18     Q.  Okay.  And the involved entities are Ruth
19 Siaba and Shannon Reberski --
20     A.  Mm-hmm.
21     Q.  -- correct?
22     A.  Mm-hmm.                         0:34:27
23     Q.  That's --
24     A.  Yes.
25     Q.  -- a "yes" --

## Page 40

1      A.  Yes.
2      Q.  -- right?  And when did you type this up?  0:34:36
3      A.  Later that day.
4      Q.  Okay.  Well, what time did your shift end
5  that day?                           0:34:43
6      A.  It ends 2:45.
7      Q.  Okay.  And this incident, according to your
8  report, occurred at 12:08.
9          Correct?  If you read the first page.  0:34:56
10     A.  12:08, yes.
11     Q.  Okay.  And if we look at COB number 2, which
12 is the second page of this document, what -- is that an
13 incident report as well?               0:35:14
14     A.  COB 02?
15     Q.  Two.
16     A.  Yeah.  It's --
17     Q.  Okay.
18     A.  -- part of the incident report.      0:35:20
19     Q.  Okay.  And who is Tricia Powers?
20     A.  She was also employee there.        0:35:27
21     Q.  Did you speak to her?
22     A.  I did.
23     Q.  Did you write any memorandum or any report as
24 to what she said to you?               0:35:34
25     A.  Yeah.

## Page 41

1      Q.  Okay.

2      A.  Yes.

3      Q.  And when -- let me ask you this.  When you

4    took Mr. Reyes in custody, are you the one that

5    handcuffed him?                              0:35:50

6      A.  I believe I did.  Yes.

7      Q.  Okay.  And did you confiscate anything from

8    him?                                         0:35:57

9      A.  Did I confiscate?  No.  His phone, but it was

10   in back.  I told him I was going to take his phone so

11   he didn't sit on it or something.            0:36:09

12     Q.  Okay.  Did you take anything else from him?

13     A.  Did I take anything else?  No, not --  0:36:16

14     Q.  Okay.

15     A.  -- that I can think of.  No.

16     Q.  Okay.  If you look at COB number 3, what is

17   that?                                        0:36:26

18     A.  COB 3?  Page --

19     Q.  Is that --

20     A.  -- 3.  Three --

21     Q.  Page --

22     A.  -- of 4.

23     Q.  -- that's page 3 of the incident report?  0:36:32

24     A.  Yeah.

25     Q.  Okay.  And responding sergeant is Volanti.

## Page 42

1      Correct?

2      A.  That's me.  Yes.                   0:36:39

3      Q.  Assisting was Monaco and Ghiloni.

4      Correct?

5      A.  Yes.

6      Q.  And did you type this up?

7      A.  Did I type this up?  Yes.          0:36:47

8      Q.  And in that -- on that page, it

9    indicates that you spoke to Tricia Powers.

10     Correct?                              0:37:10

11     A.  Correct.

12     Q.  And she indicated that -- to you that she

13   observed an unknown male subject who was walking around

14   the second floor, videotaping.

15     Correct?                              0:37:18

16     A.  Yes.

17     Q.  She felt frightened because the offices

18   located on the second floor, are the mayor's, city

19   administrator's, and city attorney offices, are usually

20   to be visited by appointment only.

21     Correct?                              0:37:28

22     A.  Correct.

23     Q.  Is there any type of signs that say no access

24   unless by --

25     A.  I don't --

## Page 43

1      Q.  -- appointment only?              0:37:32

2      A.  -- think so.

3      Q.  Okay.  And is being frightened -- if someone

4    is frightened, does that give them cause to charge

5    somebody with disorderly conduct, as far as you know as

6    a police officer?                          0:37:44

7      A.  She was frightened and alarmed.

8      Q.  That's -- I understand that's what she said

9    to you.  But --

10     A.  Right.

11     Q.  -- as a police officer, if somebody's

12   frightened and alarmed, does that give them cause to

13   charge somebody with disorderly conduct?    0:38:00

14     A.  Well, she was being disturbed.  And --

15     Q.  So --

16     A.  -- alarmed.

17     Q.  -- is that -- is your answer "yes" or "no"?  0:38:06

18     A.  It's going to be "yes."

19     Q.  Okay.  And you also spoke to Shannon

20   Reberski.

21     Correct?

22     A.  I did.                            0:38:12

23     Q.  And she related to you that (as read):

24   She observed a male subject near her desk and was going

25   to ask him if he needed help.  Once Shannon Reberski

## Page 44

1    observed the male subject was videotaping the area, she

2    began to panic, because she has been recorded in City

3    Hall in the past and a degrading video was posted.

4      Correct?                              0:38:27

5      A.  Correct.

6      Q.  But when she was -- but it wasn't -- but when

7    she was previously recorded, it was not by the same

8    person.

9      Correct?                              0:38:40

10     A.  No, it was by somebody else.

11     Q.  Okay.  Were you involved in that incident?  0:38:46

12     A.  No.

13     Q.  The -- and the paragraph above that

14   indicates that you (as read):  Spoke with Ruth Siaba

15   Green who related she was contacted by employees

16   regarding a subject videotaping inside City Hall, which

17   frightened and threatened the employees.

18     Correct?                              0:39:09

19     A.  Correct.

20     Q.  And (as read):  Ruth Siaba Green ...

21   related she will sign a criminal complaint if

22   necessary.

23     Correct?                              0:39:15

24     A.  Correct.

25     Q.  And again, that conversation took place after

11 (Pages 41 to 44)

## Page 45

1    he was arrested.
2        Correct?
3        A.  One was before and one was after.  Yes.     0:39:27
4        Q.  One -- what was before and what was --
5        A.  There was a conversation with Ruth --
6        Q.  Okay.                                    0:39:31
7        A.  -- Ms. Green, about what was --
8        Q.  Occurred.
9        A.  -- happening.  Occurring.
10       Q.  But she didn't say that she was going to sign
11   a criminal complaint --                          0:39:38
12       A.  It was --
13       Q.  -- until after he was arrested.
14       A.  I -- I --
15       MS. GRANDFIELD:  If you don't recall, you
16   don't recall.  Just --                           0:39:45
17       THE WITNESS:  I -- I --
18       MS. GRANDFIELD:  Testify --
19       THE WITNESS:  -- I -- I don't --
20       MS. GRANDFIELD:  -- truthfully.
21       THE WITNESS:  -- recall.                     0:39:48
22   BY MR. KULIS:
23       Q.  Nowhere in this narrative does it say that
24   Ruth Siaba Green felt threatened, did it?
25       A.  Not in the report.                       0:39:54

## Page 46

1        Q.  Okay.  Well, the report is supposedly what
2    she told you.  Right?
3        A.  Well, then no.  It's not in the report.     0:40:03
4        MS. GRANDFIELD:  Are those tissues?  Or is --
5    is that paper there?
6        MR. KULIS:  Oh, yeah, yeah.
7        THE WITNESS:  Just paper.                    0:40:09
8        MS. GREEN:  I do have tissues with me if --
9        MS. GRANDFIELD:  Okay.
10       MS. GREEN:  -- you want.
11       MS. GRANDFIELD:  My nose running.  I'm sorry.     0:40:14
12       MR. KULIS:  Okay.
13       MS. GREEN:  No problem.
14       MS. GRANDFIELD:  Thank you.
15       MS. GREEN:  It's allergy season.
16       MS. GRANDFIELD:  Yeah.  Okay.  Sorry.        0:40:19
17   BY MR. KULIS:
18       Q.  And then the last paragraph of COB number 3
19   talks about your conversation with Mr. Reyes.
20       Correct?
21       A.  Last conversation.
22       MS. GRANDFIELD:  It's right at the bottom.     0:41:16
23   BY MR. KULIS:
24       Q.  It's numbered --
25       A.  The page --

## Page 47

1        Q.  -- COB 3 --
2        MS. GRANDFIELD:  COB --
3        THE WITNESS:  Yeah, the --
4        MS. GRANDFIELD:  -- 3.
5        THE WITNESS:  -- papers got --               0:41:19
6    BY MR. KULIS:
7        Q.  Huh?
8        A.  The papers got mixed up.  So.
9        MS. GRANDFIELD:  Oh, okay.  Look for the big
10   number.  See where it says --                    0:41:23
11       THE WITNESS:  Yeah.
12       MS. GRANDFIELD:  -- COB 3?  Yeah.
13       THE WITNESS:  I spoke with -- yeah.
14   BY MR. KULIS:
15       Q.  The last paragraph talks about your
16   conversation with him --                         0:41:29
17       A.  Yeah.
18       Q.  -- regarding the Freedom of Information.
19   Correct?
20       A.  Correct.
21       Q.  And it indicates (as read):  After
22   completing the FOIA request, Sean Paul Reyes continued
23   to video inside City Hall.
24       Correct?                                     0:41:42
25       A.  Yeah, I'm -- he went to the desk, and I

## Page 48

1    believe he did what he wanted to do.
2        Q.  Okay.  So the third -- fourth paragraph
3    of COB page 4 indicates that (as read):  Once at Berwyn
4    Police Department, it was determined that the cited
5    statute posted in and around City Hall did not apply.     0:42:21
6        A.  Correct.
7        Q.  Correct?
8        A.  Correct.
9        Q.  And could you tell me what led up to the --
10   you typing that in this report?                  0:42:26
11       A.  Because he's not even being charged with
12   illegal videotaping.
13       Q.  Why was he not being charged?
14       A.  Because he didn't do -- because it didn't
15   meet the statute.                                0:42:41
16       Q.  What didn't meet the statute?
17       A.  Him videotaping.
18       Q.  Well, he was videotaping.  Right?        0:42:46
19       MS. GRANDFIELD:  I'm going to object.
20   Argumentative.
21       Q.  I'm just asking you.  It's not argumentative.
22   He was videotaping.
23       Correct?  He's --                            0:42:52
24       A.  Correct.  He was videotaping.  Correct.

## Page 49

1    Q.   Okay.
2    A.   Yeah.
3         Q.   So you typed in here (as read):  Once at
4    Berwyn Police Department, it was determined that the
5    cited statute posted in and around City Hall did not
6    apply.                                      0:43:01
7         What did you mean by that?
8    A.   Because of the eavesdropping.  And he -- at
9    that point, he wasn't eavesdropping.        0:43:08
10   Q.   So did you look up the statute?  Or what did
11   you do to determine that it did not --
12   A.   Once --
13   Q.   -- apply?
14   A.   -- I got back at the station, I read it again
15   and looked it up.                           0:43:35
16   Q.   And what did it tell you?
17   A.   It -- it's -- it -- that statute had nothing
18   to do with videotaping in public places.  It was more
19   of a eavesdropping.                         0:43:44
20   Q.   Okay.  And after the fact, did you ever
21   inform anyone that the statute does not apply?
22   A.   I -- I don't recall.              0:43:55
23   Q.   Did you call to tell the mayor?
24   A.   I didn't -- no, I don't speak to the mayor.  0:43:58
25   Q.   Did you tell --

## Page 50

1    A.   Well, I mean, I didn't speak to him about it.
2    I'm not going to --                         0:44:01
3    Q.   Yeah.  Did you tell Ms. Green?  She's the
4    city administrator.
5    A.   I don't think we had a conversation about it.  0:44:07
6    Q.   Did you tell the chief?
7    A.   I don't think I had a conversation with the
8    chief.
9    Q.   Did you ever learn that those signs were
10   taken down?                                 0:44:13
11   A.   I did.
12   Q.   How did you learn that?
13   A.   I -- I -- I don't know.  Someone told me or I
14   -- I don't know.                            0:44:20
15   Q.   Well, did you ever report to anyone that
16   these signs are not accurate?
17   A.   Did I?  No.                            0:44:26
18   Q.   And then -- and the last paragraph of this
19   COB 4 states a Galaxy Z fold phone with a serial number
20   and a Miu fly camera serial number, and there's a
21   serial number listed, was recovered from Seal Paul
22   Reyes' property.
23        Correct?                              0:45:05
24   A.   Correct.
25   Q.   And those items were -- were inventoried and

## Page 51

1    placed in an evidence locker?
2    A.   Correct.                              0:45:11
3    Q.   Were they given back to him that day?
4    A.   I'm not sure when they were given back to
5    him.                                       0:45:16
6    Q.   Well, what right did you have to hold his
7    phone?
8    A.   I do not know why they were confiscated.  0:45:28
9    Q.   And you --
10   A.   I know I wrote it, but I didn't confiscate
11   it.
12   Q.   And do you know if they were given back to
13   him that --
14   A.   I --                                  0:45:35
15   Q.   -- day --
16   A.   -- do not know.
17   Q.   Let me finish.  Upon being released from
18   custody that day, were -- were they given back to him?  0:45:42
19   A.   I do not know.
20   Q.   There's no inventory number.
21        Correct?
22   A.   There's no inventory number?  I guess not.  0:45:57
23   Q.   I don't know.  I'm asking --
24   A.   I don't --
25   Q.   -- you.

## Page 52

1    A.   -- see one.
2    Q.   I mean, well, you wrote the report.    0:46:02
3    A.   I know I wrote the report.
4    Q.   I mean --
5    A.   I don't -- when -- when somebody goes into
6    custody, stuff's inventoried.  Like, they take their
7    property, they sign off the property sheet.  0:46:10
8    Q.   Okay.
9    A.   So.
10   Q.   If you look at COB number 5.
11   A.   Number 5?  Yes.                       0:46:18
12   Q.   What is that?
13   A.   That's -- it's a -- it's a police report.
14   Q.   Okay.  But you -- is that a police report you
15   prepared or someone else?                   0:46:31
16   A.   I did not do that.
17   Q.   Okay.  And the remaining reports, pages 6
18   through --                                  0:46:48
19   A.   Five, six.
20   Q.   -- 11, were reports by another officer
21   regarding another incident on another date.
22        Correct?                              0:46:56
23   A.   We're talking about COB, what, 5, 6?
24   Q.   Yes.
25   A.   Seven?

## Page 53

1    Q.  Through 11.  Were reports by another officer
2  regarding another day.              0:47:08
3    A.  Yeah, I didn't do them.
4    Q.  Okay.
5    A.  I don't even know what they are.  Are -- are
6  we done with this one?              0:47:18
7    Q.  Yeah.  I will show you what is marked as
8  Volanti number --
9        THE WITNESS:  Is this yours?
10       MS. GRANDFIELD:  That is --
11       MR. KULIS:  No, that goes to him.    0:47:42
12       MS. GRANDFIELD:  -- his.
13       THE WITNESS:  Okay.
14       MS. GRANDFIELD:  So just keep --
15  BY MR. KULIS:
16    Q.  I'm going to show --
17       MS. GRANDFIELD:  -- it there --    0:47:45
18  BY MR. KULIS:
19    Q.  -- you what is marked as Volanti No. 1.  It's
20  the answer.                  0:47:48
21    (Exhibit No. 1 marked for identification.)
22       MS. GRANDFIELD:  Okay.
23  BY MR. KULIS:
24    Q.  That purports to be an answer to the
25  complaint.  I've also used that in the other

## Page 54

1  deposition.  That purports to be an answer to the
2  allegations that we've made against you and the other
3  Defendants.                  0:48:01
4    A.  Okay.
5    Q.  Have you seen that document before?
6    A.  I don't know if I've seen this.    0:48:05
7    Q.  Okay.  Do you want to read -- read it over?
8  And what I'm saying is -- let me rephrase that
9  question.
10       In the answer, there's allegations against
11  you, and an answer is given to those allegations.  I    0:48:16
12  want you to -- if you want -- if you haven't seen it,
13  if you take a look at it, I'd like to know if it is
14  true and accurate.
15       MS. GREEN:  Can I be excused for a minute?    0:48:24
16       MR. KULIS:  Yeah.  Yeah.
17       Should we go off the record while he reviews
18  that for a few minutes?              0:48:33
19       MS. GRANDFIELD:  Sure.
20       THE RECORDER:  All right.  Going off --
21       THE WITNESS:  We good?
22       THE RECORDER:  -- the record --
23       THE WITNESS:  Okay.
24       THE RECORDER:  -- 12:17 p.m.        0:48:36
25    (Off the record.)

## Page 55

1        THE RECORDER:  Back on the record, 12:30 p.m.
2  BY MR. KULIS:
3    Q.  Sergeant Volanti --          0:48:49
4    A.  Yeah.
5    Q.  -- you had a -- an opportunity to look at
6  your answer to the complaint.
7        Correct?
8    A.  I did.                0:48:53
9    Q.  And you reviewed it, and the answer's true
10  and accurate to the allegations that have been made.
11    A.  Yes.
12    Q.  Okay.  A minute ago, you though that there
13  was something that might've been incorrect?    0:49:03
14    A.  I was mistaken.
15    Q.  Okay.
16    A.  I -- yeah.
17    Q.  Okay.  I'm going to show you what is marked
18  as --
19       MR. KULIS:  What did I do with the stickers
20  -- did I use them all?  Okay.        0:49:38
21       THE RECORDER:  Yeah, just go for a new sheet.
22  BY MR. KULIS:
23    Q.  I'm going to show you what is marked as
24  Volanti Exhibit No. 2.  Whoop.  There they are.    0:50:00
25    (Exhibit No. 2 marked for identification.)

## Page 56

1        MS. GRANDFIELD:  I think you marked -- I
2  don't care.  But you marked the police report as
3  Volanti Exhibit 3.
4        MR. KULIS:  Three, yeah.        0:50:08
5        MS. GRANDFIELD:  Okay.  All right.
6        MR. KULIS:  Yeah.
7        MS. GRANDFIELD:  Okay.  Just --
8        MR. KULIS:  Yeah.
9        MS. GRANDFIELD:  -- wanted to make sure.    0:50:10
10  BY MR. KULIS:
11    Q.  I'm going to show you what is marked as
12  Volanti No. 2, which -- I'm tendering a copy to your
13  counsel -- which purports to be your answers to
14  interrogatories.  I believe it is a seven-page
15  document.                  0:50:31
16       It's not numbered, but anyway.  The last page
17  -- I don't have a signature page on this, and I don't
18  know why.  But this purports to be your answers to
19  interrogatories.                0:50:43
20       If you can view -- those are written --
21  interrogatories are written questions which we tendered
22  to you through your counsel, and these purport to be
23  your answers to interrogatories.
24       Have you seen this before?        0:50:54
25    A.  I have.

## Page 57

1     Q. And those are true and accurate? I don't
2  know why we don't have a --          0:50:59
3     A. Yeah, if it's the same ones that --
4     Q. Yeah, I haven't changed anything, so.
5     MS. GRANDFIELD: I'll go back and look
6  through my file, because I -- I'm pretty sure I had a
7  signature page for all of them, so maybe I just
8  inadvertently --          0:51:08
9     MR. KULIS: Well, or -- or my office didn't
10  copy it --
11     MS. GRANDFIELD: Yeah.
12     MR. KULIS: -- correctly. I mean -- so I
13  just want to make sure. And I haven't changed
14  anything, so.          0:51:15
15  BY MR. KULIS:
16     Q. Those --
17     A. Yeah.
18     Q. -- are your answers to the questions we've
19  tendered.
20     Correct?          0:51:19
21     A. Correct.
22     Q. Okay. Now, when -- when you were on the
23  scene with Mr. Reyes --
24     A. Yes.          0:51:38
25     Q. -- you indicated that you walked away for a

## Page 58

1  while and made some phone calls.
2     Correct?
3     A. Yes, I did.          0:51:44
4     Q. And would it be fair to say that you also
5  pulled up the statute and read the statute on the
6  scene?
7     A. I'm on my phone, and I was trying to read it.   0:51:52
8     Q. Okay. And did you determine whether the
9  statute applied on that day?
10     A. No. It was -- it was just hard to read on my
11  phone.          0:51:58
12     Q. Okay. And you had spoken to Ms. Reberski,
13  right, Shannon?
14     A. Shannon. Yes.
15     Q. And she indicated that she was upset and -- I
16  can't remember the exact language that you used, but
17  you had actually spoken to her.
18     Correct?          0:52:21
19     A. I spoke with her.
20     Q. And why didn't you have her sign a complaint?
21     A. Because I believe it was determined she was a
22  City employee.          0:52:31
23     Q. Okay. But so is Ruth Siaba Green. Isn't
24  she?
25     A. Correct.

## Page 59

1     Q. But Ruth Siaba Green signed a complaint.
2     Correct?          0:52:46
3     A. That is correct.
4     Q. She is a City --
5     MR. KULIS: Bless you.
6     MS. GRANDFIELD: Thank you.
7  BY MR. KULIS:
8     Q. She --
9     A. Correct.
10     Q. -- is a City employee.
11     Correct?          0:52:51
12     A. Correct. Yeah.
13     Q. So why -- why did you have her sign a
14  complaint and not Ms. -- Ms. Reberski?          0:52:58
15     A. Because she was --
16     Q. Hmm?
17     A. Because I believe Ruth said she would sign on
18  behalf.          0:53:09
19     Q. But Ms. Green never informed you that she
20  felt threatened, did she?
21     A. I can't recall. I don't know if it's not in
22  the report, so.          0:53:43
23     Q. Okay. Because if she told you, you would put
24  it in the report.
25     Correct?

## Page 60

1     A. Yes.          0:53:54
2     Q. Okay. How long was Mr. Reyes held in
3  custody?
4     Do you know?
5     A. I -- I don't know.          0:54:06
6     Q. And you said that you got off at 2:45?
7     A. My shift ends at 2:45.
8     Q. Was he still in custody when you left?          0:54:13
9     A. I didn't leave at 2:45. But I believe he may
10  have been gone before I ended up leaving.
11     Q. Okay.          0:54:25
12     A. I -- I'm -- I don't -- I don't know.
13     Q. And that wouldn't have been within your
14  duties. That would be the booking officer who would
15  handle --          0:54:32
16     A. Correct.
17     Q. -- that.
18     Correct?
19     A. Yeah.
20     Q. And the booking officer then would give him
21  back his phone?          0:54:38
22     A. Would give back the property. Yeah.
23     Q. Okay. And do you -- I mean, since there's no
24  inventory report, it doesn't appear that it was
25  inventoried.

## Page 61

1          Correct?                    0:54:47
2      A.  If there's no report, I -- I'm not sure what
3  happened after.
4          Q.  I mean, normally when people are arrested and
5  they're held -- and they're held in a cell, once
6  they're released, they're given back their personal
7  property --                        0:55:01
8      A.  Yeah, there's --
9          Q.  -- correct?
10     A.  -- a property sheet at their intake.
11         Q.  Okay.  Was there a property sheet in this
12  case?                             0:55:08
13     A.  There -- there is.  I -- I don't know.
14  Because I didn't see one.  But I'm sure there is.    0:55:14
15         Q.  Do you -- do you know when his phone was
16  given back to him?
17     A.  I do not.
18         Q.  Or phones.  Because it appears there were
19  two.                              0:55:20
20     A.  Yeah.  I don't know.
21         Q.  Okay.  Or do you know who gave them back --
22     A.  No.
23         Q.  -- to him?  It should've been the -- the
24  booking officer when he was released.  Right?    0:55:29
25     A.  It -- it -- it should've been.  I don't know

## Page 62

1  who gave it back.
2          Q.  Okay.  Did you -- Mr. Reyes was placed in a
3  -- in a jail cell, right, in the -- in the police       0:55:49
4      A.  He -- he was placed in the booking area.  I
5  never went back there.  So I don't know if he was
6  placed in a holding cell, just in a cell.  I -- I don't
7  know.                             0:56:00
8          Q.  Okay.  So you didn't place him in a cell.
9      A.  I did not.  No.                0:56:03
10         Q.  Okay.  Did -- when is the next time you saw
11  Mr. Reyes, if at all?
12     A.  I don't remember.
13         Q.  Were you present --          0:56:16
14     A.  He -- he --
15         Q.  Go ahead.
16     A.  I don't remember.
17         Q.  Were you present when he did the press
18  conference the next day?            0:56:22
19     A.  At City Hall?
20         Q.  Yeah.
21     A.  No, I didn't go.
22         Q.  Okay.  Did you go to court?    0:56:29
23     A.  Did I go?  Yes.
24         Q.  How many times did you go to court?
25     A.  On this case?                  0:56:33

## Page 63

1          Q.  Yes.
2      A.  I know one.  I don't know if there was any
3  status dates before that I was involved with.
4          Q.  Okay.  Were you in court the day -- or in the
5  courthouse the day the case was dismissed?    0:56:47
6      A.  Yes.
7          Q.  Okay.  And what was your understanding of why
8  -- why it was dismissed?
9      A.  My understanding -- it was either nolle pros
10  or SOO, because -- because he wanted to videotape the
11  courtroom.  And then I believe the mayor said he didn't
12  us to be blasted all over.          0:57:13
13         I -- I don't know mayor's thinking, but it
14  was the --
15         Q.  That --
16     A.  -- the --
17         Q.  You had no -- you -- you had no input in the
18  decision --                        0:57:18
19     A.  I --
20         Q.  -- though.
21     A.  -- did not.
22         Q.  Okay.  That's kind of what I was getting at.    0:57:21
23     A.  I -- I have no input in the decision.
24         Q.  Okay.
25     A.  Yes.

## Page 64

1          Q.  Oh.  Is there anything else?  Oh.  I do -- I
2  do have a couple questions.  And I'm sorry for asking
3  you this, because I have an obligation as a lawyer to
4  ask you these questions.            0:57:40
5          Because in addition to compensatory damages,
6  we're seeking punitive damages to punish wrongdoers for
7  abusing the law.
8          So I -- I'm going to have to ask you, in
9  2021, how much did you make as a police officer?    0:57:54
10     A.  In 2021?
11         Q.  Approximately.  Won't hold you to it.
12     A.  I don't know, 110,000 maybe.       0:58:01
13         Q.  Okay.  What'd you make in 2022?
14     A.  Around the same.
15         Q.  The last year, '23?            0:58:07
16     A.  A little more.  Maybe --
17         Q.  Okay.
18     A.  -- over 115.  I -- I don't know.    0:58:11
19         Q.  That's -- that's it.  Other than working as a
20  police officer for the Berwyn Police Department, do you
21  have any other employment?          0:58:19
22     A.  Right now?  No.
23         Q.  Okay.  Did you, in the last year or two, have
24  other employment?                  0:58:24
25     A.  In the last year or two?  No.

16 (Pages 61 to 64)

## Page 65

1   Q.  Okay.  Do you own any businesses --        0:58:28
2   A.  No.
3   Q.  -- outside of being a --
4   A.  I do --
5   Q.  -- police officer?
6   A.  -- not own any businesses.        0:58:31
7   Q.  Okay.  Other than a -- again, I don't know
8   for a fact.  But other than your home, do you any other
9   real estate outside your home?        0:58:37
10  A.  I do not.
11  Q.  Okay.  Do you have any -- other than your
12  vehicles, do you have any other assets that exceed
13  $5,000?        0:58:48
14  A.  Exceed $5,000?
15  Q.  That -- that -- that's more than $5,000.
16  A.  Just the cars.        0:58:53
17  Q.  Okay.  Do you have a savings account?
18  A.  Yeah.  There's a couple thousand maybe in it.  0:58:57
19  Q.  And I assume you have a pension fund?
20  A.  Yeah, I have a pension.
21  Q.  What do you have in that approximately?        0:59:02
22  A.  I don't know --
23  MS. GRANDFIELD:  I'll just --
24  THE WITNESS:  I don't know what --
25  MS. GRANDFIELD:  I -- I think that's --

## Page 66

1   THE WITNESS:  Where's this going?        0:59:05
2   MS. GRANDFIELD:  -- not something that he
3   needs to say on the record and --
4   MR. KULIS:  Well, I have a obligation to ask
5   those questions.        0:59:11
6   MS. GRANDFIELD:  Well, you could ask those
7   questions in written form --
8   MR. KULIS:  But I can --
9   MS. GRANDFIELD:  -- instead of --        0:59:15
10  MR. KULIS:  -- and I -- but I --
11  MS. GRANDFIELD:  -- waiting --
12  MR. KULIS:  -- don't have to.
13  MS. GRANDFIELD:  Instead of waiting till his
14  deposition.        0:59:19
15  MR. KULIS:  I ask them in every deposition.
16  MS. GRANDFIELD:  You didn't --
17  MR. KULIS:  So I --
18  MS. GRANDFIELD:  -- ask Ruth.
19  MR. KULIS:  I -- because I forgot.  I know --
20  I -- I wrote a note because I forgot to ask her.  She's
21  --        0:59:26
22  MS. GRANDFIELD:  So --
23  MR. KULIS:  -- not -- I can't get her back on
24  the stand, so I get to ask the question.  And you can
25  object.        0:59:33

## Page 67

1   BY MR. KULIS:
2   Q.  Has all -- what do you have in your pension
3   fund?
4   MS. GRANDFIELD:  I'm going to object and I'm
5   going to say that he can provide it in writing --        0:59:42
6   MR. KULIS:  Okay.
7   MS. GRANDFIELD:  -- pursuant to a protective
8   order.
9   BY MR. KULIS:
10  Q.  So you're -- you're going to follow your
11  attorney's advice and not answer that question?        0:59:47
12  A.  Mm-hmm.
13  Q.  That's a "yes"?
14  A.  Yes.
15  Q.  And you understand if I have to go to Court
16  and force that answer for you, you can be assessed
17  attorney's fees and costs in this --        0:59:56
18  MS. GRANDFIELD:  He cannot personally be
19  assessed attorney's fees and costs.
20  MR. KULIS:  Well, you're not quite accurate
21  about that.  Yes, he does -- whoever pays, it's another
22  thing.  But he can be assessed attorney's fees and
23  costs as a Defendant.        1:00:09
24  MS. GRANDFIELD:  Well, why don't you not
25  instruct my client on the law.  I'm telling you that I

## Page 68

1   will provide it to you in writing.  I --
2   MR. KULIS:  Okay.        1:00:15
3   MS. GRANDFIELD:  -- just don't want him to be
4   testifying --
5   MR. KULIS:  I understand, Cynthia, and
6   normally I -- I -- you know, I -- I adhere to counsel's
7   suggestions on a lot of things.  But there were a lot
8   of things that you did -- you decided to -- for
9   whatever reason.
10  So I'm not going to discuss it.        1:00:31
11  BY MR. KULIS:
12  Q.  So you're going to follow your attorney's
13  advice.  Correct?
14  A.  Do you want to know how much is in my pension
15  fund?        1:00:35
16  Q.  Yeah.
17  MS. GRANDFIELD:  You want to tell him?  Go
18  ahead.  If you want to tell him.
19  THE WITNESS:  I -- I don't know.        1:00:41
20  BY MR. KULIS:
21  Q.  Oh.
22  MS. GRANDFIELD:  Oh.  Well, there we go.
23  Well --
24  BY MR. KULIS:
25  Q.  Okay.  Well, yeah, but --

17 (Pages 65 to 68)

## Page 69

1    A.  There's your answer.              1:00:44
2    Q.  -- ballpark.
3    A.  I don't -- no, I don't.
4    Q.  Okay.  Okay.  Other than that, do you have
5    any other financial accounts, stock accounts, bonds?    1:00:52
6        MS. GRANDFIELD:  Do you have any other ones
7    other than that?
8        THE WITNESS:  Yes.
9    BY MR. KULIS:
10   Q.  Okay.  What is the value of those?      1:01:03
11   A.  I don't know.  I don't look at it daily.
12   Q.  I didn't ask if you look at it daily.  But
13   you look at it yearly.  Right?              1:01:10
14   A.  I don't know.  Ten thousand maybe.
15   Q.  Okay.  Other than financial accounts, do you
16   have a -- a boat or some asset --          1:01:17
17   A.  No.
18   Q.  -- that's worth --
19   A.  No boat.
20   Q.  -- more than, you know, 5 -- well, I'm not --
21   A.  No boat, no RV, no plane, no nothing.    1:01:23
22   Q.  No painting?  Some Renoir --
23   A.  No --
24   Q.  -- somewhere?
25   A.  -- paintings.

## Page 70

1    Q.  Okay.
2    A.  No statutes [sic], no.              1:01:29
3    Q.  Okay.  Let me just look at my notes.
4        As we sit here today, do you now realize that
5    in -- an individual can film in City Hall?    1:01:52
6        MS. GRANDFIELD:  Objection, lack of
7    foundation, calls for speculation in the sense that
8    it's an incomplete hypothetical.
9        MR. KULIS:  It's not a hypothetical.      1:02:02
10       MS. GRANDFIELD:  He can't film anywhere and
11   everywhere in City Hall, because the -- not every --
12   BY MR. KULIS:
13   Q.  Within the public areas of City Hall, yeah,
14   are you aware of the fact --              1:02:09
15   A.  As of today?
16   Q.  Yes.
17   A.  Yes.
18   Q.  Okay.  What about as of -- as of November 8th
19   of 2018?                              1:02:15
20   A.  I do not know.
21   Q.  Okay.
22       (Conversation held in sotto voce.)
23   BY MR. KULIS:
24   Q.  So back to the -- when you were on the scene
25   outside at City Hall.  And you walked away to make some

## Page 71

1    phone calls.
2        Were you making calls to get clarification on
3    whether the statute applied or not?        1:02:53
4    A.  I may have.  But nobody answered.
5    Q.  Okay.  But you spoke to -- you said you spoke
6    to your wife and you spoke to Taft or --    1:03:03
7    A.  Tate.
8    Q.  Tate.  I'm sorry.
9    A.  Mm-hmm.
10   Q.  Anyone else?                      1:03:06
11   A.  Fellows.  But I didn't ask him about that.
12   Q.  You wanted to know if they were going to come
13   --
14   A.  Yeah.
15   Q.  -- assist you?                    1:03:15
16   A.  Yeah.
17   Q.  Why did you need assistance when you had two
18   other officers with you?
19       MS. GRANDFIELD:  Objection --
20       THE WITNESS:  I --
21       MS. GRANDFIELD:  -- asked and answered.    1:03:21
22       THE WITNESS:  I answered.
23   BY MR. KULIS:
24   Q.  Huh?
25   A.  I answered it already.

## Page 72

1    Q.  Well, I -- I -- I don't recall if you did.    1:03:27
2        MR. KULIS:  But are you going to instruct him
3    not to answer?
4    BY MR. KULIS:
5    Q.  Why did you call for other --          1:03:30
6    A.  Well --
7    Q.  -- officers?
8    A.  -- as I said before --
9        MS. GRANDFIELD:  I wasn't instructing him not
10   to answer.  I'm --                      1:03:32
11       MR. KULIS:  All right.
12       MS. GRANDFIELD:  -- saying that it --
13       MR. KULIS:  Okay.
14       MS. GRANDFIELD:  -- I'm making the objection
15   of asked and answered because you did ask that question
16   before and he --                      1:03:38
17       MR. KULIS:  I don't --
18       MS. GRANDFIELD:  -- answered it.
19       MR. KULIS:  -- know if I did, but.
20       MS. GRANDFIELD:  You did.
21       THE WITNESS:  You -- you did and --      1:03:39
22       MS. GREEN:  You did.
23       THE WITNESS:  -- now I'll answer the same
24   way.  For possible guidance.
25   BY MR. KULIS:

                              18 (Pages 69 to 72)

www.InDemandReporting.com                    (773) 239-6008

## Page 73

1       **Q.  Okay.  Guidance for what, though?**        1:03:45
2       A.  On the situation.
3       **Q.  And what type of guidance in the situation**
4   **were --**
5       A.  Because --                    1:03:50
6       **Q.  -- you asking for?**
7       A.  -- we just showed -- I read the statute,
8   couldn't really read it clearly, wasn't sure.  So --    1:03:57
9       **Q.  Okay.**
10      A.  -- and then eventually he was brought into
11  custody.
12      **Q.  Okay.  So you didn't get any guidance.**    1:04:02
13      A.  I didn't get any guidance.
14      **Q.  Okay.**
15      MR. KULIS:  I have nothing else.            1:04:07
16      MS. GRANDFIELD:  Okay.  We have the same
17  thing as with Ruth, whether you want to waive or
18  reserve signature.  If you waive, you just trust that
19  everything's taken down correctly.            1:04:20
20      If you reserve, you'll have a opportunity to
21  review, correct spellings.  Can't change anything
22  substantive.  It's up to you.  Most people waive.  But
23  you have to say --                    1:04:29
24      THE WITNESS:  So it's just changing spelling,
25  typos?

## Page 74

1       MS. GRANDFIELD:  Right.  Like, you can't
2   change something --                    1:04:33
3       THE WITNESS:  I -- I can't --
4       MS. GRANDFIELD:  -- substantive.
5       THE WITNESS:  -- go back and say I didn't say
6   that, didn't say that.                    1:04:36
7       MS. GRANDFIELD:  Right.
8       THE WITNESS:  I'll -- I'll just waive it.
9       MS. GRANDFIELD:  Okay.
10      MR. KULIS:  Most people do.
11      MS. GRANDFIELD:  All right.
12      THE RECORDER:  All right.
13      Going off the record, 12:46 p.m.
14      (Off the record.)
15
16
17
18
19
20
21
22
23
24
25

## Page 75

1               CERTIFICATION
2       I, Matthew D. Schulte, do hereby certify that
3   the foregoing transcript of said deposition is a true,
4   complete and correct report of the entire testimony so
5   given by said witness, together with such other matters
6   and things as counsel for the parties present at the
7   taking of said deposition desire to have appear of
8   record.
9       I further certify that on April 9, 2024 said
10  witness, RICHARD JAMES VOLANTI was first duly sworn to
11  testify to the truth, the whole truth and nothing but
12  the truth in the cause aforesaid; that the testimony
13  then was recorded by audio/visual recording device, by
14  me in the presence of said witness and thereafter
15  transcribed into typewriting under my direction and
16  control.
17      I further certify that I am not counsel for,
18  nor attorney for any of the parties to the aforesaid
19  cause, nor am I related to any of the parties to the
20  aforesaid cause, nor am I interested in any manner in
21  the said cause or in its outcome.
22      I further certify that the signature to the
23  foregoing deposition was waived by the witness.
24
25

## Page 76

1       IN TESTIMONY WHEREOF:  I have hereunto set
2   my hand and affixed my notarial seal:
3
4
5               Matthew D. Schulte
6               May 1, 2024
7

# Exhibit 3

www.InDemandReporting.com                    (773) 239-6008

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------------------------------

Sean Paul Reyes,

    Plaintiff,

    vs.        Case Number 1:22-cv-07339

Richard Volanti, Detective Monaco,
Officer Ghiloni, and Ruth Siaba
Individually, the City of Berwyn,
a Municipal Corporation,

    Defendants.

------------------------------------------------------

Deposition of Robert Daniel Monaco
Tuesday
April 9, 2024
-at-
Gregory E. Kulis and Associates, Ltd.
134 North LaSalle Street
Suite 444
Chicago, Illinois 60602

## Page 2

```
 1    APPEARANCES
 2
 3    For the Plaintiff:
 4
 5    Gregory E. Kulis
 6    Gregory E. Kulis and Associates, Ltd.
 7    134 North LaSalle Street
 8    Suite 444
 9    Chicago, Illinois 60602
10
11    For the Defendants:
12
13    Cynthia Grandfield
14    Del Galdo Law Group, LLC
15    1441 South Harlem Avenue
16    Berwyn, Illinois 60402
17
18    Also present:
19
20    Sean Paul Reyes
21
22
23
24
25
```

## Page 3

```
 1    EXAMINATION INDEX
 2
 3    DIRECT    CROSS    REDIRECT    RECROSS
 4    5         --       --          --
 5
 6    EXHIBIT INDEX
 7
 8    EXHIBIT               PAGE NUMBER
 9    1 -                   36
10    2 -                   37
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1        THE RECORDER:  Good afternoon.  We are now on
 2    the record on Tuesday, April 9th, 2024.  The time is
 3    12:52 p.m.  We are located at Gregory E. Kulis and
 4    Associates -- Associates, Ltd., 134 North La Salle
 5    Street, Suite 444, Chicago, Illinois 60602, for a
 6    video-recorded deposition in the matter of Sean Paul
 7    Reyes v. Richard Volanti, et al., Case No.
 8    1:22-CV-07339, in the United States District Court for
 9    the Northern District of Illinois, Eastern Division.   0:00:34
10        This deposition is being recorded by In
11    Demand Court Reporting, located at 216 South Jefferson
12    Street, Chicago, Illinois 60661, on behalf of the
13    Plaintiff and being taken at the instance of the
14    Plaintiff.  The witness today is Robert Daniel Monaco.  0:00:45
15        Mr. Monaco, my name is Matthew Schulte.  I am
16    a notary public and the video recording device operator
17    for this deposition.  At this time, would you please
18    raise your right hand for the oath?              0:00:50
19        (Witness sworn.)
20        THE RECORDER:  Thank you.
21        Would the attorneys please state their
22    appearances for the record?                     0:01:00
23        MR. KULIS:  I'm Gregory Kulis, K-U-L-I-S, for
24    the Plaintiff.
25        MS. GRANDFIELD:  Cynthia Grandfield for the
```

## Page 5

1    Defendants.                          0:01:05
2         THE RECORDER:  Also present is Plaintiff,
3    Sean Paul Reyes.  That completes the required
4    information, and we can proceed.
5              DIRECT EXAMINATION
6    BY MR. KULIS:
7         Q.  We've gone through some instructions, but let
8    me ask you.  Officer Monaco, you heard my instructions
9    before.                             0:01:20
10         I'm here to ask you some questions regarding
11   some allegations my client has made against you and
12   other employees of the -- of Berwyn.
13         Do you understand that?          0:01:28
14        A.  Yes.
15        Q.  Okay.  I'm not here to trick you.  I'm not
16   here to corner you.  I just want your version of the
17   facts, what you heard, what you saw, what you did, what
18   actions you took.                    0:01:36
19         If at any time I ask you a question that you
20   don't understand and want me to repeat it, I'd be happy
21   to do so.  All you have to do is tell me, Mr. Kulis,
22   Counsel, Greg, whatever you want to call me, I'm not
23   sure what you mean, or could you rephrase that.  And
24   I'd be happy to do so.
25         Okay?                          0:01:51

## Page 6

1         A.  Yes.
2         Q.  If you answer a question, I will assume that
3    you understood the question.
4         Is that fair?
5         A.  Yes.                          0:01:56
6         Q.  If I ask you a question that calls for a
7    "yes" or "no" answer, you must answer the question
8    "yes" or "no," because the court reporter cannot take
9    down a "uh-huh," a nod, a grunt.  They have to hear
10   "yes" or "no."
11        Okay?                            0:02:07
12        A.  Yes.
13        Q.  If you need to take a break, I would be happy
14   to accommodate you.  But if we need to -- if we take a
15   break, you must answer any question that's hanging out
16   there, then we can take a break.
17        Okay?                            0:02:17
18        A.  Okay.
19        Q.  As you anticipate -- as you become accustomed
20   to my questioning, you've heard through two depositions
21   already, if I -- you may start anticipating my
22   question.                            0:02:29
23         By that, I mean as it's rolling off my
24   tongue, you may anticipate what I'm -- I'm getting at
25   or what question I'm going to be ask, and you may

## Page 7

1    attempt to answer that question before I've completed
2    asking it.                          0:02:40
3         Please refrain from doing so for three
4    reasons.  One, you may be anticipating the wrong
5    question.  Two, you may deprive your counsel of raising
6    objection.  And thirdly and most importantly, the
7    record's got to be clean.            0:02:53
8         Question/answer, question/answer.  We don't
9    want to talk over each other.
10        Okay?
11        A.  Okay.                         0:02:57
12        Q.  Lastly, this is a federal deposition, as you
13   -- and as a police officer, I'm sure you're aware that
14   once you take the witness stand in any type of case,
15   you cannot discuss your testimony with anyone.
16        You understand that.  Correct?   0:03:10
17        A.  Yes.
18        Q.  And a federal deposition is an evidence
19   deposition, so it is as if you were on a witness stand.
20   So once we start, you cannot discuss your testimony
21   with anyone.
22        Okay?                            0:03:19
23        A.  Yes.
24        Q.  Okay.
25        A.  Okay.

## Page 8

1         Q.  Sir, you've heard two depositions, so you
2    kind of know where I'm going with most things.  But let
3    me go through some areas.  Tell me, where were you
4    born?                               0:03:32
5         A.  Chicago --
6         Q.  Where'd you --
7         A.  -- Illinois.
8         Q.  -- go to high school?
9         A.  Holy Cross.                  0:03:35
10        Q.  What year'd you graduate?
11        A.  1983.
12        Q.  Upon graduation, what'd you -- what did you
13   do?                                 0:03:43
14        A.  I worked --
15        Q.  What'd you do?
16        A.  Trying to think.  I worked for a landscaping
17   company --
18        Q.  Mm-hmm.
19        A.  -- for the City of Chicago.   0:03:52
20        Q.  What other jobs did you have before you
21   joined the Berwyn Police Department?
22        A.  I drove a truck.  I was an electrician for a
23   little while.  And that's it.         0:04:08
24        Q.  What was your first law enforcement position?
25        A.  With the City of Berwyn.

## Page 9

| | | |
|---|---|---|
| 1 | Q. When did you join Berwyn? | 0:04:15 |
| 2 | A. 1995. | |
| 3 | Q. And did you go to academy? | |
| 4 | A. Yes, sir. | |
| 5 | Q. Where? | |
| 6 | A. Chicago Police Academy. | 0:04:28 |
| 7 | Q. And since you've been a -- a Berwyn police | |
| 8 | officer, have you ever been sued before? | |
| 9 | A. Yes. | |
| 10 | Q. How many times? | 0:04:43 |
| 11 | A. I think once. | |
| 12 | Q. For what? | |
| 13 | A. It was back in the late '90s. I'm trying to | |
| 14 | think. Someone -- a prisoner hung -- committed suicide | |
| 15 | in the cell. | 0:05:00 |
| 16 | Q. Okay. | |
| 17 | A. And the family sued the City. I don't | |
| 18 | remember exactly what year. It was, like, in the '90s. | |
| 19 | Late -- | 0:05:10 |
| 20 | Q. Okay. | |
| 21 | A. -- '90s. | |
| 22 | Q. Any other lawsuits? | |
| 23 | A. No. That I could recall. | 0:05:15 |
| 24 | Q. Since you've been a Berwyn police officer, | |
| 25 | have you ever been disciplined? | |

## Page 10

| | | |
|---|---|---|
| 1 | A. Yes. | |
| 2 | Q. For what? | 0:05:19 |
| 3 | A. One time a prisoner escaped from the back of | |
| 4 | my vehicle. Someone placed the prisoner in the back of | |
| 5 | the vehicle, and he escaped. Another time it was a -- | |
| 6 | just a verbal warning. | 0:05:36 |
| 7 | I didn't go to court. And call in that I | |
| 8 | wasn't going to court. | |
| 9 | Q. So court deviation? That's what it's called. | 0:05:44 |
| 10 | A. Yeah -- | |
| 11 | Q. So you didn't -- you -- you missed court or | |
| 12 | -- | |
| 13 | A. Yeah. I missed court. I didn't call in that | |
| 14 | day. | 0:05:49 |
| 15 | Q. Okay. | |
| 16 | A. I think it was traffic court. | |
| 17 | Q. Did -- since you've been a Berwyn police | |
| 18 | officer, has any citizens filed complaint -- internal | |
| 19 | complaints with you -- internal complaints with the | |
| 20 | City of Berwyn against you? | 0:06:05 |
| 21 | A. No. Not that I recall. | |
| 22 | Q. When you joined the police -- the Berwyn | |
| 23 | Police Department, you started as a patrol officer? | 0:06:22 |
| 24 | A. Yes, sir. | |
| 25 | Q. Why don't you give me your history as a | |

## Page 11

| | | |
|---|---|---|
| 1 | Berwyn police officer. | |
| 2 | A. I started off in patrol. I was in patrol | |
| 3 | till 2012, when I was asked if I wanted to be a | |
| 4 | juvenile detective. | 0:06:39 |
| 5 | I was a juvenile detective for about -- I | |
| 6 | can't remember the exact year. But then I was moved | |
| 7 | from juvenile unit to regular investigations, and I | |
| 8 | started doing background investigations of City | |
| 9 | employees. | 0:07:00 |
| 10 | Q. So that's back in 2013 or '14 or something? | |
| 11 | A. Well, 2012 I became a juvenile detective. | |
| 12 | Then -- | |
| 13 | Q. For how long? | 0:07:09 |
| 14 | A. Until, like, when COVID hit. | |
| 15 | Q. Okay. So -- | |
| 16 | A. Around 2020. | |
| 17 | Q. '19, yeah. | 0:07:13 |
| 18 | A. Yeah. | |
| 19 | Q. Okay. | |
| 20 | A. Because that's when everything shut down. | |
| 21 | Q. Yep. And then you started doing | |
| 22 | investigative backgrounds in 2019 or -- | 0:07:21 |
| 23 | A. Yeah. | |
| 24 | Q. -- when COVID -- | |
| 25 | A. Yes. | |

## Page 12

| | | |
|---|---|---|
| 1 | Q. And then what do you do now? | |
| 2 | A. Same thing. | 0:07:27 |
| 3 | Q. Okay. | |
| 4 | A. Investigating backgrounds. | |
| 5 | Q. Sergeant Volanti. You've worked with him | |
| 6 | before? | |
| 7 | A. Yes. | |
| 8 | Q. Friend of his? | 0:07:42 |
| 9 | A. Work. Yeah. | |
| 10 | Q. Have you ever -- | |
| 11 | A. Yes. | |
| 12 | Q. -- socialized with him outside the job? | 0:07:46 |
| 13 | A. Yes. | |
| 14 | Q. Okay. What about Ghiloni? | |
| 15 | A. Ghiloni? No. I -- I mean, I'm friends with | |
| 16 | them at work. But never outside the job. | 0:08:00 |
| 17 | Q. Okay. Prior to November 8th of 2021, did you | |
| 18 | know of Sean Paul Reyes? | |
| 19 | A. No, sir. | 0:08:09 |
| 20 | Q. And how did you become aware of Sean Paul | |
| 21 | Reyes -- Reyes on the date he was arrested? | |
| 22 | A. Could you rephrase that? | |
| 23 | Q. How did you become aware of what was going on | |
| 24 | with Mr. Reyes on November 8th -- | 0:08:22 |
| 25 | A. Oh, okay. | |

3 (Pages 9 to 12)

## Page 13

1    Q.  -- 2021?
2    A.  I happened to go to City Hall, stopped by
3    City Hall that morning, to drop some paperwork off.  I
4    was in Ruth's office.  She received a phone call saying
5    that someone was downstairs video recording and the
6    employees were getting upset.                    0:08:46
7        And she asked me to -- if I could contact the
8    station to call for a supervisor.  And then -- standing
9    in the office.  And I noticed -- we observed Mr. Reyes
10   standing by the door with a recorder in his hand.    0:09:12
11       And then Ruth went out to speak with him.  I
12   think I followed her.  And then --
13       Q.  Well, so you stand -- standing within earshot
14   of her when she was talking to Mr. Reyes?            0:09:28
15   A.  Yes, I believe so.
16       Q.  Did you have any conversation with Mr. Reyes
17   at that time?
18   A.  I -- I can't recall.                    0:09:36
19       Q.  Okay.
20   A.  I -- I --
21       Q.  What do you recall her saying to him and he
22   saying to her?                    0:09:41
23   A.  I -- I don't want to assume or whatever, but
24   I can't remember --
25       Q.  Just --

## Page 14

1    A.  -- the exact words.
2        Q.  As best you can recall.                    0:09:54
3    A.  But it was something to the effect that, you
4    know, you can't -- you're not allowed to videotape
5    without permission, prior permission.            0:10:03
6        Q.  What was his response?
7    A.  I don't recall.
8        Q.  Anything else you recall her saying?    0:10:13
9    A.  No, not at -- not at this moment.
10       Q.  So what happened then?
11   A.  She was talking to him.  Then I think she
12   went back in her office.  And then I went out there and
13   I was talking to him.  I asked him -- I think I asked
14   him what his business was, and if I'm not mistaken, he
15   said he was an independent journalist.            0:10:45
16       Q.  Okay.
17   A.  I asked him if he has any -- I don't know if
18   I put it as -- like, credentials or ID.  I don't recall
19   what he said.  And then I can't recall the exact
20   conversation.                    0:11:04
21       And then we started walking towards the
22   stairs.  We walked down the stairs and were on, like,
23   the -- like, the first landing.  And then Officer
24   Ghiloni arrived.                    0:11:17
25       Q.  Why -- why did you walk -- did you ask him to

## Page 15

1    go downstairs or?
2    A.  I believe I did.  I believe I asked him, you
3    know, could we downstairs and -- talk more.    0:11:28
4        Q.  And he complied?
5    A.  Yes, sir.
6        Q.  Was he rude?
7    A.  No, sir.
8        Q.  Was he screaming?                    0:11:35
9    A.  No, sir.
10       Q.  Yelling?
11   A.  No, sir.
12       Q.  Any profanity?
13   A.  No, sir.                    0:11:41
14       Q.  Okay.  He was just filming.
15   Correct?
16   A.  Yes, sir.
17       Q.  And he -- he -- he informed you that he
18   believed that it was his right to film in a public
19   building?                    0:11:49
20   A.  I believe so.  I can't really recall exactly.
21   It was two and a half years ago.  I'm --
22       Q.  Mm-hmm.
23   A.  -- trying to remember the best I can.  But --    0:11:58
24       Q.  Okay.
25   A.  -- I believe -- I believe he did, because I

## Page 16

1    know he said, you know, he has a right to record and
2    that he was an independent journalist.            0:12:09
3        Q.  Okay.  So -- and you asked him to go
4    downstairs, and he complied, and you and he walked
5    downstairs.
6    A.  Yes, sir.                    0:12:16
7        Q.  And then you said Ghiloni met you guys on the
8    landing?
9    A.  Yeah.  When you -- the way City Hall is
10   situated, to go to the second floor, you go up a few
11   stairs, there's a landing, you turn, and you go up
12   more.                    0:12:31
13       Q.  Okay.
14   A.  So we were on that landing.  And then I think
15   from there, we walked down to the first main level.
16       Q.  Okay.  And then who joined you at that point?  0:12:43
17   A.  Then I believe Sergeant Volanti arrived on
18   the scene.
19       Q.  Okay.  So the -- the -- and Ghiloni.
20       Am I pronouncing that right?            0:12:52
21   A.  Ghiloni.  Yeah.
22       Q.  Ghiloni.  Did you hear him say anything to
23   Mr. Reyes?  Ghiloni.                    0:13:03
24   A.  Ghiloni?  No.
25       Q.  Okay.  So then --

## Page 17

1    A. And --

2    Q. -- the three of you walked down the first

3  level. And Volanti was there?    0:13:11

4    A. Then he arrived.

5    Q. Okay. And what -- were you in uniform, or

6  were you in plainclothes?    0:13:17

7    A. I was dressed kind of like I am now, but the

8  only difference is I had my vest on.

9    Q. Okay.

10    A. Ballistic vest. And I had my radio on. And

11  we had masks on at the time, because it was still -- I

12  think the mask was still in effect at the time.    0:13:34

13    Q. Okay.

14    A. Because everybody had a mask.

15    Q. Were you wearing any type of camera?

16    A. No. I wasn't. No, sir.    0:13:48

17    Q. So -- so Berwyn does not have body cams?

18    A. Not at that time.

19    Q. Okay. And did you have any personal body

20  camera on you?    0:13:56

21    A. No, sir. I mean, well, I -- my phone. My

22  cell phone has a camera, but I wasn't -- it was in my

23  pocket.

24    Q. Yeah.

25    A. I mean. So --    0:14:06

## Page 18

1    Q. Okay.

2    A. -- yeah, I did have a a -- a camera on is

3    Q. No, I mean --

4    A. -- me, but --

5    Q. -- other than a phone.

6    A. No.    0:14:11

7    Q. Okay.

8    A. No.

9    Q. So when you walked downstairs and -- and

10  Volanti showed up, what occurred that you recall?    0:14:17

11    A. He walked in. I advised him what was going

12  on, that Ruth got a phone call, and that some of the

13  employees downstairs were, you know, getting alarmed

14  because someone was video recording. And --    0:14:35

15    Q. And --

16    A. -- then I kind of told him and then I stepped

17  away.

18    Q. And what did -- at that point, did Mr. Reyes

19  say anything?    0:14:44

20    A. I'm trying to picture how we were and I -- I

21  don't know if Sergeant Volanti started talking to him

22  or not.

23    Q. Okay. Do you recall --    0:15:03

24    A. I think --

25    Q. Go ahead.

## Page 19

1    A. I -- I think he -- something about a FOIA.

2    Q. Okay. And what happened -- and what was said

3  regarding that?    0:15:14

4    A. Then I seen Sergeant Volanti walk by the desk

5  where they take FOIAs or requests.

6    Q. Okay. What occurred then?    0:15:25

7    A. I think after that, we -- I think we all

8  walked downstairs and outside.

9    Q. Okay. Why -- did you hear -- I'm sorry. Did

10  you hear Volanti ask Mr. Reyes to exit the building?    0:15:53

11    A. I think so, because that's why we went

12  outside.

13    Q. Prior to exiting the --

14    A. I --

15    Q. I'm sorry.    0:16:04

16    A. I mean, I -- I think I asked Mr. Reyes at one

17  time if we could go step outside and talk.

18    Q. Okay.

19    A. I'm not -- you know, I'm not sure, but I know

20  at some time he was asked if we could go outside.    0:16:19

21    Q. Why did you want to take him outside?

22    A. Just to get out of the area, the crowd.

23    Q. Okay.    0:16:24

24    A. You know, I mean, because there were all

25  people starting, you know, to look around, see what was

## Page 20

1  going on and all that. So.

2    Q. Prior to exiting the building, did Mr. Reyes

3  act in any type of aggressive manner towards anyone in

4  --    0:16:37

5    A. No.

6    Q. -- your view? Was --

7    A. No.

8    Q. -- he rude to anybody?

9    A. No.

10    Q. Did you see him threaten anyone?    0:16:42

11    A. No.

12    Q. He continued to film.

13    Correct?

14    A. Yes, sir.

15    Q. Okay. Other than that, was there anything

16  that you saw that -- forgetting the filming -- anything

17  that you saw that violated any law?    0:16:55

18    A. No. I mean, I didn't -- I wasn't -- didn't

19  speak to any employees to see what was going on.

20  Because I was kind of watching him and, you know, all

21  that.    0:17:08

22    Q. And when you went to do the FOIA, he didn't

23  have any issue with the person who -- the clerk who

24  took -- the --

25    A. I --

## Page 21

1    Q. -- FOIA, did you?                    0:17:15
2    A. I will -- I'll be -- I wasn't paying
3  attention --
4    Q. Okay.
5    A. -- when he was over there.
6    Q. But you didn't hear any commotion or
7  anything.                              0:17:22
8    A. No.
9    Q. Okay.
10   A. No.
11   Q. So when he was asked to exit the building, he
12 complied and exited the building.
13       Correct?                         0:17:27
14   A. Yes.
15   Q. Okay. When you guys exited the building,
16 where did you go?
17   A. We were on, like, the stairs to the City
18 Hall.                                  0:17:39
19   Q. Okay. And was -- what occurred there?
20   A. I'm trying to remember where Sergeant Volanti
21 went. But me and Mr. Reyes were kind of face to face.
22 And then his video camera was, like, near me.    0:18:00
23       And I was, like, you know, doing -- I don't
24 want to be recorded. And he was kind of getting close,
25 so I -- I don't recall if I -- you know, but I kind of,

## Page 22

1  like, made him back up.                0:18:13
2        And then I was -- I don't know if we stayed
3  on the stairs or the landing right there, or if we
4  walked down the stairs and were on, like, the main
5  sidewalk area.                        0:18:27
6    Q. What occurred there?
7    A. He was video recording. I -- you know, I had
8  my hand up because I didn't want to be recorded, I
9  didn't want my face on video.          0:18:48
10       I -- I'm trying to picture the area. He was
11 standing -- like I said, I don't remember if he was
12 still on the landing or down. I walked away.    0:19:01
13       Sergeant Volanti was -- walked away, and he
14 was standing there, video -- you know, I -- I'm
15 assuming he was videoing still.
16   Q. Mm-hmm.                          0:19:11
17   A. Because he still had a camera. I think it
18 was a camera in his hand.
19   Q. When Sergeant Volanti walked away, did he
20 tell you what he was -- why he was walking away?  0:19:24
21   A. No. He was getting on the phone.
22   Q. Okay. At this point in time, was Mr. Reyes
23 in custody?                           0:19:31
24   A. No.
25   Q. So he was not in handcuffs?

## Page 23

1    A. No, sir.
2    Q. He had not been seized?            0:19:36
3    A. No.
4    Q. Okay. And you said that Volanti was on the
5  phone?
6    A. Yes.
7    Q. Did you hear any part of the --        0:19:44
8    A. No.
9    Q. -- conversation? Do you know who he was
10 calling?
11   A. No. Because he was further away.     0:19:49
12   Q. Did it appear he made one phone call,
13 two phone calls? Three --
14   A. I -- I really -- I don't know. Because then
15 I got a phone call. And I --
16   Q. Who'd you --
17   A. -- was on my --
18   Q. -- get a phone call from?          0:19:59
19   A. -- phone. I'm not sure if it was my wife or
20 my daughter. I got -- I got one phone call from Unit
21 Commander Fellows, who was my immediate supervisor,
22 asking where I was.                    0:20:12
23       And I told him I was at City Hall, I had to
24 drop off some paperwork, and there's an incident going
25 on here. And then I think -- I'm not sure if it was my

## Page 24

1  wife or my daughter that called me.     0:20:25
2    Q. Okay. What did Fellows say, if anything,
3  when you said there was an incident going on?
4    A. He asked what happened. I believe I told him
5  that someone was video recording at City Hall. He said
6  okay. And we just hung up.             0:20:43
7    Q. Okay. So what'd you do then?
8    A. Then I think I was still standing. Mr. Reyes
9  was still -- like I says, I -- I don't remember if he
10 was on the stairs or down.             0:20:55
11       He was kind of video recording. I think
12 Sergeant Volanti went up to him and was talking to him.
13 And then I believe they were looking at -- there was a
14 sign posted by the door. Or by -- on the glass next to
15 the door.                             0:21:14
16   Q. Mm-hmm.
17   A. And then a little while later, we were
18 advised, you know, we're going to take him in for an
19 investigation. I assisted with them handcuffing him.  0:21:30
20       We put him back in -- we put him into the
21 back seat of the police squad. And then it was -- I
22 don't -- I think it was Ghiloni's car that was there.  0:21:44
23   Q. Did Ghiloni have any conversation with Mr.
24 Reyes?
25   A. I think when we were on the -- on -- you

## Page 25

1  know, when we were still in the building earlier --
2  because I remember Mr. Reyes asking for our names.      0:22:07
3          And I think he asked Ghiloni his name.  And
4  Ghiloni says -- I don't know if he says it's right here
5  or he says it's Ghiloni and spelled it.  I -- I can't
6  be sure.                                              0:22:21
7          Q.  Okay.
8          A.  But that was inside.
9          Q.  Did you ever hear Mr. Reyes say why he was
10 filming?                                              0:22:27
11         A.  I think he just said he had a right to film
12 in public spaces.
13         Q.  Okay.
14         A.  But I don't recall him saying why.        0:22:39
15         Q.  Okay.  And so --
16         A.  Or -- correct.  Could I --
17         Q.  Sure.                                     0:22:44
18         A.  -- talk?  I don't want to interrupt your --
19         Q.  No, no, no.  If you got something to add,
20 please add it.                                        0:22:48
21         A.  I'm trying to remember if at some time -- I
22 know he said he's an -- he -- he said he was an
23 independent journalist.  And I don't remember when.
24 And he was doing a story.                             0:23:01
25         Q.  Okay.

## Page 26

1          A.  But I don't remember when.
2          Q.  When Volanti walked away, how long was he
3  gone when he stepped away?                            0:23:10
4          A.  Not long.  I mean, I -- you know, a couple
5  minutes maybe.  I'm not -- you know, I -- not --
6          Q.  And --
7          A.  -- too long.                             0:23:19
8          Q.  And at this point in time, were you in the
9  station or were you outside the station?
10         A.  The police station?
11         Q.  Yeah.  Or not the police station.  The --  0:23:26
12         A.  Oh.
13         Q.  -- City Hall.  I'm sorry.  Thank you.
14         A.  We were outside.
15         Q.  Okay.  And Reyes continued to film.
16             Correct?                                  0:23:37
17         A.  Yes.  I mean, he had his hand in his -- you
18 know, he had the camera in his hand, so I'm assuming he
19 was filming.
20         Q.  And Volanti walked away to make some phone
21 calls.
22             Correct?                                  0:23:46
23         A.  Yes.
24         Q.  Did he ask you -- have any conversation with
25 you regarding the statute that's posted on the sign?

## Page 27

1          A.  I can't -- I can't remember.             0:23:59
2          Q.  Did you hear him have any conversation with
3  Ghiloni?
4          A.  No.  I didn't hear any -- I mean, I -- if he
5  did talk to him, I don't know.                        0:24:11
6          Q.  Okay.
7          A.  I -- I know that I think Sergeant Volanti and
8  Mr. Reyes went by the front door, where the sign was.
9          Q.  And when Volanti got off the phone and came
10 back, is that when he placed him under arrest?        0:24:28
11         A.  I don't remember if it was right away or not.
12         Q.  Do you recall what he said when he placed him
13 under arrest?                                         0:24:36
14         A.  I don't know.  I -- I don't know.
15         Q.  Okay.
16         A.  I'm trying -- if you give me a minute.  I'm
17 trying -- I'm trying to think back.  Yeah, I'm -- yeah,
18 I -- I don't recall.  I'm not going to say something
19 that I don't remember.                                0:24:56
20         Q.  When he placed him under arrest, were you
21 aware of what charges he was being arrested for?
22         A.  At that time, I was not.
23         Q.  Okay.  Did -- and did you witness him -- did
24 you as a police officer witness Mr. Reyes committing
25 anything that amounted to a crime?                    0:25:17

## Page 28

1          A.  No.  When I talked to him, no.
2          Q.  Okay.  I mean, what -- not -- not when you
3  talked to him.  But did you see --                   0:25:23
4          A.  I mean, I -- I saw some of the employees --
5  the clerks were, like, you know, nervous.
6          Q.  Mm-hmm.
7          A.  But I mean, no.                          0:25:33
8          Q.  Okay.  Because, you know, some people don't
9  like to be filmed, as you told me.  You didn't want --
10         A.  Yes.
11         Q.  -- to be filmed.                         0:25:40
12         A.  Yes.
13         Q.  Okay.  Did -- and when Volanti placed him
14 under arrest, did you hear what he said to him?
15         A.  I think he said we're going -- we're taking
16 you to the station to investigate this matter.       0:26:05
17         Q.  Okay.  And -- and what Reyes's response?
18         A.  He -- he complied.  He, you know -- I -- I --
19 I don't know if he said for what and why.            0:26:27
20         Q.  And when he was handcuffed, who handcuffed
21 him?
22         A.  Well, I know I was there.  I had -- I mean, I
23 had my hands on one of his wrists.  I -- I -- I'm
24 assuming -- I mean, I -- I don't want to assume.     0:26:49
25         I -- I would say Sergeant Volanti put his

7 (Pages 25 to 28)

Page 29

1   handcuffs on him.
2       Q.   Okay.
3       A.   Could've been Sergeant Volanti, you know, or
4   Ghiloni.
5       Q.   Okay.  But you didn't handcuff him.        0:26:59
6       A.   No.
7       Q.   Okay.
8       A.   No.
9       Q.   Did he tell him why he was going to be
10  arrested?                                          0:27:08
11      A.   I heard was going to the station for an
12  investigation.
13      Q.   Okay.
14      A.   I'm -- I'm not -- I wasn't really paying
15  attention.                                         0:27:18
16      Q.   Okay.  And then when he was placed in --
17  whose vehicle?
18      A.   I think it was Ghiloni's.                  0:27:24
19      Q.   Okay.  And then Ghiloni transported him?
20      A.   Yes, sir.
21      Q.   And did you go to the station at that point?  0:27:30
22      A.   I went back to the station.
23      Q.   And did you have any contact with Mr. Reyes
24  at the station?
25      A.   No.                                        0:27:35

Page 30

1       Q.   Did you see --
2       A.   I --
3       Q.   -- did you --
4       A.   I'm -- I'm sorry.  Go ahead.               0:27:40
5       Q.   Did you talk to anybody about what Mr. Reyes
6   did before he was arrested?
7       A.   What do you mean?
8       Q.   Any of the -- any of the employees at the
9   City Hall.                                          0:27:49
10      A.   No.
11      Q.   Okay.  So when you went back to the station,
12  what did you do?
13      A.   I went upstairs to my desk.  I started doing
14  my work.  I did go downstairs in booking to get
15  something.  I seen Mr. Reyes in, like, the holding
16  area.  And I walked out.                           0:28:11
17      Q.   Okay.  Did you -- did you write any reports?
18      A.   Yes.
19      Q.   Okay.  And what reports did you write?     0:28:20
20      A.   I did a supplement.
21      Q.   Okay.
22      A.   It's called a supplemental report to the
23  original incident.                                 0:28:26
24      Q.   Okay.  Mm-hmm.  And what -- what did the
25  supplement say?  I'm sure I saw the --

Page 31

1       A.   I mean, I'd -- I'd have to read exact what I
2   -- why I was -- I think why I was at City Hall and what
3   happened.                                          0:28:38
4       Q.   Okay.
5       A.   I mean, I'd have to, you know, review my
6   report.
7       Q.   And why did you do -- do a supplement?     0:28:50
8       A.   Because I was there.
9       Q.   Okay.  Did anyone tell you to do a report?  0:29:06
10      A.   No.
11      Q.   Did you have a case number for that report at
12  that point?  Or an incident --
13      A.   Well, I --
14      Q.   -- number?
15      A.   Well, yeah, the one that was generated for
16  the call.
17      Q.   Okay.  So how did you get the incident
18  number?                                            0:29:22
19      A.   I think I called dispatch and asked them if
20  there was a report generated, and then they gave me the
21  incident number.  I don't know, it could've been I
22  called dispatch or I could've looked on the computer.
23      Q.   When did you do that report?
24      A.   After I got into the station.
25      Q.   So at this point, were you aware that he was

Page 32

1   under arrest and what he was being charged for?    0:29:43
2       A.   I didn't --
3       Q.   Charged with?
4       A.   -- know what he -- I didn't know what he was
5   being charged with.                                0:29:47
6       Q.   Okay.  So you just did a -- a supplemental
7   report as to why you were in the station.  I know I saw
8   it.
9       A.   You mean why I was at City Hall.           0:29:54
10      Q.   At City Hall.  I keep --
11      A.   Yeah.
12      Q.   -- screwing those two up.
13      A.   Yes.
14      Q.   Yeah.
15      A.   Yes.  I mean, I'd have to look at my -- my --  0:30:00
16      Q.   We'll --
17      A.   -- supplement, so.
18      Q.   -- take a break in a little while.
19           Did you speak to anyone else that afternoon
20  regarding the incident?                            0:30:08
21      A.   No.  I may have told Commander Fellows what
22  was going on and what happened.  And then I just went
23  to doing what I was doing, my work.                0:30:19
24      Q.   Subsequent to the arrest of Mr. Reyes, did
25  you speak to Volanti as to why he -- Reyes being

## Page 33

1   arrested?

2    A. No.

3    **Q. Did you ever learn that the -- the -- the**

4   **sign that said you cannot film in the -- in City Hall**

5   **was not applicable?**     0:30:44

6    A. I learned later, after -- after the fact.

7    **Q. And when did you learn?**

8    A. I believe before I left work. That's when I

9   learned that Mr. Reyes was being charged with

10   disorderly conduct and not video recording. Because --

11   something with the statute was eavesdropping.    0:31:13

12    **Q. Okay.**

13    A. And then I left.

14    **Q. Okay. So I mean, did you look at the**

15   **statute, or did somebody come and say, listen, that**

16   **statute on --**     0:31:22

17    A. No, I --

18    **Q. -- City --**

19    A. -- didn't look up the statue [sic].

20    **Q. Okay. Well, then how did you find out that**

21   **it was not applicable?**     0:31:27

22    A. Because I -- pretty sure Detective Volanti

23   told me before I was leaving work.

24    **Q. Okay. Oh --**

25    A. Because I didn't --     0:31:33

## Page 34

1    **Q. -- okay.**

2    A. -- have no contact with Mr. Reyes. Once he

3   got to the station, I went upstairs. Like I says, I

4   went in booking, because I remember seeing him in the

5   holding area.     0:31:45

6     And then I just -- I left, went back to my

7   desk, and before I left work, I seen Sergeant Volanti.

8    **Q. And what did he tell you?**     0:31:56

9    A. No, I just asked what was going on. And he

10   says, oh, we're charging him with disorderly conduct.

11   And I says, oh, okay. And then I -- I think he told me

12   about, you know, the -- the statute that was on -- by

13   City Hall, the -- the sign.     0:32:15

14     That was more for eavesdropping. I'm, like,

15   oh, all right. And then I just left.

16    **Q. Did you ever learn that those signs were**

17   **taken down?**     0:32:23

18    A. Yeah. I think the next -- the next day they

19   were.

20    **Q. And how did you learn that?**     0:32:28

21    A. Because I -- I don't know if they called it a

22   press conference or whatever. But Mr. Reyes was at

23   City Hall with some other people.     0:32:39

24     I drove over there. And then I seen them,

25   but then I -- I left. And then I -- I can't recall if

## Page 35

1   I was there when the mayor took them down or if I was

2   told that they were taken down. I mean, I don't

3   recall.     0:33:02

4    **Q. How -- how did you know that the mayor took**

5   **them down?**

6    A. I don't -- I don't recall if I was there when

7   he took them down or someone told me that he -- that he

8   took them down.     0:33:12

9    **Q. Were you there at the press conference?**

10    A. For a couple minutes.

11    **Q. What did you hear?**     0:33:16

12    A. Mr. Reyes was video recording. There was --

13   there were a bunch of people there, just chanting

14   stuff. I don't really recall what it was.    0:33:33

15     There was some other gentleman there, saying

16   he was a lawyer and Mr. Reyes was -- his rights were

17   violated. And --

18    **Q. Okay.**

19    A. -- and then I left. I mean --     0:33:47

20    **Q. Yeah.**

21    A. I don't remember how long I was there.

22    **Q. Okay. So you -- so you didn't ever -- you**

23   **never placed Mr. Reyes under arrest.**

24    **Correct?**     0:33:55

25    A. Well, I assisted them in --

## Page 36

1    **Q. Yeah, you assisted.**

2    A. I didn't --

3    **Q. But --**

4    A. -- ask --

5    **Q. -- Volanti's the one that came in and said**

6   **he's under arrest.**

7     **Correct?**     0:34:02

8    A. Yeah. I mean --

9    **Q. And you --**

10    A. -- I don't ever recall -- I'm sorry.    0:34:07

11    **Q. Yeah. And you had no contact with Reyes at**

12   **the station.**

13    A. No. I just remember seeing him in the cell.   0:34:15

14    **Q. Subsequent to leaving the second floor after**

15   **you were with Ruth Siaba Green, did you go back and**

16   **talk to her that afternoon or talk to her over the**

17   **phone?**

18    A. No.     0:34:28

19    **Q. Did you go to court on this matter?**

20    A. No, I didn't.

21    **Q. Okay. I'm going to show you what is marked**

22   **as Monaco Exhibit 1, which purports to be your answer.**   0:35:09

23     (Exhibit No. 1 marked for identification.)

24   BY MR. KULIS:

25    **Q. Have you seen this document before?**

## Page 37

1     A.  I believe so.

2     Q.  And that's the answers to the allegations of

3     the complaint.  Correct?                    0:35:18

4     A.  Yes.

5     Q.  And as best you can recall, or if you want to

6     take time to read it, are those allegation -- are those

7     answers to the complaint true and accurate?    0:35:29

8     A.  Yes.

9     Q.  Okay.

10    A.  I believe they are.

11    Q.  I'm going to show you what is marked as

12    Monaco Exhibit No. 2.                        0:35:37

13    A.  Do you --

14    Q.  It goes to him.

15    (Exhibit No. 2 marked for identification.)

16    BY MR. KULIS:

17    Q.  Which -- this purports to be Monaco's answers

18    to the -- tendering a copy to Counsel -- which purports

19    to be Defendant Monaco's answers to the

20    interrogatories, which are written questions to tender

21    to you.                                      0:36:07

22    Again, there is not a signature line -- a

23    signature page.  But did you answer those questions?

24    A.  Yes.

25    Q.  And are your answers true and accurate?    0:36:16

## Page 38

1     A.  Yes.  I remember signing on a page.

2     Q.  Okay.  If you look at No. 4 on that

3     document, it says Officer Monaco -- the answer says (as

4     read):  Officer Monaco states that he communicated with

5     the reporting party, victims, and other police officers

6     involved in the investigation.              0:36:39

7     What victims did you discuss this matter

8     with?

9     A.  Ms. Green.

10    Q.  Okay.

11    A.  And Trish Powers was there in the room too.

12    But I didn't really talk to her.            0:36:56

13    Q.  Okay.

14    A.  And then the police officers was Ghiloni and

15    Sergeant Volanti.

16    Q.  Did you ever tell Sean Paul Reyes to stop

17    filming?                                     0:37:22

18    A.  I may have.  I don't -- I -- you know what?

19    I -- I would say yes, I did.

20    MR. KULIS:  Could we take a -- like, a

21    few-minute break?                            0:38:26

22    MS. GRANDFIELD:  Yeah.  Is there more water

23    in that pitcher there?

24    THE RECORDER:  Going off the record --

25    MR. KULIS:  I -- we -- I can have her fill it

## Page 39

1     up.

2     THE RECORDER:  Going off the record, 1:30

3     p.m.                                         0:38:32

4     (Off the record.)

5     THE RECORDER:  Back on the record, 1:40 p.m.

6     BY MR. KULIS:

7     Q.  So back to this report.  I don't seem to have

8     it.                                          0:38:43

9     A.  Okay.

10    Q.  When is the last time you saw it?

11    A.  I actually read it this morning before I came

12    down here.                                   0:38:51

13    Q.  Oh.  You don't have access to it now, do you?

14    A.  No.  Not here.                           0:39:00

15    Q.  Well, on your phone or anything --

16    A.  No.

17    Q.  -- like that.

18    A.  I --

19    Q.  No.

20    A.  -- can't.

21    Q.  Yeah.                                     0:39:02

22    A.  On my phone --

23    Q.  I -- because I --

24    A.  -- we don't have access to City --

25    Q.  Okay.

## Page 40

1     A.  -- computers.                            0:39:06

2     Q.  Yeah, yeah.  I mean, because I -- we don't

3     seem to have it.  It -- it'd -- would make sense that

4     it would be right after the reports in this incident.    0:39:13

5     A.  Yeah.  Usually the --

6     Q.  They'd all be --

7     A.  -- incidents --

8     Q.  -- sequential.

9     A.  Yeah.

10    Q.  So -- okay.  Let me ask you this.  Did -- are

11    you aware that Mr. -- no, let me ask you this.    0:39:25

12    When -- at one point you indicated that you

13    said you didn't want to be filmed and you kind of put

14    your hand up and said.  What right did you feel that

15    you -- you did not have to be filmed as a public

16    employee --                                  0:39:39

17    A.  Well, I --

18    Q.  -- of Berwyn?

19    A.  Because he was, like, getting close to me.

20    And I didn't want --                         0:39:43

21    Q.  Okay.

22    A.  -- people, like, close to me.

23    Q.  Well, you -- was he getting close to you or

24    you getting close to him?                    0:39:48

25    A.  I mean, we were kind of, like, back and

## Page 41

1    forth.  So yeah, I could've been getting close to him.
2    He could've been getting close to me.          0:39:57
3        Q.  Did she -- did he -- do you recall at one
4    point that you put a hand on him and grabbed his arm
5    with the -- that -- that had the camera?
6        A.  I may have.                    0:40:06
7        Q.  And do you recall that he -- if he complained
8    that you were grabbing him and putting your hands on
9    him?
10       A.  I -- I don't recall.               0:40:20
11       Q.  And -- and this was actually before he was
12   arrested by Volanti.
13           Correct?
14       A.  Yes, sir.                     0:40:25
15       Q.  Okay.  So you didn't place him under arrest.
16           Correct?
17       A.  No.
18       Q.  But you did -- do you recall grabbing his arm
19   and trying to prevent him from filming?          0:40:34
20       A.  I -- I -- I may have grabbed his arm.
21       Q.  Okay.  Do you recall if he actually filed a
22   complaint with Berwyn against you?             0:40:41
23       A.  I -- I don't know.  I -- I think he wanted
24   to.
25           THE RECORDER:  Can I actually have you lower

## Page 42

1    your hands?                         0:40:48
2        THE WITNESS:  Oh, I'm sorry.
3    BY MR. KULIS:
4        Q.  Do you recall if you -- were you ever
5    notified by the Berwyn Police Department that Mr. Reyes
6    had filed a -- a -- a citizen's complaint against you,
7    an internal complaint?                  0:41:02
8        A.  I think he said he was going to file one.
9        Q.  Okay.  And did you ever learn that he did?   0:41:08
10       A.  I never heard anything after that.
11       Q.  Okay.  So if he did, your department never
12   informed you of such?                  0:41:16
13       A.  They -- they would've.
14       Q.  But did they?
15       A.  I can't recall.  I mean, I --
16       Q.  Okay.  If you don't recall, you don't recall.   0:41:26
17       A.  I -- I can't recall.
18       Q.  Did you ever have to respond to any type of
19   complaint?
20       A.  No.
21       Q.  Were you disciplined at all?           0:41:35
22       A.  They talked to me.
23       Q.  Who talked to you?
24       A.  I think my unit commander.           0:41:41
25       Q.  Okay.  And what did he say to you?

## Page 43

1        A.  After all -- everything, after the fact, he
2    says, you know, we found out that he could video record
3    and -- on a public -- public place and that you can be
4    video recorded because you're a public servant.      0:41:57
5        Q.  Okay.
6        A.  Said okay.
7        Q.  But did anybody question you regarding why
8    you put your hands on him?               0:42:02
9        A.  No.
10       Q.  All right.  Do you recall putting your hands
11   on him?
12       A.  I -- I -- I think I may have.  I'm not -- I
13   -- not for sure, but I think I may have.         0:42:20
14       Q.  Because you were upset that he was filming?
15       A.  Because he was getting, like, close to me.  I
16   mean.                            0:42:27
17       Q.  Okay.
18           MR. KULIS:  Anything else?
19   BY MR. KULIS:
20       Q.  The only thing I will -- oh, well, I -- I'm
21   going to ask you these questions briefly.  How much did
22   you make as a police officer for -- in 2021?
23   Approximately.                      0:42:47
24       A.  Oh.  Ninety-one.
25       Q.  Okay.

## Page 44

1        A.  I mean.
2        Q.  And what'd you make in '22?           0:42:53
3        A.  Ninety-three.
4        Q.  Okay.  2023?
5        A.  Ninety -- a hundred and three.         0:43:06
6        Q.  Okay.
7        A.  I mean, I -- I -- you know --
8        Q.  And --
9        A.  -- I don't know exactly.  I mean --       0:43:09
10       Q.  No, I -- I -- I -- yeah.  I don't think
11   anyone knows exactly what they make each year, but --
12       A.  I mean, because we had a contract --
13       Q.  Yeah.
14       A.  -- you know, so.
15       Q.  You -- do you -- outside of being a -- a --
16   employed as a police officer for Berwyn, do you have
17   any other outside employment?              0:43:22
18       A.  No.
19       Q.  Do you own any businesses?
20       A.  No.
21       Q.  Other than your home, do you own any assets
22   that exceed, say, $5,000?                0:43:29
23       A.  My car.
24       Q.  Other than your car.
25       A.  No.

11 (Pages 41 to 44)

Page 45

1      Q.  And other than -- do you know how much you
2   have in your pension fund?                0:43:34
3      A.  I don't know.  I mean, they take money out of
4   our check for the pension, and I mean, I -- you know, I
5   don't have a number.
6      Q.  Do you have any other, like, stock accounts,
7   bank --                                   0:43:45
8      A.  No.
9      Q.  -- accounts?  Okay.
10      A.  I mean, I have a small savings account, but
11   --
12      Q.  Yeah.
13      A.  -- there's nothing.             0:43:54
14      Q.  Well, nothing substantial in there?
15      A.  No.
16      Q.  Okay.  I -- something else is here.  The only
17   thing I will -- again, since we don't seem to have that
18   -- that one report that you're speaking of, subject to
19   that, I think I'm done.                  0:44:10
20      But there's a possibility, and I'd say a
21   possibility, that you may be called back.  Because if
22   we haven't been tendered that report, then you may have
23   to come back to answer some questions regarding that
24   report.                                  0:44:20
25      A.  Okay.

Page 46

1      Q.  Okay?  So --
2      A.  I don't have a problem with --
3      Q.  -- subject to that --
4      A.  -- that.
5      Q.  -- I don't have any other questions.     0:44:24
6      MS. GRANDFIELD:  Okay.
7      THE WITNESS:  Okay.
8      MS. GRANDFIELD:  And I would just say I'll --
9   I'll look for it.  We'll get it for you.  And if there
10   is a way that you have questions and maybe you want to
11   ask him in writing just --               0:44:32
12      THE WITNESS:  Do I need --
13      MS. GRANDFIELD:  -- because it's easier --
14      THE WITNESS:  -- this now?
15      MR. KULIS:  It goes to him.         0:44:33
16      MS. GRANDFIELD:  -- I'm happy to do that as
17   well.  But we'll -- we'll look at it and see.
18      MR. KULIS:  And signature?         0:44:38
19      MS. GRANDFIELD:  Oh.  That's right.
20   So you heard the spiel already twice.
21      THE WITNESS:  Yes.
22      MS. GRANDFIELD:  Do you want to waive or
23   reserve signature?                      0:44:45
24      THE WITNESS:  I'll -- I'll waive.  I --
25      MS. GRANDFIELD:  Okay.

Page 47

1      THE RECORDER:  All right.  Going off the
2   record, 1:46 p.m.
3      (Off the record.)

Page 48

1      CERTIFICATION
2      I, Matthew D. Schulte, do hereby certify that
3   the foregoing transcript of said deposition is a true,
4   complete and correct report of the entire testimony so
5   given by said witness, together with such other matters
6   and things as counsel for the parties present at the
7   taking of said deposition desire to have appear of
8   record.
9      I further certify that on April 9, 2024 said
10   witness, ROBERT DANIEL MONACO was first duly sworn to
11   testify to the truth, the whole truth and nothing but
12   the truth in the cause aforesaid; that the testimony
13   then was recorded by audio/visual recording device, by
14   me in the presence of said witness and thereafter
15   transcribed into typewriting under my direction and
16   control.
17      I further certify that I am not counsel for,
18   nor attorney for any of the parties to the aforesaid
19   cause, nor am I related to any of the parties to the
20   aforesaid cause, nor am I interested in any manner in
21   the said cause or in its outcome.
22
23      I further certify that the signature to the
24   foregoing deposition was waived by the witness.
25

# Exhibit 4

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SEAN PAUL REYES, | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 22 CV 7339** |
| v. | ) | |
| | ) | |
| RICHARD VOLANTI, et al. | ) | |
| | ) | |

## DEFENDANT GHILONI'S ANSWER TO INTERROGATORIES

1. State your full name, work address, positions you held, your date of birth and approximate height and weight on November 8, 2021.

**ANSWER:  Officer Ghiloni states that he is a member of Berwyn Police Department and can be contacted via counsel in this cause.  He objects to providing his date of birth and approximate height and weight as an unwarranted invasion of privacy and on grounds of relevance.**

2. State the full name and address of each person who witnessed or claims to have witnessed any interaction between you and Sean Paul Reyes on November 8, 2021, at the Berwyn Police Station and City Hall.

**ANSWER:  Pursuant to Rule 33(d), Officer Ghiloni refers Plaintiff to the police report generated in this cause.**

3. State the name and address of each person who was not present but has knowledge or information of any interaction between you and Sean Paul Reyes on November 8, 2021.

**ANSWER: None.**

4. Please state the name(s), address(es) and contact information of each person you communicated with concerning the interaction between you and Sean Paul Reyes on November 8, 2021.

**ANSWER: Officer Ghiloni states that he did not communicate with anyone regarding his interaction with Mr. Reyes on November 8, 2021.**

5. Please identify precisely what you were doing and where you were located just prior to observing Sean Paul Reyes on November 8, 2021.

1

**ANSWER: Officer Ghiloni does not understand this question. He was called to City Hall. Officer Ghiloni refers the Plaintiff, again, to the police report pursuant to Rule 33(d).**

6. State your assigned duties on November 8, 2021, and the circumstances surrounding how, on November 8, 2021, you or any other Berwyn Police Officers were called to City Hall. Include the names of all the officers present at the scene, how you were notified to be there and by whom, including the names of any individuals who provided you with information regarding any suspicious activity at that location.

**ANSWER:  Officer Ghiloni again refers Plaintiff to the police report pursuant to Rule 33(d).**

7. State, with specificity, what criminal act(s), if any, you observed Sean Paul Reyes commit on November 8, 2021. For each act:
a. The specific actions which amounted to said alleged criminal act(s);
b. The location at which the act(s) was/were allegedly committed; and
c. Your specific location in relation to Sean Paul Reyes when you observed said act(s).

**ANSWER:  Pursuant to Rule 33(d), Officer Ghiloni refers Plaintiff to the police report, criminal court case file and the criminal complaint filed against him. Officer Ghiloni further states that Plaintiff was trespassing and engaging in disorderly conduct in that he was being disruptive, going into areas not open to the public, and not leaving or stopping his camera even when asked to do so. Officer Ghiloni further notes that the people that Reyes was continuing to film despite their alarm and upset – which took them from their daily duties were regular line office workers – so, putting the legality to the side, this was deplorable behavior that Mr. Reyes was engaging in for absolutely no other purpose than the sake of his own profit in posting to social media.**

8. State the nature of any conversation you had with Sean Paul Reyes on November 8, 2021, and state:
a. Who initiated the conversation;
b. Where and when the conversation took place; and
c. The names, addresses, and phone numbers of any individuals, including officers and civilians, present during the conversation.

**ANSWER: Officer Ghiloni responded to a call for service along with Sgt. Volanti and Detective Monaco. He arrived as the incident was already in**

**progress in a backup capacity and does not independently recall minor details that were inconsequential to his role at the scene.**

9. Did you write any reports and/or statements regarding your encounter with Brian Bianco on November 8, 2021? If so, name and/or describe each report and/or statements you wrote, when you wrote it, and who is now in possession of said report(s).

**ANSWER: Officer Ghiloni presumes that Plaintiff intends to reference Mr. Reyes. Officer Ghiloni again refers the Plaintiff to the police report pursuant to Federal Rule of Civil Procedure 33(d).**

10. Did you give any statements, oral/written/recorded, regarding your involvement in the incident which occurred on November 8, 2021? If so, please identify when and where the statement was given/taken, the identities of all the individuals present when the statement was given/taken, and the identity of the custodian of such statement(s).

**ANSWER:** No

11. State what actions you took or attempts you made to arrest Sean Paul Reyes on November 8, 2021.

**ANSWER: Officer Ghiloni refers the Plaintiff to the police report pursuant to Federal Rule of Civil Procedure 33(d).**

12. Were you ever employed with any other law enforcement agency other than the Berwyn Police Department? If so, state: a. The name of the law enforcement agency; b. The dates of your employment with said agency; c. Whether any citizen complaint was ever filed against you, the date the complaint was filed, the name of the complainant and the circumstances and disposition of the complaint and/or investigation; and d. Whether any law or drug enforcement agency complaint or investigation was filed or opened against you, the name of the complainant and the circumstances and disposition of the complaint and/or investigation.

**ANSWER: Chicago Police Department June 2015- Aug 2019**
No citizen/Law enforcement complaints
**Drug Enforcement Administration March 2019- March 2020**
No citizen/law enforcement complaints
**Secretary of State Police: Sept 2020-Nov 2020**
No citizen/law enforcement complaints
**Cook County State's Attorney's Office Investigations Bureau: Nov 2020-Aug 2021**

No citizen/law enforcement complaints
**Berwyn Police Department: Aug 2021-Present**
No citizen/law enforcement complaints

13. Have you ever been disciplined as a police officer or as a municipal employee? If so, state the nature of the charge against you, the date the charge was filed, the date upon which you were disciplined, and the nature of any such disciplinary action.

**ANSWER: Officer Ghiloni objects to this request as not being limited in time or scope. Nevertheless and without waiving said objection, Officer Ghiloni states that he has not been disciplined in the five years preceding the November 8, 2021 incident.**

14. Have you ever been the subject of an investigation by any other agency besides the Berwyn Police Department? If so, please state the name of the law enforcement agency and officers involved in the investigation, the date of the investigation(s), the status and result/disposition of each investigation, what documents are in your possession concerning said investigation(s), and whether you were represented by an attorney or other representative during said investigation(s).

**ANSWER: No.**

15. Has a verbal or written citizen complaint ever been filed against you with the Berwyn Police Department or Berwyn City Government or any other disciplinary body governing the Berwyn Police Department? If so, state the date the complaint was filed, the name of the complainant, and the circumstances and disposition of the complaint and/or investigation.

**ANSWER: Officer Ghiloni states that Plaintiff filed a complaint in relation to this incident. Other than that, Officer Ghiloni states he has no knowledge of any other complaints filed against him by any other person.**

16. Have you ever been a defendant in a civil or criminal case prior to this litigation? If so, please state the case number, the name of the case, the status of the case, and year filed.

**ANSWER: No**

17. Did you make any postings or contributions via any identity or virtual presence on the internet under your own name or any pseudonym or alias, such as an e-mail account or on a blog or on YouTube or on a social networking site including, but not limited to, "Facebook," "Instagram," "MySpace," "Twitter," "LinkedIn," "SnapChat," or "Parler," related in any way to your actions associated with the incident

complained of in Plaintiff's complaint on November 8, 2021? If yes, explain in detail each and every posting or other contribution, including the specific website and/or account identification, the nature of the posting/contribution and whether the posting/contribution included a photograph or video. **Furthermore, you are requested pursuant to Federal Rule of Civil Procedure 34 not to alter, amend, delete, or destroy any electronically-stored data currently or previously stored thereon, including for example, metadata.**

**ANSWER: No.**

18. Have you ever been arrested? If yes, without referring to any documents, state for each arrest: a. the date and time you were arrested;
b. identify the law enforcement agency and officers who arrested you;
c. identify the charge(s) filed or cited against you;
d. identify the judicial jurisdiction in which the arrest occurred;
e. state whether you pleaded guilty or not guilty;
f. if the arrest resulted in a judicial, administrative, or regulatory disposition, state:
i. the Court, or administrative or regulatory agency;
ii. the judge, or administrative or regulatory hearing officer;
iii. the charges; and
iv. the disposition of those charges.

**ANSWER: Officer Ghiloni objects to the relevance, admissibility and scope of this question. Nonetheless and without waiving said objection, Officer Ghiloni states no.**

19. In chronological order, identify each occupation or job you've had within the last 10 years and with respect to each employer, state:
a. The name and address of each employer;
b. The date of commencement and termination of each such employment;
c. The positions you held in each such employment;
d. the weekly average wages or earnings in such employment;
e. a general description of your job duties when you began and any subsequent changes in the job for each such employment;
f. whether a physical examination was required prior to employment, and if so, the place, date and person giving such examination; and
g. the name of your immediate foreman, supervisor, or superior at each such place of employment.

**ANSWER: Officer Ghiloni states that he has been employed with the City of Berwyn Police Department. He has held the following positions in the police department in the past 10 years:**
**Booking Officer: June 2020 – Sept 2020**
**Police Officer: August 2021-Present**

5

20. Have you ever seen or met Sean Paul Reyes before November 8, 2021? If so, state:
a. The date of each meeting;
b. What physical contact, if any, you had;
c. What verbal contact, if any, you had;
d. Where you saw or met him.

**ANSWER: No.**

Respectfully submitted,

By: */s/ Cynthia S. Grandfield*

Cynthia S. Grandfield (ARDC No. 6277559)
Sean M. Sullivan
DEL GALDO LAW GROUP, LLC
111 N. Wabash, Suite 908
Chicago, Illinois 60602
(312) 222-7000 (t)
grandfield@dlglawgroup.com
sullivan@dlglawgroup.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SEAN PAUL REYES,                    )
Plaintiff,                          )
                                    )          Case No. 22 CV 7339
v.                                  )
                                    )
RICHARD VOLANTI, et al.             )
                                    )

## CERTIFICATION

I, Charles Ghiloni, do hereby certify, pursuant to Fed. R. Civ. P. 33(b), that the answers provided to Plaintiff's interrogatories are true and correct to the best of my knowledge.

_____ #245

Officer Charles Ghiloni

# Exhibit 5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SEAN PAUL REYES,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 22 CV 7339** |
| **v.** | ) | |
| | ) | |
| **RICHARD VOLANTI, et al.** | ) | |
| | ) | |

**DEFENDANT RUTH SIABA GREEN'S ANSWER TO INTERROGATORIES**

1. State your full name, work address, positions you held, your date of birth and approximate height and weight on November 8, 2021.

**ANSWER: Ruth Siaba Green states that she is the City Administrator and can be contacted via counsel in this cause. She objects to providing her date of birth and approximate height and weight as an unwarranted invasion of privacy and on grounds of relevance.**

2. State the full name and address of each person who witnessed or claims to have witnessed any interaction between you and Sean Paul Reyes on November 8, 2021, at the Berwyn Police Station and City Hall.

**ANSWER: Pursuant to Rule 33(d), Ruth Siaba Green refers Plaintiff to the police report generated in this cause.**

3. State the name and address of each person who was not present but has knowledge or information of any interaction between you and Sean Paul Reyes on November 8, 2021.

**ANSWER: None.**

4. Please state the name(s), address(es) and contact information of each person you communicated with concerning the interaction between you and Sean Paul Reyes on November 8, 2021.

**ANSWER: Ruth Siaba Green states that she communicated with the following individuals regarding her interaction with Mr. Reyes on November 8, 2021: Mayor Robert Lovero, City of Berwyn's Legal Counsel, law enforcement who prepared the police report, and the Cook County State's Attorney's Office.**

1

5. Please identify precisely what you were doing and where you were located just prior to observing Sean Paul Reyes on November 8, 2021.

**ANSWER: I was in my office with my administrative assistant Tricia Powers and Detective Robert Monaco conducting City business. Ruth Siaba Green further refers the Plaintiff, again, to the police report pursuant to Rule 33(d).**

6. State your assigned duties on November 8, 2021, and the circumstances surrounding how, on November 8, 2021, you or any other Berwyn Police Officers were called to City Hall. Include the names of all the officers present at the scene, how you were notified to be there and by whom, including the names of any individuals who provided you with information regarding any suspicious activity at that location.

**ANSWER: Ruth Siaba Green states that she is not a police officer and assumes this interrogatory is not directed at her.**

7. State, with specificity, what criminal act(s), if any, you observed Sean Paul Reyes commit on November 8, 2021. For each act:
a. The specific actions which amounted to said alleged criminal act(s);
b. The location at which the act(s) was/were allegedly committed; and
c. Your specific location in relation to Sean Paul Reyes when you observed said act(s).

**ANSWER: Pursuant to Rule 33(d), Ruth Siaba Green refers Plaintiff to the police report, criminal court case file and the criminal complaint filed against him. Ruth Siaba Green further states that Plaintiff was trespassing and engaging in disorderly conduct in that he was being disruptive, going into areas not open to the public, and not leaving or stopping his camera even when asked to do so. Ruth Siaba Green further notes that the people that Reyes was continuing to film despite their alarm and upset – which took them away from their daily duties as regular line office workers – so, putting the legality to the side, this was deplorable behavior that Mr. Reyes was engaging in for absolutely no other purpose than the sake of his own profit in posting to social media.**

8. State the nature of any conversation you had with Sean Paul Reyes on November 8, 2021, and state:
a. Who initiated the conversation;
b. Where and when the conversation took place; and
c. The names, addresses, and phone numbers of any individuals, including officers and civilians, present during the conversation.

2

**ANSWER: I was in my office with my administrative assistant Tricia Powers and Detective Robert Monaco conducting City business when I observed a person filming in the 2nd floor hallway of City Hall outside of my office.  (Contact information for these two individuals can be found within the Police Report.)  I had just received a call from a concerned employee on the first floor informing them that a person who was not conducting City business or identifying themselves to staff was filming within City Hall.  I approached the individual filming and asked if I could be of assistance.  They informed me that they were filming in a public space as was their right.  I asked them to stop filming as per a sign on our front door indicated that filming individuals without their permission was not allowed within City Hall.  Detective Monaco then began addressing the person filming, and I believe that he called for assistance to address the issue from the Berwyn Police Department.**

9. Did you write any reports and/or statements regarding your encounter with Brian Bianco on November 8, 2021? If so, name and/or describe each report and/or statements you wrote, when you wrote it, and who is now in possession of said report(s).

**ANSWER: Ruth Siaba Green presumes that Plaintiff intends to reference Mr. Reyes.  Ruth Siaba Green again refers the Plaintiff to the police report pursuant to Federal Rule of Civil Procedure 33(d).**

10. Did you give any statements, oral/written/recorded, regarding your involvement in the incident which occurred on November 8, 2021? If so, please identify when and where the statement was given/taken, the identities of all the individuals present when the statement was given/taken, and the identity of the custodian of such statement(s).

**ANSWER: I gave my statement only to the police officer writing the police report regarding the incident, the City's legal counsel,  and members of the Cook County State's Attorney's Office.**

11. State what actions you took or attempts you made to arrest Sean Paul Reyes on November 8, 2021.

**ANSWER:  Ruth Siaba Green is not a police officer.  She presumes that this interrogatory is only directed to the police officers in this cause.**

12. Were you ever employed with any other law enforcement agency other than the Berwyn Police Department? If so, state: a. The name of the law enforcement agency; b. The dates of your employment with said agency;

3

c. Whether any citizen complaint was ever filed against you, the date the complaint was filed, the name of the complainant and the circumstances and disposition of the complaint and/or investigation; and

d. Whether any law or drug enforcement agency complaint or investigation was filed or opened against you, the name of the complainant and the circumstances and disposition of the complaint and/or investigation.

**ANSWER: Ruth Siaba Green again states that she is not a police officer.**

13. Have you ever been disciplined as a police officer or as a municipal employee? If so, state the nature of the charge against you, the date the charge was filed, the date upon which you were disciplined, and the nature of any such disciplinary action.

**ANSWER: Ruth Siaba Green objects to this request as not being limited in time or scope. Nevertheless and without waiving said objection, Ruth Siaba Green states that she has not been disciplined in the five years preceding the November 8, 2021 incident.**

14. Have you ever been the subject of an investigation by any other agency besides the Berwyn Police Department? If so, please state the name of the law enforcement agency and officers involved in the investigation, the date of the investigation(s), the status and result/disposition of each investigation, what documents are in your possession concerning said investigation(s), and whether you were represented by an attorney or other representative during said investigation(s).

**ANSWER: Ruth Siaba Green again states that she is not a police officer.**

15. Has a verbal or written citizen complaint ever been filed against you with the Berwyn Police Department or Berwyn City Government or any other disciplinary body governing the Berwyn Police Department? If so, state the date the complaint was filed, the name of the complainant, and the circumstances and disposition of the complaint and/or investigation.

**ANSWER: Ruth Siaba Green states that she is not a police officer. With respect to a citizen complaint Ruth Siaba Green states that she has never had a complaint filed against her during her 14 years with the City of Berwyn.**

16. Have you ever been a defendant in a civil or criminal case prior to this litigation? If so, please state the case number, the name of the case, the status of the case, and year filed.

**ANSWER: No.**

4

17. Did you make any postings or contributions via any identity or virtual presence on the internet under your own name or any pseudonym or alias, such as an e-mail account or on a blog or on YouTube or on a social networking site including, but not limited to, "Facebook," "Instagram," "MySpace," "Twitter," "LinkedIn," "SnapChat," or "Parler," related in any way to your actions associated with the incident complained of in Plaintiff's complaint on November 8, 2021? If yes, explain in detail each and every posting or other contribution, including the specific website and/or account identification, the nature of the posting/contribution and whether the posting/contribution included a photograph or video. **Furthermore, you are requested pursuant to Federal Rule of Civil Procedure 34 not to alter, amend, delete, or destroy any electronically-stored data currently or previously stored thereon, including for example, metadata.**

**ANSWER:   No.**

18. Have you ever been arrested? If yes, without referring to any documents, state for each arrest: a. the date and time you were arrested;
b. identify the law enforcement agency and officers who arrested you;
c. identify the charge(s) filed or cited against you;
d. identify the judicial jurisdiction in which the arrest occurred;
e. state whether you pleaded guilty or not guilty;
f. if the arrest resulted in a judicial, administrative, or regulatory disposition, state:
i. the Court, or administrative or regulatory agency;
ii. the judge, or administrative or regulatory hearing officer;
iii. the charges; and
iv. the disposition of those charges.

**ANSWER: Ruth Siaba Green objects to the relevance, admissibility and scope of this question.  Nonetheless and without waiving said objection, Ruth Siaba Green states no.**

19. In chronological order, identify each occupation or job you've had within the last 10 years and with respect to each employer, state:
a. The name and address of each employer;
b. The date of commencement and termination of each such employment;
c. The positions you held in each such employment;
d. the weekly average wages or earnings in such employment;
e. a general description of your job duties when you began and any subsequent changes in the job for each such employment;
f. whether a physical examination was required prior to employment, and if so, the place, date and person giving such examination; and
g. the name of your immediate foreman, supervisor, or superior at each such place of employment.

**ANSWER: Ruth Siaba Green states that she has been employed with the City of Berwyn as its City Administrator. She has held the following positions in the City in the past 10 years: Assistant City Administrator, then City Administrator. Ruth Siaba Green declines to provide her wages and earnings on grounds of relevance. She states the same with respect to whether a "physical examination" was requirement. This again appears to be geared towards police officers.**

20. Have you ever seen or met Sean Paul Reyes before November 8, 2021? If so, state:
a. The date of each meeting;
b. What physical contact, if any, you had;
c. What verbal contact, if any, you had;
d. Where you saw or met him.

**ANSWER: No.**

Respectfully submitted,

By: */s/ Cynthia S. Grandfield*

Cynthia S. Grandfield (ARDC No. 6277559)
Sean M. Sullivan
DEL GALDO LAW GROUP, LLC
111 N. Wabash, Suite 908
Chicago, Illinois 60602
(312) 222-7000 (t)
grandfield@dlglawgroup.com
sullivan@dlglawgroup.com

6

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SEAN PAUL REYES,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 22 CV 7339** |
| **v.** | ) | |
| | ) | |
| **RICHARD VOLANTI, et al.** | ) | |
| | ) | |

## <u>CERTIFICATION</u>

    I, Ruth Siaba Green, do hereby certify, pursuant to Fed. R. Civ. P. 33(b), that the answers provided to Plaintiff's interrogatories are true and correct to the best of my knowledge.

_____
Ruth Siaba Green

# Exhibit 6

www.InDemandReporting.com                    (773) 239-6008

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
-------------------------------------------------------
Sean Paul Reyes,

           Plaintiff,

      vs.            Case Number 1:22-cv-07339

Richard Volanti, Detective Monaco,
Officer Ghiloni, and Ruth Siaba
Individually, the City of Berwyn,
a Municipal Corporation,

           Defendants.
-------------------------------------------------------
Deposition of Robert Ruth Elena Siaba Green
Tuesday
April 9, 2024
-at-
Gregory E. Kulis and Associates, Ltd.
134 North LaSalle Street
Suite 444
Chicago, Illinois 60602

## Page 2

```
 1            APPEARANCES
 2
 3    For the Plaintiff:
 4
 5       Gregory E. Kulis
 6    Gregory E. Kulis and Associates, Ltd.
 7       134 North LaSalle Street
 8            Suite 444
 9       Chicago, Illinois 60602
10
11    For the Defendants:
12
13       Cynthia Grandfield
14    Del Galdo Law Group, LLC
15       1441 South Harlem Avenue
16       Berwyn, Illinois 60402
17
18    Also present:
19
20       Sean Paul Reyes
21       Richard Volanti
22       Robert Monaco
23
24
25
```

## Page 3

```
 1         EXAMINATION INDEX
 2
 3    DIRECT    CROSS    REDIRECT    RECROSS
 4    5          --        --          --
 5
 6         EXHIBIT INDEX
 7
 8    EXHIBIT            PAGE NUMBER
 9    1 -                   40
10    2 -                   41
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1       THE RECORDER:  Good morning.  We are now on
 2    the record on Tuesday, April 9th, 2024.  The time is
 3    10:28 a.m.  We are located at Gregory E. Kulis and
 4    Associates, Ltd., 134 North LaSalle Street, Suite 444,
 5    Chicago, Illinois 60602, for a video-recorded
 6    deposition in the matter of Sean Paul Reyes v. Richard
 7    Volanti, et al., Case No. 1:22-CV-07339, in the United
 8    States District Court for the Northern District of
 9    Illinois, Eastern Division.          0:00:29
10       This deposition is being recorded by In
11    Demand Court Reporting, located at 216 South Jefferson
12    Street, Chicago, Illinois 60661, on behalf of the
13    Plaintiff and being taken at the instance of the
14    Plaintiff.  The witness today is Ruth Elena Siaba
15    Green.                    0:00:46
16       Ms. Siaba Green, my name is Matthew Schulte.
17    I'm a notary public and the video recording device
18    operator for this deposition.  At this time, would --
19    would you please raise your right hand for the oath?    0:00:55
20          (Witness sworn.)
21       THE RECORDER:  Thank you.
22       Would the attorneys please state their
23    appearances for the record?         0:01:04
24       MR. KULIS:  Gregory Kulis, K-U-L-I-S, for the
25    Plaintiff.
```

1 (Pages 1 to 4)

www.InDemandReporting.com                    (773) 239-6008

## Page 5

1      MR. GRANDFIELD:  Cynthia Grandfield for the
2  Defendant, G-R-A-N-D-F-I-E-L-D.          0:01:12
3      THE RECORDER:  And also present we have
4  Plaintiff, Sean Paul Reyes, and Co-Defendants Richard
5  Volanti and Robert Monaco.  That completes the required
6  information, and we can proceed.         0:01:20
7      MR. KULIS:  Yeah.
8            DIRECT EXAMINATION
9  BY MR. KULIS:
10     **Q.  Ms. Green, good morning.**
11     A.  Good morning.              0:01:22
12     **Q.  My name is Gregory Kulis.  I won't go through**
13 **the -- I won't list the case name the reporter has done**
14 **that.  Let me go over a few ground rules so you and I**
15 **are on the same page.**          0:01:30
16     **This is my opportunity as Plaintiff's**
17 **attorney to ask you some questions regarding some**
18 **allegations that my client has made against you and the**
19 **municipality.  I'm not here to trick you.  I'm not here**
20 **to corner you.**                0:01:41
21     **I just want to know your version of the**
22 **facts.  What occurred, what you did, what you saw, what**
23 **you heard.**
24     **Okay?**
25     A.  Sure.                      0:01:49

## Page 6

1      **Q.  If at any time I ask you a question you don't**
2  **understand or you want me to repeat, all you have to do**
3  **is say, Counsel, Greg, Mr. Kulis, whatever you want to**
4  **call me, I'm not sure what you mean, could you repeat**
5  **that or rephrase that.**
6      **Okay?**                       0:02:00
7      A.  Sure.  First question for you that I might
8  have.  What is the use of everyone's use of electronics
9  within this room and during this deposition --
10     **Q.  Can't record it.**          0:02:09
11     A.  Can't record.  Are people allowed to use
12 their cell phones for any reason?
13     **Q.  No.  While they can -- they can go on -- they**
14 **can text and communicate, but they can't record**
15 **anything.  We've --**              0:02:19
16     A.  Okay.
17     **Q.  -- got an official court reporter here,**
18 **taking down everything.**
19     A.  I just wanted to check the rules.    0:02:23
20     **Q.  Okay.**
21     A.  Thank you.
22     **Q.  No problem.  If I ask -- if I ask you a**
23 **question and you don't understand and you want me to**
24 **repeat, I'd be happy to do so.**      0:02:29
25     **All you have to do is tell me, Greg, Mr.**

## Page 7

1  **Kulis, whatever, you know, I'm not sure what you mean,**
2  **could you repeat that or rephrase that, and I'd be**
3  **happy to accommodate you.**
4      **Okay?**                       0:02:36
5      A.  Thank you.
6      **Q.  If at any time you -- I ask a question that**
7  **calls for a "yes" or "no" answer, you must voice your**
8  **answer "yes" or "no."  Because the court reporter**
9  **cannot take down a shrug of the shoulders, "uh-huh."**   0:02:45
10     **He has to hear "yes" or "no."**
11     **Okay?**
12     A.  Yes.
13     **Q.  As you become accustomed to my personality,**
14 **you're going to start anticipating my questions.  By**
15 **that, I mean as it's rolling off my tongue, you may**
16 **anticipate what I'm going to be asking.**   0:02:57
17     **But I want you to refrain from answering**
18 **until I've completed the question.  For three reasons.**
19 **One, you may anticipate the question incorrectly.**   0:03:03
20     **Two, may -- you may deprive your counsel of**
21 **raising objection.  And thirdly and most importantly,**
22 **our record has to be clean.  Question/answer,**
23 **question/answer.**                  0:03:12
24     **If we talk over each other, it causes chaos.**
25     **Okay?**

## Page 8

1      A.  Understood.
2      **Q.  If you need to -- excuse me.  If you need to**
3  **take a break, we can take a break at any time.  Need to**
4  **use the restroom.  Might get a little stuffy in here**
5  **because we have -- have, you know, a fair amount of**
6  **people.**                        0:03:25
7      **You want to use the restroom, take a break,**
8  **just stretch your legs or whatever, I'd be happy to**
9  **accommodate you.  All you have to do is ask me,**
10 **Counsel, can we take a break, and I'd be happy to --**
11 **would be happy to do so.**          0:03:36
12     **However, if there's a question outstanding,**
13 **you must answer that question first.  Then we can take**
14 **a break.**
15     **Okay?**
16     A.  Understood.                0:03:42
17     **Q.  Also, I don't know -- have you ever given a**
18 **deposition before?**
19     A.  I haven't.
20     **Q.  Okay.  This is matter in federal court.  So**
21 **in federal court, this is as if you were on the witness**
22 **stand.**                          0:03:55
23     **In state court, they have discovery**
24 **depositions.  But in federal court, this is as if**
25 **you're on the witness stand.  And the reason I'm**

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com                    (773) 239-6008

## Page 9

1  telling you that is once we start the deposition, you
2  cannot discuss your testimony with anyone.     0:04:07
3      It is like you're in the middle of a
4  courtroom.  And if we take a break, we could take a
5  break, but you cannot discuss your testimony.
6      Okay?     0:04:14
7      A.  Understood.
8      Q.  I'm -- I'm trying to think of what else.  I'm
9  a little fuzzy this morning.  I'll get into it.     0:04:24
10      Anyway, let me ask you this.  Are -- you are
11  being represented by Counsel.
12      Correct?
13      A.  Yes, I am.     0:04:27
14      Q.  Okay.  Let me ask you this.  What have you
15  reviewed, if anything, to prepare for this deposition?
16      A.  I think it's just been the police report, and
17  I think that's about it.     0:04:37
18      Q.  Okay.  And you have not given a deposition
19  before.
20      Correct?
21      A.  I have not.     0:04:42
22      Q.  Okay.  You'll get a -- you'll learn as we go.
23  And again, if there's any question, just tell me.  I
24  -- I'm not trying to trick you, not trying to corner
25  you.  I just want to know your version of the facts.     0:04:55

## Page 10

1      A.  Sure.
2      Q.  Okay?  First of all, I'm going to go through
3  a little background.  Where were you born?     0:05:01
4      A.  Rockford, Illinois.
5      Q.  And could you tell me your education --
6  education -- educational background?
7      A.  Sure.  I have a bachelor's in fine arts from
8  Columbia College and a master's from National Louis in
9  business administration.     0:05:16
10      Q.  And where's your master's from?
11      A.  National Louis University.
12      MR. GRANDFIELD:  What is Mr. Reyes doing with
13  his phone?     0:05:29
14      MR. KULIS:  He's texting.
15      MR. GRANDFIELD:  He seems to be texting
16  something every single time that my client answers the
17  question.     0:05:36
18      MR. KULIS:  He can text.  There's no
19  prohibition from anybody texting during a deposition.
20      MR. GRANDFIELD:  There is --     0:05:43
21      MR. KULIS:  So.
22      MR. GRANDFIELD:  -- a prohibition from him
23  posting something about this deposition --
24      MR. KULIS:  Okay.
25      MR. GRANDFIELD:  -- so --     0:05:47

## Page 11

1      MR. KULIS:  For the record.
2      MR. GRANDFIELD:  What are --
3      MR. KULIS:  Okay.
4      MR. GRANDFIELD:  -- you doing?
5      MR. REYES:  For the -- for the record, I'm
6  not posting anything about the deposition.     0:05:52
7      MR. KULIS:  Okay.  So he's not posting.
8  Because I text during depositions as well.  So he's not
9  posting.  He's been instructed not to post anything.     0:05:59
10      He's got a court order which is to adhere to.
11  And so he's going to adhere to that court order.
12      MR. GRANDFIELD:  Well, I would like for him,
13  if he's going to be present, to put his phone down.     0:06:09
14      MR. KULIS:  Well, he doesn't have to.  I'm
15  sorry, Cynthia.  He doesn't have to.
16      MR. GRANDFIELD:  I think that --     0:06:14
17      MR. KULIS:  Cynthia, you can do whatever
18  you'd like.  He does not have to.  I mean, I get bored.
19  I text.  I do -- you know --     0:06:23
20      MR. GRANDFIELD:  Well, he's here to be at
21  this deposition.  He drove presumably all this way to
22  be at this deposition, so I don't know what he needs to
23  be doing that involves this -- this.  And like I said,
24  given the circumstances, I normally wouldn't care.     0:06:39
25      But could you, please, just not be texting

## Page 12

1  every time there's a answer?
2      MR. REYES:  I'm going to use my phone, but I
3  mean -- I --     0:06:46
4      MR. KULIS:  Why don't you take a break for a
5  while?
6      MR. REYES:  Okay.
7      MR. KULIS:  And then you can go back on for a
8  while.  Okay?     0:06:50
9      MR. REYES:  Sure.  No --
10      MR. KULIS:  Thank you.
11      MR. REYES:  -- problem.
12      MR. KULIS:  I appreciate that.  I'm sure
13  Counsel does as well.     0:06:53
14      MR. REYES:  Yeah.  No problem.
15  BY MR. KULIS:
16      Q.  Well, first of all, do you go by Ms. Green?
17  Could I call you -- is that fine?     0:07:01
18      A.  That's perfectly fine.
19      Q.  Okay.  So back to the record.  Upon getting
20  your master's -- no, I'm sorry -- getting your master's
21  what year?     0:07:10
22      A.  Oh.  I'm not sure of the specific year.
23  Probably about four years ago.
24      Q.  Okay.  Why don't you give me your -- your
25  work background, your employment background.     0:07:20

3 (Pages 9 to 12)

## Page 13

1    A. Sure. I used to work for the Department of
2  Cultural Affairs in the City of Chicago. After there,
3  I worked for the City of Berwyn. I've been there for
4  about 14-1/2 years now.                    0:07:32
5    Q. And with the City of Berwyn, tell me what --
6  what you do -- when'd you start with them?
7    A. Fourteen and a half years ago.
8    Q. So, what -- so, 2019?
9    A. 2009.                                0:07:43
10   Q. 2009. I heard you say 19. 2009.
11   A. Correct.
12   Q. Okay. And what position did you start at?  0:07:48
13   A. I was an administrative assistant for the
14  city administrator at that time.
15   Q. How long did you do that?
16   A. Oh. A few years. And then I was the
17  administrative assistant for both city administrator
18  and the mayor. And then after that, I was the
19  assistant city administrator. And then I was the city
20  administrator.
21     So you can span that over the 14-1/2 years.  0:08:09
22   Q. Okay. And your current -- your current
23  position?
24   A. City administrator.
25   Q. And could you tell me what a city

## Page 14

1  administrator does in the City of Berwyn?      0:08:16
2    A. Sure. The city administrator works within
3  the department of the mayor. I -- it is a strawman
4  form of government. So he -- I would give the example
5  he's the CEO of the -- the company.
6      Him and all the alderman, they make the
7  decisions regarding the ordinances and the rules. My
8  job is to go ahead and put forth whatever the agenda
9  that's set forth by counsel and the mayor is. I work
10  all the different department heads to move forward
11  whatever those initiatives are.                0:08:46
12   Q. So you're like the grease -- you kind of
13  grease the wheels between everybody.
14   A. I am -- I communicate with all the different
15  department heads to move                        0:08:56
16   Q. Mm-hmm.
17   A. -- forward whatever projects need to be moved
18  forward. Correct.
19   Q. So tell me you do on a day-to-day -- and I
20  say -- and if you were not here, what would you be
21  doing?                                          0:09:04
22   A. I do everything from project management to
23  HR, insurance, customer service. Anything that you can
24  imagine, I probably do.
25   Q. Okay. Drawing your attention -- oh. Why do

## Page 15

1  I forget the dates of everything?              0:09:22
2    A. Sure.
3    Q. November 8th of 2021. You were a -- a -- the
4  administrator for the City of Berwyn.
5      Correct?                                  0:09:31
6    A. Correct.
7    Q. And what time do you start your day?
8    A. Usually 9 a.m.                          0:09:35
9    Q. And do you recall what day of the week that
10  was?
11   A. I do not.
12   Q. Okay. And prior to that date, did you -- did
13  you know Sean Paul Reyes?                      0:09:45
14   A. No.
15   Q. Okay. And how did you first become aware of
16  Sean Paul Reyes on that date?
17   A. On that day, when I got a phone call from
18  staff on the first floor. They were calling because
19  they were threatened. And they were concerned. And so
20  they brought it to my attention.              0:10:04
21   Q. And who made that call?
22   A. That call came to my administrative
23  assistant. I believe -- I'm not sure which -- which of
24  the clerks she received that from. It was --  0:10:13
25   Q. Okay.

## Page 16

1    A. -- from one of the first floor clerks.
2    Q. And they said they were threatened?        0:10:17
3    A. They felt threatened. Correct.
4    Q. And did -- did you get any -- any elaboration
5  on that?                                        0:10:24
6    A. Elaboration on what was happening was someone
7  was within City Hall, walking throughout the first
8  floor, filming. They were not seeking any City
9  services.                                       0:10:36
10     They found that out of the ordinary. Usually
11  when people come to City Hall, they seek City services.
12  And they informed me that this individual was not
13  seeking any City services, just walking through the
14  building, filming.                              0:10:48
15   Q. Okay. And approximately what time did that
16  call come in?
17   A. I don't recall at this moment.            0:10:57
18   Q. Do you know if it was morning or afternoon?
19   A. It was before my lunchtime, so I'm assuming
20  morning.                                        0:11:03
21   Q. Okay. And your office is on the second
22  floor?
23   A. Correct.
24   Q. Okay. And upon receiving that call, what did
25  you do?                                         0:11:11

Page 17

1   A.  I was doing business there in my office.
2   Actually, Detective Monaco was there, delivering
3   different information I needed for HR purposes that I
4   conduct.  And I was just in discussions regarding HR
5   issues.                                    0:11:27
6   Q.  Yeah.  Upon receiving the phone call, what
7   did you do?
8   A.  What did I do?  I concluded my conversation.
9   And then at that moment, Mr. Reyes was -- actually came
10  up to the second floor and was outside my office door.  0:11:43
11  Q.  Okay.  And what -- what's on the second floor
12  of City Hall?
13  A.  Second floor are offices of administration.
14  So you have the mayor's office, you have a conference
15  room, you the city attorney, my office and counsel
16  chambers, and IT is hidden away.            0:11:58
17  Q.  Okay.  And were you in your office when you
18  saw Mr. Reyes?
19  A.  I was.
20  Q.  Okay.  And what did you do when you saw Mr.
21  Reyes?                                     0:12:07
22  A.  I'm sorry.  Repeat --
23  Q.  What did --
24  A.  -- please?
25  Q.  -- you sure.  What did you do when you saw

Page 18

1   Mr. Reyes?                                 0:12:12
2   A.  I approached him to see if I could be of any
3   service, if there was anything I could assist with, as
4   I usually do with anyone who comes up to the second
5   floor without an appointment.              0:12:22
6   Q.  And what did you say to him; what'd he say to
7   you?
8   A.  I can't say specifically since this was over
9   two -- two and a half years ago.           0:12:31
10  Q.  Mm-hmm.
11  A.  But it would probably -- I probably went
12  about "Can I be of assistance?"  And then when he was
13  recording me, I said, "Please stop recording me."  0:12:42
14      And I think he said he was with a member of
15  the press.  I probably would've asked for credentials.
16  Because I deal with media also at -- within my job
17  duties.                                    0:12:56
18  Q.  So you said that he may have said he was a
19  member of the press, or he did say he was a member of
20  the press?
21  A.  I think he did.  I said -- like I mentioned,
22  this was over two years ago.  So.  A lot's happened
23  since then.                                0:13:09
24  Q.  Okay.  And when you approached Mr. Reyes,
25  this was outside your office?

Page 19

1   A.  I was within the door of my office.     0:13:19
2   Q.  Okay.  And where was -- you said Monaco --
3   Detective Monaco was with you?
4   A.  Correct.
5   Q.  And waw he in your office or was he outside
6   the --                                     0:13:26
7   A.  He was --
8   Q.  -- office?
9   A.  -- inside my office.
10      THE RECORDER:  If I could just ask you to
11  wait for the end of the question, and then maybe just a
12  beat after in case there's an objection.  Just so we
13  have one person speaking at a time.         0:13:36
14      THE WITNESS:  No problem.
15  BY MR. KULIS:
16  Q.  And upon you asking him what -- no, upon you
17  asking him to stop filming you, what occurred, if
18  anything?                                  0:13:46
19  A.  He stated -- I believe he stated that he
20  would continue recording, that he was with the press,
21  and he the right to record.  And that summarizes it.  0:14:00
22  Q.  Okay.  And at that point in time, did you
23  know that -- if he -- in fact he had a right to record?
24  A.  Not particularly, since I was in my own
25  private office.                            0:14:14

Page 20

1   Q.  Okay.
2   A.  So no.  We do --
3   Q.  Were you -- oh, go ahead --
4   A.  We did --
5   Q.  -- I'm sorry.                         0:14:19
6   A.  -- have signs within City Hall that stated
7   please do not record unless you ask permission.
8   Q.  Where were those signs?
9   A.  Those were located on the front door of City
10  Hall.  And I believe also on the Plexiglas near the
11  clerk's counters.                          0:14:36
12  Q.  And did it cite a -- a statute?
13  A.  I believe I did.  I'm not sure of that
14  statute number right now.                  0:14:42
15  Q.  Okay.  I can't -- I'm a lawyer, and I can't
16  refer to the statute number, so don't worry about it.
17      And did you ever learn if that statute was
18  held to be invalid?                        0:14:52
19      MR. GRANDFIELD:  If you -- if you know.
20      THE WITNESS:  Okay.
21      Sure.  After the fact, I learned.  Yes.  0:15:01
22  BY MR. KULIS:
23  Q.  And -- and who did you hear that from?
24  A.  My attorney.
25  Q.  Okay.                                 0:15:13

5 (Pages 17 to 20)

## Page 21

1     MR. GRANDFIELD:  Oh.
2     MR. KULIS:  I just assumed --
3     MR. GRANDFIELD:  Let's -- yeah, let's --
4  let's --
5     MR. KULIS:  That's okay.
6     MR. GRANDFIELD:  -- go ahead and --
7  BY MR. KULIS:
8     Q.  Well, I --
9     MR. GRANDFIELD:  -- strike that.        0:15:19
10 BY MR. KULIS:
11    Q.  -- I'm not asking you what was said.  So.
12    A.  It was after the fact.              0:15:24
13    Q.  Okay.  But yeah.  Why don't you tell me, who
14 -- who did -- who did you discuss this with?   0:15:31
15    A.  Who did I discuss?
16    Q.  The statute with.
17    A.  The statute with?                   0:15:35
18    Q.  Yeah.  I don't --
19    A.  With legal --
20    Q.  -- want to know what they said, but who'd you
21 --
22    A.  With legal counsel.                 0:15:38
23    Q.  Okay.  Well, who -- what legal counsel?  I'm
24 not asking who -- what you --
25    A.  A name?

## Page 22

1     Q.  -- discussed?  Yeah.               0:15:43
2     A.  Cynthia Grandfield.
3     Q.  Okay.  If I ask you about a conversation and
4  you had a conversation with your lawyer, just tell me
5  it was with my lawyer and you don't have to say what
6  the conversation entailed.               0:16:01
7     A.  Okay.
8     Q.  Okay?
9     MR. GRANDFIELD:  Yes.
10 BY MR. KULIS:
11    Q.  It's called attorney --            0:16:03
12    MR. GRANDFIELD:  I'm sorry --
13 BY MR. KULIS:
14    Q.  -- client --
15    MR. GRANDFIELD:  -- I didn't realize that was
16 happening.  The only --
17    MR. KULIS:  Well, I didn't either.
18    MR. GRANDFIELD:  -- way you found out.   0:16:06
19 BY MR. KULIS:
20    Q.  It's called attorney-client privilege.  Okay?
21 So.
22    Did you speak with Ms. Grandfield on that --
23 the day of the incident?                  0:16:15
24    A.  I did not.
25    Q.  Okay.  Who's the City attorney?

## Page 23

1     A.  Anthony Bertuca.                    0:16:27
2     Q.  How old is Mr. Bertuca?
3     A.  He's about to be 80.
4     Q.  Oh.  So it's the Anthony Bertuca I know.   0:16:40
5     A.  It is.  Must be.
6     MR. GRANDFIELD:  Yeah.  It is.
7  BY MR. KULIS:
8     Q.  So.  Oh, my God.  Wow.  Okay.  We're not
9  friends friends, but we know each other.   0:16:57
10    So after you -- Mr. Reyes said he was going
11 to continue to film, what occurred?
12    A.  That's when -- well, I asked, once again,
13 please do not record me.  And at that moment, I believe
14 Detective Monaco stepped in to assist.     0:17:14
15    Q.  And is Detective Monaco the gentleman sitting
16 next to you?
17    A.  He is.
18    Q.  Okay.  And was he in plainclothes or was he
19 in a uniform?                             0:17:25
20    A.  He was in plain detective clothes.
21    Q.  Okay.
22    A.  As is he is today.                  0:17:30
23    Q.  Okay.  Are those detective clothes?  No --
24    A.  It's --
25    Q.  I'm only joking.  I --

## Page 24

1     A.  Standard detective --
2     Q.  He was --
3     A.  -- they were --
4     Q.  -- he was wearing --               0:17:38
5     A.  They wear --
6     Q.  He wasn't wearing --
7     A.  -- a dress --
8     Q.  -- a uniform.
9     A.  -- shirt and they wear a tie.  That's --   0:17:40
10    Q.  Okay.
11    A.  -- the standard --
12    Q.  That's fine.
13    A.  -- there for the Berwyn Police Department,
14 yes.                                      0:17:44
15    Q.  And when Detective Monaco interceded, what,
16 if anything, occurred?
17    A.  I kept on doing my business, and I believe he
18 spoke with Mr. Reyes and took him downstairs.   0:18:01
19    Q.  Did you --
20    A.  I was not -- I didn't participate in anything
21 after that or hear of anything.
22    Q.  Okay.  Did --                       0:18:10
23    A.  After that.
24    Q.  -- you hear any of the -- I'm sorry.  Did you
25 hear any of the conversation between Mr. Reyes and Mr.

## Page 25

1    Monaco?                                    0:18:15
2      A. I did not.
3      Q. Okay. So you went back in your office. And
4    then they went on their merry way, wherever they went.    0:18:22
5      A. Correct.
6      Q. Okay. Did you see where they went?
7      A. They -- well, they down to the first floor.
8    That's the main staircase. To go down.        0:18:34
9      Q. And did anyone accompany Detective Monaco and
10   Mr. Reyes?
11     A. It was originally just Detective Monaco. I
12   don't know what happened when they were downstairs, as
13   I was not party to that.                        0:18:47
14     Q. I'm -- I'm going to jump ahead. When is the
15   next time you saw Mr. Reyes?
16     A. When he decided to have a press conference in
17   front of City Hall.                            0:18:58
18     Q. And when was that?
19     A. I believe it was the day after.
20     Q. Did you learn at any point on -- during that
21   day, did you learn what happened downstairs?    0:19:23
22     A. I heard a little bit. Yes.
23     Q. And who'd you hear it from?
24     A. Who did I hear it from. I think from the
25   mayor. He informed me. Other parties that were at

## Page 26

1    City Hall. Clerks downstairs on the first floor filled
2    me --                                          0:19:40
3      Q. And --
4      A. -- in on some --
5      Q. -- and the --
6      A. -- items.
7      Q. -- mayor's name?
8      A. Robert J. Lovero.                        0:19:44
9      Q. And was Mayor Lovero in his office that
10   morning?
11     A. Not at the time of the incident. No.      0:19:54
12     Q. Okay. So what did the mayor tell you about
13   what -- what occurred?
14     A. Basically that Mr. Reyes had been arrested
15   for disturbance. He'd been taken to the police
16   station. And that was about it.                0:20:10
17     Q. Did you have any discussion with anyone else?
18     A. Clerks probably who -- you know, who spoke to
19   me. I don't --                                0:20:19
20     Q. What --
21     A. -- remember anyone exactly.
22     Q. Okay.
23     A. I speak to everyone there at City Hall on a
24   daily basis.                                  0:20:26
25     Q. Did you -- you -- did you speak to Mr.

## Page 27

1    Bertuca on that day?
2      A. I think that morning he was out.
3      Q. Okay. Did you -- did -- you learned -- I'm
4    sorry. You learned that Mr. Reyes had been arrested.
5      Correct?                                    0:20:58
6      A. Yes.
7      Q. And did you know who arrested him at that
8    point?
9      A. I didn't know.                          0:21:02
10     Q. Okay. Were you asked to sign any type of
11   complaint against him?
12     A. I was.
13     Q. And when were you asked to sign a complaint?    0:21:11
14     A. I believe by the end of that day or the next
15   day. I don't recall exactly which day.
16     Q. So when you were asked to sign -- I'm sorry.
17   So at the point in time when you were asked to sign a
18   complaint, Mr. Reyes had already been arrested.
19     Correct?                                    0:21:36
20     A. Yes.
21     Q. Because he was --
22     A. To my --
23     Q. -- similarly --
24     A. -- to my knowledge.
25     Q. Yeah. To your knowledge.                  0:21:43

## Page 28

1      A. Yeah.
2      Q. Everything's to your knowledge. Okay? You
3    --
4      A. Yeah.
5      Q. -- can only tell me what's to your knowledge.    0:21:46
6      A. Yeah.
7      Q. So assuming that he was arrested at some
8    point that morning or that day.
9      Correct?                                    0:21:52
10     A. I would assume so.
11     Q. And then you were asked to sign a complaint
12   when?
13     A. I believe by the end of that day -- business
14   day.                                          0:21:58
15     Q. And who asked you to sign the complaint?
16     A. That would've been -- I believe it was
17   Volanti. Detective Volanti.                    0:22:08
18     Q. And what did Detective Volanti say to you
19   when you signed the complaint?
20     A. That the complaint was regarding the
21   disturbance there at City Hall that occurred, and if I
22   were to go ahead and sign off on it. And I agreed I
23   would.                                        0:22:23
24     Q. Did he ask you or tell you?
25     A. He asked.

7 (Pages 25 to 28)

## Page 29

1　Q.　Okay.  Describe the disturbance that you
2　claim occurred.　0:22:33
3　　A.　Disturbance.  As I mentioned before,
4　individual going through City Hall, not seeking any
5　City services, interrupting daily business just by
6　filming, making our clerks feel uncomfortable.　0:22:45
7　　　　And then when I asked him to stop filming, he
8　continued.  Never representing who he was, his name.
9　So that was the disturbance, just disruption and making
10　the employees there at City Hall feel uncomfortable and
11　threatened.　0:23:02
12　Q.　Which employees?
13　A.　On the first floor, the clerks.
14　Q.　Do you know the names of any of them?　0:23:05
15　A.　One of them was Shannon I know that called.
16　Q.　Shannon what?
17　A.　Shannon Reberski.  She works in the building
18　department.　0:23:13
19　Q.　And she felt uncomfortable?
20　A.　She did.  She did.  If --
21　Q.　Okay.
22　A.　-- you want, I can elaborate on that.　0:23:20
23　Q.　Sure.  Please.
24　A.　Sure.  About a month prior, she had -- well,
25　assisting residents.  They decided to film her.  And at

## Page 30

1　that time, they decided to post whatever was filmed.　0:23:32
2　　　　And then they cyberbullied her, attacking her
3　on social media.  Attacking her appearance, her
4　physique.  And it left her, you know, uncomfortable
5　with being filmed again.  So she was alarmed when
6　someone came in again.　0:23:52
7　Q.　That was not Mr. Reyes, though, that did
8　that.
9　　Right?
10　A.　That was not.  That was a different resident.　0:23:55
11　Q.　Did -- was that person arrested?
12　A.　That person was not arrested.  No.
13　Q.　Was that person --　0:24:03
14　A.　They were escorted out of City Hall.  Yes.
15　Q.　Okay.
16　A.　For disruption.
17　Q.　But not arrested.
18　　Correct?　0:24:09
19　A.　No.
20　Q.　Do you know the name of that person?
21　A.　I believe the last name was Dikter.　0:24:16
22　Q.　I'm sorry?
23　A.　Dikter.
24　Q.　D-I-C --
25　A.　D-I-K-T-E-R, I believe.

## Page 31

1　Q.　First name, do you know?　0:24:23
2　A.　I think it was Ian.  I'd never met him
3　personally.
4　Q.　And was he a resident of Berwyn?　0:24:29
5　A.　He was at that time, I believe.  I don't know
6　if he still is.
7　Q.　And he was not arrested for causing a
8　disturbance.
9　　Correct?　0:24:40
10　A.　No, because he complied and left right away
11　after --
12　Q.　He was not --
13　A.　-- he was asked to.　0:24:43
14　Q.　-- arrested.  But any type of harassment or
15　anything like that.
16　　Correct?
17　A.　He was escorted out because he was harassing
18　clerks.　0:24:50
19　Q.　Okay.
20　A.　Yes.
21　Q.　And what was he doing by harassing clerks?
22　A.　He was being -- he was bullying the clerk.
23　Being aggressive.  Vocally being aggressive.　0:25:04
24　Q.　Now, when you met Mr. Reyes, he was not being
25　verbally aggressive in any form or fashion, was he?

## Page 32

1　A.　No, he was not.
2　Q.　He didn't bully you, did he?　0:25:15
3　A.　No.  But when I asked for him to stop
4　filming, he kept on filming.
5　Q.　Which you learned he had a right to do.
6　　Correct?　0:25:26
7　　MR. GRANDFIELD:  Objection to the extent it
8　calls for a legal conclusion.  And --
9　BY MR. KULIS:
10　Q.　Forget the legal stuff.  It was your
11　understanding that he had a right to do that --　0:25:32
12　　MR. GRANDFIELD:  I'm --
13　BY MR. KULIS:
14　Q.　-- correct?
15　　MR. GRANDFIELD:  -- going to object again
16　because it calls for a legal conclusion and it does
17　call for attorney-client communication.　0:25:38
18　　MR. KULIS:  Okay.
19　BY MR. KULIS:
20　Q.　He didn't use any -- he didn't raise his
21　voice with you.
22　　Correct?
23　A.　No, he didn't.　0:25:46
24　Q.　Didn't swear at you?
25　A.　No, he didn't.

8 (Pages 29 to 32)

## Page 33

1    Q.  Did you ask him his name?
2    A.  I don't recall at this time.          0:25:55
3    Q.  Had -- prior to that date, had you ever
4  signed a criminal complaint against anyone?
5    A.  I have not.
6    Q.  Now, you indicated -- and you did not see Mr.
7  Reyes the rest of that day.
8    Correct?                               0:26:35
9    A.  I did not.
10   Q.  And you said the next time you saw him was
11 the following day?
12   A.  Outside of a window, but I've never seen him
13 again in person.  Until this day.        0:26:45
14   Q.  You said you saw him outside the window?
15   A.  Correct.  When they were doing the press
16 conference in front of City Hall.        0:26:51
17   Q.  And how did you learn about the press
18 conference?
19   A.  There was a big press conference and a lot of
20 people in front, making a lot of noise.  0:26:57
21   Q.  When you say a lot of people, what is --
22 approximately?
23   A.  There were at least 20 people probably.  0:27:04
24   Q.  And was there press there?
25   A.  I don't recall, because I wasn't out there.

## Page 34

1  I glanced out, and I decided to stay in.   0:27:16
2    Q.  But you recognized Mr. Reyes?
3    A.  Yes.
4    Q.  Did you hear anything he was saying?
5    A.  No.  I was inside on the second floor, and he
6  was outside of the building.  I couldn't have heard.  0:27:33
7    Q.  Did you talk to the mayor at all that day of
8  the press conference?
9    A.  I did.
10   Q.  Did you have any discussion with the mayor
11 regarding the press conference?            0:27:43
12   A.  Not really.  No.
13   Q.  Did you have any discussion with the mayor
14 regarding him taking down any signs?       0:27:53
15   A.  He informed us that he was going to be taking
16 down the sign.
17   Q.  So what did he tell you?
18   A.  That he decided to take down the sign.    0:28:01
19   Q.  Did he tell you why?
20   A.  No.
21   Q.  Did you ever ask him why?
22   A.  No.
23   Q.  Weren't you concerned because you had signed
24 a criminal complaint against Mr. Reyes for filming in a
25 --                                         0:28:13

## Page 35

1    A.  I did -- it was not for --
2    Q.  Let me finish --
3    A.  -- filming.  It was for -- I'm sorry.    0:28:16
4    Q.  Let me finish my question.  Please.
5    A.  Go ahead.
6    Q.  It's a -- it's a habit everybody gets into.  0:28:20
7    A.  No problem.  I'm sorry --
8    Q.  So.
9    A.  -- for interrupting.
10   Q.  No.  So you had signed a complaint against
11 him, Mr. Reyes.
12   Correct?                               0:28:27
13   A.  Correct.
14   Q.  And did you inquire of the mayor as to why he
15 was taking down the signs?
16   A.  Why he was taking down the signs?  Because he
17 wanted to make peace and take down the signs.  0:28:41
18   Q.  He wanted to make peace or he -- he -- did --
19 I'm sorry.  Did he tell you that he learned that that
20 statute was inapplicable?               0:28:56
21   A.  Not at that time, no.
22   Q.  Did he ever tell you that?
23   A.  After the fact.                    0:29:00
24   Q.  When?
25   A.  I have no idea.

## Page 36

1    Q.  Okay.  And so you glanced and you saw Mr.
2  Reyes having a press conference.  Did you have any
3  conversation with anyone else that day regarding the
4  press conference or what occurred outside?  0:29:14
5    A.  Within hours of that press conference, I
6  actually had to disconnect my phone as well as many --
7  as well as many other people upstairs because of the
8  inundation of his followers.  So.          0:29:31
9    Q.  Because of the what?
10   A.  Inundation of calls and contacts from his
11 followers to email, phone, social media.
12   Q.  Okay.  Did you go -- after the press
13 conference, did you ever go online to view anything
14 that Mr. Reyes published?                  0:29:51
15   A.  I did.
16   Q.  When?
17   A.  Probably the day of, after I started getting
18 all the calls.  And emails.                0:29:59
19   Q.  And what did you watch?
20   A.  What did I watch?
21   Q.  Or listen to?                       0:30:05
22   A.  I just listened to part of it.  In which he
23 stated he was at City Hall and was removed.
24   Q.  Which was accurate.
25   Correct?                               0:30:15

9 (Pages 33 to 36)

www.InDemandReporting.com                    (773) 239-6008

## Page 37

1    A.  Correct.  He was removed from City Hall.
2    Q.  He didn't say anything defamatory about you,
3  did he?                                    0:30:23
4    A.  He put my name out there multiple times.
5    Q.  Well, you're the one that signed a complaint
6  against him.
7      Right?                                 0:30:29
8      MR. GRANDFIELD:  I -- I'm just going to
9  object.  That is argumentative.  Is there really a --
10 BY MR. KULIS:
11   Q.  No, I'm --
12     MR. GRANDFIELD:  -- question?          0:30:32
13 BY MR. KULIS:
14   Q.  -- asking you.  But that's -- you -- that's a
15 fact.  Right?  You're the one that signed a complaint
16 against him.  Correct?                     0:30:36
17   A.  Yes.
18   Q.  Okay.  You were his accuser.
19     Correct?
20   A.  Yes.
21   Q.  And you -- you learned that when you sign a
22 criminal complaint against somebody, you're the
23 complaining witness.
24     Correct?                               0:30:57
25   A.  Correct.

## Page 38

1    Q.  And did you go to court?
2    A.  Yes.
3    Q.  How many times did you go to court?     0:31:03
4    A.  I entered a court -- a court.  But I never
5  made it to the courtroom.
6    Q.  Okay.  You -- did you go to court for his
7  case is what -- that's probably the better question.  0:31:14
8    A.  Yes.
9    Q.  And how many times did you go to court for
10 his case?
11   A.  Once.
12   Q.  Do you know what date that was?        0:31:23
13   A.  No.
14   Q.  Was that the date the case was dismissed?
15   A.  I believe so.  Yes.                    0:31:31
16   Q.  Did you become aware of the fact that Mr.
17 Reyes had an attorney?
18   A.  Yes.
19   Q.  Did you know the attorney?             0:31:46
20   A.  No.
21   Q.  Since this -- I'm sorry.  You said that there
22 were signs not only outside the building but within
23 City Hall.
24     Correct?                                0:32:13
25   A.  Correct.

## Page 39

1    Q.  Were those taken down?
2    A.  Yes, they were.
3    Q.  Did you learn why they were taken down?     0:32:19
4    A.  The same response as I gave you previously.
5    Q.  Do you know when they were taken down?
6    A.  At the same time as the signs outside.    0:32:30
7    Q.  The day of the press conference.
8      Correct?
9    A.  I believe so.
10   Q.  And who took them down?                0:32:36
11   A.  It would've been the mayor.
12   Q.  Subsequent to him taking down those signs,
13 did the mayor or anybody from Berwyn issue a -- a memo
14 to Berwyn employees regarding filming in City Hall?   0:32:55
15   A.  Regarding -- up to this date or when?
16   Q.  No.  At --
17   A.  Right at that --
18   Q.  Yeah.
19   A.  -- moment?                            0:33:03
20   Q.  That -- that moment or shortly thereafter.
21   A.  No, not at that moment.
22   Q.  Did -- was a memo ultimately issued
23 discussing the subject of filming within City Hall?   0:33:15
24   A.  No.  A memo wasn't.  But he spoke with the
25 personnel one on one.

## Page 40

1    Q.  When?
2    A.  Close to after the conference.  I'm not sure
3  the exact date.                            0:33:27
4    Q.  And were you present?
5    A.  No.
6    Q.  Did he speak to you?
7    A.  He spoke to me also.  Yes.            0:33:35
8    Q.  What did he tell you?
9    A.  That if someone were to come to City Hall and
10 they were to film, to ask them if they needed any
11 assistance.  And if they didn't, just to walk away and
12 do our own things.                         0:33:47
13   Q.  I'm going to show you what has -- excuse me.
14 I wanted you to staple these, but we'll staple them
15 afterwards.
16     I'm going to show you what is marked as Siaba
17 Green Exhibit 1 for identification.  Tendering a copy
18 to Counsel.
19     MR. GRANDFIELD:  Thank you.            0:34:51
20     (Exhibit No. 1 marked for identification.)
21 BY MR. KULIS:
22   Q.  Ms. Green, this is a document that is
23 approximately eight -- eight pages.  It is titled
24 Answer to the Complaint.
25     Have you seen this document?           0:35:06

10 (Pages 37 to 40)

## Page 41

1     A. Yes.

2     Q. And this is what purports to be you -- your

3 answer along with the answer of the other Defendants to

4 the allegations that we've made against you.

5     Correct?             0:35:19

6     A. Correct.

7     Q. And are you verifying that that -- those

8 answers are true and accurate?

9     A. Yes.            0:35:26

10     Q. Okay. I will show you what is marked as

11 Green Exhibit No. 2. Tendering a copy to Counsel.    0:36:00

12     (Exhibit No. 2 marked for identification.)

13 BY MR. KULIS:

14     Q. That is a document that again is

15 approximately six -- seven pages. If you turn to the

16 last page, which is the certification with a signature

17 line that says Ruth Siaba Green.

18     Do you recognize that signature?     0:36:23

19     A. That's my signature.

20     Q. You write your Gs similarly to me sometime.

21 Anyway. I don't know why I said that. But that --

22 that purports to be a certification that these answers

23 to interrogatories are true and accurate.     0:36:35

24     A. That's correct.

25     Q. Okay. And would I -- would it be fair to say

## Page 42

1 that you read over and prepared these answers with

2 Counsel?            0:36:42

3     A. Correct.

4     Q. And these answers are true and accurate.

5     Correct?

6     A. That's correct.        0:36:46

7     Q. Okay. In conjunction with the arrest of Mr.

8 Reyes, did you ever have to write any type of memos to

9 anyone in the -- in the City of Berwyn?     0:37:00

10     A. Regarding this? No.

11     Q. Okay. So you prepared no reports or no

12 memos.

13     A. Not regarding this --      0:37:05

14     Q. Okay.

15     A. -- no.

16     Q. Did you ever prepare any reports or memos

17 regarding filming in Berwyn City Hall?     0:37:15

18     A. No.

19     Q. Okay.

20     A. Wait. Do you -- I take that back. Because I

21 am in charge of commercial filming for the City of

22 Berwyn. And in part of that, sometimes we do have TV

23 crews come to City Hall and film TV shows.     0:37:30

24     So I'm in charge of that. That's one of my

25 responsibilities --

## Page 43

1     Q. Okay.

2     A. -- also, is dealing with that.     0:37:35

3     Q. Did -- oh, that's another thing I want to get

4 to. We're almost finished, but --

5     A. Sure.          0:37:39

6     Q. -- if I -- if I ask a question and you answer

7 it, and then later on you want to go back and say,

8 "Remember the answer you gave you? I want to amend it or

9 change it," feel free.

10     Okay?          0:37:49

11     A. Okay.

12     Q. It's not, like, you know, it's carved in

13 stone. You --

14     A. Sure.

15     Q. -- can go back.       0:37:52

16     A. No problem.

17     Q. And you told -- back -- I'm going to jump

18 around a little. Back when you -- Mr. Reyes was on the

19 second floor, you told him to stop filming?    0:38:16

20     A. Correct.

21     Q. Okay. Did you raise your voice?

22     A. No.

23     Q. Okay. You did not want to be filmed.

24     Correct?             0:38:23

25     A. I did not want to be filmed.

## Page 44

1     Q. Okay. Why is that?       0:38:26

2     A. Why is that?

3     Q. Yeah. Some people like to be filmed. I

4 don't know. Just asking.      0:38:30

5     A. I -- honestly, I just go to work and I like

6 to do my work.

7     Q. Okay.

8     A. And go home.       0:38:34

9     Q. Other than speaking to Detective Monaco and

10 then subsequently speaking to the mayor and Detective

11 Volanti, did you speak to anyone else that day -- oh,

12 and I -- oh, you also told me you spoke to a clerk?

13 About what had occurred?      0:39:11

14     A. Different clerks.

15     Q. Clerks.

16     A. Correct.

17     Q. Okay. Did you speak to anyone else?    0:39:15

18     A. My family.

19     Q. Okay. You -- I -- and again, I don't like to

20 get too much personal. Are you married?

21     A. I am married.      0:39:24

22     Q. And you're married to a -- an officer for

23 Berwyn?

24     A. Correct.

25     Q. Okay. Did you speak to him?     0:39:29

11 (Pages 41 to 44)

www.InDemandReporting.com                    (773) 239-6008

## Page 45

1    A.  He was out of town, so I called him on the
2    phone to let him know what happened.
3        Q.  Okay.  What'd you say to him; what'd he say
4    to you?                          0:39:35
5        A.  He just -- what did I say to him.  I
6    basically informed him that someone was at City Hall.
7    I signed off on -- you know, after the fact, after I
8    did sign off by the end of the day, that I signed off
9    on a complaint.                  0:39:52
10       I described the event that happened.  And I
11   was responsible for -- I have three children at the
12   house now.  At that time.  And so -- and he was out of
13   town.                            0:40:03
14       So I just wanted to give him the heads up on
15   what was happening.  He just told me to be vigilant.
16       Q.  Okay.  Did he tell -- did he give you any
17   information as to whether it was illegal or legal to
18   film in City Hall?               0:40:17
19       A.  No, he didn't.
20       Q.  Okay.  You indicated you went to court one
21   time.
22       Correct?                     0:40:36
23       A.  Correct.
24       Q.  But you didn't go into the courtroom.
25       Correct?

## Page 46

1        A.  Correct.                  0:40:40
2        Q.  And you learned that the case was disposed of
3    or dismissed that day?
4        A.  Correct.
5        Q.  Okay.  Did you have any reaction to that?   0:40:47
6        A.  Did I have any reaction to that?
7        Q.  Yeah.
8        A.  Not really.
9        Q.  Okay.
10       A.  I just went back to work.     0:40:55
11       Q.  Okay.
12       MR. KULIS:  Could we take, like, a
13   five-minute, six-minute --
14       MR. GRANDFIELD:  Yeah.
15       MR. KULIS:  -- break?  You know me.  I move
16   along really quickly.                0:41:37
17       MR. GRANDFIELD:  Yeah, no, I --
18       MR. KULIS:  I don't --
19       MR. GRANDFIELD:  -- appreciate it.
20       MR. KULIS:  -- waste time.  So.     0:41:39
21       MR. GRANDFIELD:  Yeah.
22       MR. KULIS:  You're going to take a break?
23       MR. REYES:  Yeah.  I'm going to go to the
24   bathroom.                            0:41:41
25       MR. KULIS:  Yeah.  There's a key up on the

## Page 47

1    counter that --
2        MR. REYES:  By the --
3        MR. KULIS:  Yeah, yeah.  Just make sure you
4    don't take it home with you.          0:41:47
5        MR. REYES:  I'll try.
6        MR. KULIS:  I'm tired of paying for keys.
7        THE RECORDER:  Going off the record, 11:10
8    a.m.
9        (Off the record.)
10       THE RECORDER:  Back on the record, 11:19 a.m.  0:41:57
11   BY MR. KULIS:
12       Q.  Ms. Green, on the date that this incident
13   occurred when Mr. Reyes was -- was on the second floor,
14   he explained to you that he believed he had a right to
15   film you.
16       Didn't he?                     0:42:06
17       A.  Correct.
18       Q.  And he indicated that since you're a public
19   employee and this is a public building of Berwyn, he
20   felt that he had a right to -- to film you.
21       Correct?                       0:42:14
22       A.  "Public official," I believe he used.
23       Q.  Okay.  And did you have any question or
24   distinction that you made with him?    0:42:22
25       A.  I said I was not an elected official.

## Page 48

1        Q.  Okay.
2        A.  Which I'm not.
3        Q.  But you are an employee of the --     0:42:28
4        A.  I am employee of the City of Berwyn.
5        Q.  Okay.
6        A.  I'm sorry for interrupting.         0:42:32
7        Q.  That's okay.  And -- and it is a public
8    building, City Hall.
9        Correct?
10       A.  Correct.
11       Q.  Okay.  Did -- did you ever learn from your
12   husband that anybody called him before or during the
13   arrest, Mr. Reyes?                     0:42:51
14       A.  No.
15       Q.  Okay.
16       A.  As I mentioned, my husband was away at
17   school.
18       Q.  Okay.
19       A.  So.                            0:42:59
20       Q.  Well, I know you said he was out of town.
21   But --
22       A.  Yeah.
23       Q.  -- that's why I said -- you'd ever learn that
24   anybody called him regarding the arrest or prior to the
25   arrest?                               0:43:08

12 (Pages 45 to 48)

In Demand Electronic Court Reporting, Inc  www.InDemandReporting.com                    (773) 239-6008

## Page 49

1    A. No.

2    Q. Okay. Now, you -- I know you're not a lawyer

3 and I know you're not a police officer. So.

4    A. Correct.      0:43:14

5    Q. But you alleged that Mr. Reyes was

6 disorderly.

7      Correct?

8    A. He was disrupting, yes, the business at City

9 Hall. He --      0:43:25

10    Q. Okay.

11    A. -- alarmed the different clerks on the first

12 floor. And my -- one of my jobs is to make sure that

13 City Hall runs where everyone can go in and get their

14 services and employees feel safe.      0:43:37

15    Q. Okay. But the actions that he took were --

16 was filming.

17      Correct?

18      MR. GRANDFIELD: I'm just going to object.

19 Argumentative.      0:43:47

20 BY MR. KULIS:

21    Q. I mean --

22      MR. GRANDFIELD: Go ahead.

23 BY MR. KULIS:

24    Q. -- is there anything he did other than film?   0:43:51

25    A. Other than film? No.

## Page 50

1    Q. Okay. He didn't harass -- verbally harass

2 any of the clerks downstairs.      0:44:00

3    A. Verbally harass? No.

4    Q. Make any rude or obscene gestures to any --

5 any of the employees downstairs.

6      Correct?      0:44:09

7    A. No.

8    Q. He didn't bully anybody.

9      Correct?

10    A. Verbally bully, no.

11    Q. Okay. As far as you know, all he did was

12 walking around, filming.

13      Correct?      0:44:18

14    A. Correct.

15    Q. Okay.

16      MR. KULIS: Anything else?

17      (Conversation held in sotto voce.)

18 BY MR. KULIS:

19    Q. And I think I asked you -- I think I asked

20 you this before. But you did not do any reports or

21 memos to anyone?      0:44:35

22    A. I did not.

23    Q. Did you have to write any -- any narrative to

24 -- to anyone as to -- other than your lawyer as to what

25 occurred?

## Page 51

1    A. I did not.      0:44:46

2    Q. Okay. Did anyone interview you -- again,

3 other than your lawyer, interview you with a recording

4 device as to what occurred?      0:44:56

5    A. No.

6    Q. Okay.

7      MR. KULIS: I don't believe I have anything

8 else.

9      MR. GRANDFIELD: Okay. Then I'm not going to

10 ask any questions of my own client.      0:45:10

11      So Ruth, at the end of this deposition, you

12 have the option to reserve or waive signature. If you

13 reserve it, you have the opportunity to review a

14 transcript if one's created.      0:45:22

15      You can't make any substantive corrections,

16 but you could correct things like misspellings of

17 names, what have you. It's up to you. A lot of people

18 waive because it's just easier than having to go

19 through the whole thing.      0:45:36

20      But you need to state on the record whether

21 you waive or reserve.

22      THE WITNESS: I waive.

23      THE RECORDER: All right.      0:45:41

24      MR. KULIS: Okay.

25      THE RECORDER: Going off the record, 11:23

## Page 52

1    a.m.

2      (Off the record.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13 (Pages 49 to 52)

## Page 53

1        CERTIFICATION

2        I, Matthew D. Schulte, do hereby certify that

3    the foregoing transcript of said deposition is a true,

4    complete and correct report of the entire testimony so

5    given by said witness, together with such other matters

6    and things as counsel for the parties present at the

7    taking of said deposition desire to have appear of

8    record.

9        I further certify that on April 9, 2024 said

10   witness, RUTH ELENA SIABA GREEN was first duly sworn to

11   testify to the truth, the whole truth and nothing but

12   the truth in the cause aforesaid; that the testimony

13   then was recorded by audio/visual recording device, by

14   me in the presence of said witness and thereafter

15   transcribed into typewriting under my direction and

16   control.

17       I further certify that I am not counsel for,

18   nor attorney for any of the parties to the aforesaid

19   cause, nor am I related to any of the parties to the

20   aforesaid cause, nor am I interested in any manner in

21   the said cause or in its outcome.

22

23       I further certify that the signature to the

24   foregoing deposition was waived by the witness.

25

## Page 54

1        IN TESTIMONY WHEREOF:  I have hereunto set

2        my hand and affixed my notarial seal:

3

4

5        Matthew D. Schulte

6        May 3, 2024

7

# Exhibit 7

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SEAN PAUL REYES,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 22 CV 7339** |
| **v.** | ) | |
| | ) | |
| **RICHARD VOLANTI, et al.** | ) | |
| | ) | |

**DEFENDANT MONACO'S ANSWER TO INTERROGATORIES**

1. State your full name, work address, positions you held, your date of birth and approximate height and weight on November 8, 2021.

**ANSWER:  Officer Monaco states that he is a member of Berwyn Police Department and can be contacted via counsel in this cause.  He objects to providing his date of birth and approximate height and weight as an unwarranted invasion of privacy and on grounds of relevance.**

2. State the full name and address of each person who witnessed or claims to have witnessed any interaction between you and Sean Paul Reyes on November 8, 2021, at the Berwyn Police Station and City Hall.

**ANSWER:  Pursuant to Rule 33(d), Officer Monaco refers Plaintiff to the police report generated in this cause.**

3. State the name and address of each person who was not present but has knowledge or information of any interaction between you and Sean Paul Reyes on November 8, 2021.

**ANSWER: None.**

4. Please state the name(s), address(es) and contact information of each person you communicated with concerning the interaction between you and Sean Paul Reyes on November 8, 2021.

**ANSWER: Officer Monaco states that he communicated with the reporting party, victims, and other police officers involved in the investigation. Their information is detailed in Berwyn police report 22-10215 which was previously tendered.**

1

5. Please identify precisely what you were doing and where you were located just prior to observing Sean Paul Reyes on November 8, 2021.

**ANSWER: Officer Monaco was speaking with Ruth Siaba Green on the second floor along with Tricia Powers addressing City business when Ms. Green began getting calls from concerned employees on the first floor. Officer Monaco refers the Plaintiff, again, to the police report pursuant to Rule 33(d).**

6. State your assigned duties on November 8, 2021, and the circumstances surrounding how, on November 8, 2021, you or any other Berwyn Police Officers were called to City Hall. Include the names of all the officers present at the scene, how you were notified to be there and by whom, including the names of any individuals who provided you with information regarding any suspicious activity at that location.

**ANSWER: Officer Monaco again refers Plaintiff to the police report pursuant to Rule 33(d).**

7. State, with specificity, what criminal act(s), if any, you observed Sean Paul Reyes commit on November 8, 2021. For each act:
a. The specific actions which amounted to said alleged criminal act(s);
b. The location at which the act(s) was/were allegedly committed; and
c. Your specific location in relation to Sean Paul Reyes when you observed said act(s).

**ANSWER: Pursuant to Rule 33(d), Officer Monaco refers Plaintiff to the police report, criminal court case file and the criminal complaint filed against him. Officer Monaco further states that Plaintiff was trespassing and engaging in disorderly conduct in that he was being disruptive, going into areas not open to the public, and not leaving or stopping his camera even when asked to do so. Officer Monaco further notes that the people that Reyes was continuing to film despite their alarm and upset – which took them from their daily duties were regular line office workers – so, putting the legality to the side, this was deplorable behavior that Mr. Reyes was engaging in for absolutely no other purpose than the sake of his own profit in posting to social media.**

8. State the nature of any conversation you had with Sean Paul Reyes on November 8, 2021, and state:
a. Who initiated the conversation;
b. Where and when the conversation took place; and
c. The names, addresses, and phone numbers of any individuals, including officers and civilians, present during the conversation.

**ANSWER: Officer Monaco states that he requested that Plaintiff stop filming after he refused to do so upon Ms. Green's request. This took place on the 2nd floor of City Hall. He then called for additional officers for assistance in handling the matter. Officer Monaco further refers to the police report and any video footage of the matter for further information.**

9. Did you write any reports and/or statements regarding your encounter with Brian Bianco on November 8, 2021? If so, name and/or describe each report and/or statements you wrote, when you wrote it, and who is now in possession of said report(s).

**ANSWER: Officer Monaco presumes that Plaintiff intends to reference Mr. Reyes. Officer Monaco again refers the Plaintiff to the police report pursuant to Federal Rule of Civil Procedure 33(d).**

10. Did you give any statements, oral/written/recorded, regarding your involvement in the incident which occurred on November 8, 2021? If so, please identify when and where the statement was given/taken, the identities of all the individuals present when the statement was given/taken, and the identity of the custodian of such statement(s).

**ANSWER: Officer Monaco states the follow up Berwyn police report under 22-10215 represents the totality of his documentation of the incident.**

11. State what actions you took or attempts you made to arrest Sean Paul Reyes on November 8, 2021.

**ANSWER: Officer Monaco refers the Plaintiff to the police report pursuant to Federal Rule of Civil Procedure 33(d).**

12. Were you ever employed with any other law enforcement agency other than the Berwyn Police Department? If so, state: a. The name of the law enforcement agency; b. The dates of your employment with said agency;
c. Whether any citizen complaint was ever filed against you, the date the complaint was filed, the name of the complainant and the circumstances and disposition of the complaint and/or investigation; and
d. Whether any law or drug enforcement agency complaint or investigation was filed or opened against you, the name of the complainant and the circumstances and disposition of the complaint and/or investigation.

**ANSWER: No.**

3

13. Have you ever been disciplined as a police officer or as a municipal employee? If so, state the nature of the charge against you, the date the charge was filed, the date upon which you were disciplined, and the nature of any such disciplinary action.

**ANSWER: Officer Monaco objects to this request as not being limited in time or scope as he has been with the Berwyn Police Department for decades. Nevertheless and without waiving said objection, Officer Monaco states that he has not been disciplined in the five years preceding the November 8, 2021 incident.**

14. Have you ever been the subject of an investigation by any other agency besides the Berwyn Police Department? If so, please state the name of the law enforcement agency and officers involved in the investigation, the date of the investigation(s), the status and result/disposition of each investigation, what documents are in your possession concerning said investigation(s), and whether you were represented by an attorney or other representative during said investigation(s).

**ANSWER: Officer Monaco has never the subject of any investigation in his capacity as a law enforcement officer by any other agency.**

15. Has a verbal or written citizen complaint ever been filed against you with the Berwyn Police Department or Berwyn City Government or any other disciplinary body governing the Berwyn Police Department? If so, state the date the complaint was filed, the name of the complainant, and the circumstances and disposition of the complaint and/or investigation.

**ANSWER: Officer Monaco states that Plaintiff filed a complaint in relation to this incident. Other than that, Officer Monaco states he has no knowledge of any other complaints against him in the past 5 years whatsoever.**

16. Have you ever been a defendant in a civil or criminal case prior to this litigation? If so, please state the case number, the name of the case, the status of the case, and year filed.

**ANSWER: Officer Monaco recalls some involvement in a civil case against police officers in the late 1990's, but has no access to any documents or further information. A search on PACER reveals that the name of the case was Biondi, et al. v. City of Berwyn, et al, Case No. 96-CV-03050 in the Northern District of Illinois, that several officers were named as defendants, and that the matter was dismissed pursuant to settlement as stated on the docket.**

4

17. Did you make any postings or contributions via any identity or virtual presence on the internet under your own name or any pseudonym or alias, such as an e-mail account or on a blog or on YouTube or on a social networking site including, but not limited to, "Facebook," "Instagram," "MySpace," "Twitter," "LinkedIn," "SnapChat," or "Parler," related in any way to your actions associated with the incident complained of in Plaintiff's complaint on November 8, 2021? If yes, explain in detail each and every posting or other contribution, including the specific website and/or account identification, the nature of the posting/contribution and whether the posting/contribution included a photograph or video. **Furthermore, you are requested pursuant to Federal Rule of Civil Procedure 34 not to alter, amend, delete, or destroy any electronically-stored data currently or previously stored thereon, including for example, metadata.**

ANSWER:   No.

18. Have you ever been arrested? If yes, without referring to any documents, state for each arrest: a. the date and time you were arrested;
b. identify the law enforcement agency and officers who arrested you;
c. identify the charge(s) filed or cited against you;
d. identify the judicial jurisdiction in which the arrest occurred;
e. state whether you pleaded guilty or not guilty;
f. if the arrest resulted in a judicial, administrative, or regulatory disposition, state:
i. the Court, or administrative or regulatory agency;
ii. the judge, or administrative or regulatory hearing officer;
iii. the charges; and
iv. the disposition of those charges.

**ANSWER: Officer Monaco objects to the relevance, admissibility and scope of this question.  Nonetheless and without waiving said objection, Officer Monaco states no.**

19. In chronological order, identify each occupation or job you've had within the last 10 years and with respect to each employer, state:
a. The name and address of each employer;
b. The date of commencement and termination of each such employment;
c. The positions you held in each such employment;
d. the weekly average wages or earnings in such employment;
e. a general description of your job duties when you began and any subsequent changes in the job for each such employment;
f. whether a physical examination was required prior to employment, and if so, the place, date and person giving such examination; and
g. the name of your immediate foreman, supervisor, or superior at each such place of employment.

**ANSWER: Officer Monaco states that he has been employed with the City of Berwyn Police Department. He has held the following positions in the police department in the past 10 years: Officer Monaco has been a police Detective/Investigator for the past 10 years.**

20. Have you ever seen or met Sean Paul Reyes before November 8, 2021? If so, state:
a. The date of each meeting;
b. What physical contact, if any, you had;
c. What verbal contact, if any, you had;
d. Where you saw or met him.

**ANSWER: No.**

Respectfully submitted,

By: */s/ Cynthia S. Grandfield*

Cynthia S. Grandfield (ARDC No. 6277559)
Sean M. Sullivan
DEL GALDO LAW GROUP, LLC
111 N. Wabash, Suite 908
Chicago, Illinois 60602
(312) 222-7000 (t)
grandfield@dlglawgroup.com
sullivan@dlglawgroup.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SEAN PAUL REYES, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 22 CV 7339 |
| v. | ) | |
| | ) | |
| RICHARD VOLANTI, et al. | ) | |
| | ) | |

## CERTIFICATION

I, Robert Monaco, do hereby certify, pursuant to Fed. R. Civ. P. 33(b), that the answers provided to Plaintiff's interrogatories are true and correct to the best of my knowledge.

_____

Officer Robert Monaco

# Exhibit 8

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SEAN PAUL REYES, | ) | |
| Plaintiff, | ) | |
| | ) | **Case No. 22 CV 7339** |
| v. | ) | |
| | ) | |
| RICHARD VOLANTI, et al. | ) | |
| | ) | |

### DEFENDANT VOLANTI'S ANSWER TO INTERROGATORIES

1. State your full name, work address, positions you held, your date of birth and approximate height and weight on November 8, 2021.

**ANSWER:  Sergeant Volanti states that he is a member of Berwyn Police Department and can be contacted via counsel in this cause.  He objects to providing his date of birth and approximate height and weight as an unwarranted invasion of privacy and on grounds of relevance.**

2. State the full name and address of each person who witnessed or claims to have witnessed any interaction between you and Sean Paul Reyes on November 8, 2021, at the Berwyn Police Station and City Hall.

**ANSWER:  Pursuant to Rule 33(d), Sergeant Volanti refers Plaintiff to the police report generated in this cause.**

3. State the name and address of each person who was not present but has knowledge or information of any interaction between you and Sean Paul Reyes on November 8, 2021.

**ANSWER: None.**

4. Please state the name(s), address(es) and contact information of each person you communicated with concerning the interaction between you and Sean Paul Reyes on November 8, 2021.

**ANSWER:  Pursuant to Rule 33(d), Sergeant Volanti refers Plaintiff to the police report generated in this cause as a complete record.**

5. Please identify precisely what you were doing and where you were located just prior to observing Sean Paul Reyes on November 8, 2021.

**ANSWER:  Sergeant Volanti does not understand this question.  He was called to City Hall.  Sergeant Volanti refers the Plaintiff, again, to the police report pursuant to Rule 33(d).**

6. State your assigned duties on November 8, 2021, and the circumstances surrounding how, on November 8, 2021, you or any other Berwyn Police Officers were called to City Hall. Include the names of all the officers present at the scene, how you were notified to be there and by whom, including the names of any individuals who provided you with information regarding any suspicious activity at that location.

**ANSWER:  Sergeant Volanti again refers Plaintiff to the police report pursuant to Rule 33(d).**

7. State, with specificity, what criminal act(s), if any, you observed Sean Paul Reyes commit on November 8, 2021. For each act:
a. The specific actions which amounted to said alleged criminal act(s);
b. The location at which the act(s) was/were allegedly committed; and
c. Your specific location in relation to Sean Paul Reyes when you observed said act(s).

**ANSWER:  Pursuant to  Rule 33(d), Sergeant Volanti refers Plaintiff to the police report, criminal court case file and the criminal complaint filed against him.  Sergeant Volanti further states that Plaintiff was trespassing and engaging in disorderly conduct in that he was being disruptive, going into areas not open to the public, and not leaving or stopping his camera even when asked to do so.  Sergeant Volanti further notes that the people that Reyes was continuing to file despite their alarm and upset – which took them from their daily duties were regular line office workers – so, putting the legality to the side, this was deplorable behavior that Mr. Reyes was engaging in for absolutely no other purpose than the sake of his own profit in posting to social media.**

8. State the nature of any conversation you had with Sean Paul Reyes on November 8, 2021, and state:
a. Who initiated the conversation;
b. Where and when the conversation took place; and
c. The names, addresses, and phone numbers of any individuals, including officers and civilians, present during the conversation.

**ANSWER:   Pursuant to Rule 33(d), Sergeant Volanti refers Plaintiff to the police report generated in this cause.**

9. Did you write any reports and/or statements regarding your encounter with Brian Bianco on November 8, 2021? If so, name and/or describe each report and/or statements you wrote, when you wrote it, and who is now in possession of said report(s).

**ANSWER: Sergeant Volanti presumes that Plaintiff intends to reference Mr. Reyes.  Sergeant Volanti again refers the Plaintiff to the police report pursuant to Federal Rule of Civil Procedure 33(d).**

10. Did you give any statements, oral/written/recorded, regarding your involvement in the incident which occurred on November 8, 2021? If so, please identify when and where the statement was given/taken, the identities of all the individuals present when the statement was given/taken, and the identity of the custodian of such statement(s).

**ANSWER:   Pursuant to Rule 33(d), Sergeant Volanti refers Plaintiff to the police report generated in this cause.**

11. State what actions you took or attempts you made to arrest Sean Paul Reyes on November 8, 2021.

**ANSWER:  SergeantVolanti refers the Plaintiff to the police report pursuant to Federal Rule 33(d).**

12. Were you ever employed with any other law enforcement agency other than the Berwyn Police Department? If so, state: a. The name of the law enforcement agency; b. The dates of your employment with said agency;
c. Whether any citizen complaint was ever filed against you, the date the complaint was filed, the name of the complainant and the circumstances and disposition of the complaint and/or investigation; and
d. Whether any law or drug enforcement agency complaint or investigation was filed or opened against you, the name of the complainant and the circumstances and disposition of the complaint and/or investigation.

**ANSWER:   No.**

13. Have you ever been disciplined as a police officer or  as a municipal employee? If so, state the nature of the charge against you, the date the charge was filed, the date upon which you were disciplined, and the nature of any such disciplinary action.

each and every posting or other contribution, including the specific website and/or account identification, the nature of the posting/contribution and whether the posting/contribution included a photograph or video. **Furthermore, you are requested pursuant to Federal Rule of Civil Procedure 34 not to alter, amend, delete, or destroy any electronically-stored data currently or previously stored thereon, including for example, metadata.**

**ANSWER:  No.**

18. Have you ever been arrested? If yes, without referring to any documents, state for each arrest: a. the date and time you were arrested;
b. identify the law enforcement agency and officers who arrested you;
c. identify the charge(s) filed or cited against you;
d. identify the judicial jurisdiction in which the arrest occurred;
e. state whether you pleaded guilty or not guilty;
f. if the arrest resulted in a judicial, administrative, or regulatory disposition, state:
i. the Court, or administrative or regulatory agency;
ii. the judge, or administrative or regulatory hearing officer;
iii. the charges; and
iv. the disposition of those charges.

**ANSWER: Sergeant Volanti objects to the relevance, admissibility and scope of this question.  Nonetheless and without waiving said objection, Sergeant Volanti states nothing other than what is referenced in Interrogatory No. 16, further details of which he does not recall.**

19. In chronological order, identify each occupation or job you've had within the last 10 years and with respect to each employer, state: a. The name and address of each employer;
b. The date of commencement and termination of each such employment;
c. The positions you held in each such employment;
d. the weekly average wages or earnings in such employment;
e. a general description of your job duties when you began and any subsequent changes in the job for each such employment;
f. whether a physical examination was required prior to employment, and if so, the place, date and person giving such examination; and
g. the name of your immediate foreman, supervisor, or superior at each such place of employment.

**ANSWER: Sergeant Volanti states that he has been employed with the City of Berwyn Police Department.  He has held the following positions in the police department in the past 10 years:**

**Sergeant Volanti served as an investigator and then a Sergeant in the past 10 years. He has also worked piecemeal side jobs for various entities who asked to contract out Berwyn Police Officers for security work.**

20. Have you ever seen or met Sean Paul Reyes before November 8, 2021? If so, state:
a. The date of each meeting;
b. What physical contact, if any, you had;
c. What verbal contact, if any, you had;
d. Where you saw or met him.

**ANSWER: No.**

Respectfully submitted,

By: */s/ Cynthia S. Grandfield*

Cynthia S. Grandfield (ARDC No. 6277559)
Sean M. Sullivan
DEL GALDO LAW GROUP, LLC
111 N. Wabash, Suite 908
Chicago, Illinois 60602
(312) 222-7000 (t)
grandfield@dlglawgroup.com
sullivan@dlglawgroup.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SEAN PAUL REYES,                      )
Plaintiff,                            )
                                      )          **Case No. 22 CV 7339**
v.                                    )
                                      )
RICHARD VOLANTI, et al.               )
                                      )

## CERTIFICATION

I, Richard Volanti, do hereby certify, pursuant to Fed. R. Civ. P. 33(b), that the answers provided to Plaintiff's interrogatories are true and correct to the best of my knowledge.

_____
Officer Richard Volanti

# Exhibit 9

**In The Matter Of:**

*Sean Paul Reyes vs*
*City Of Berwyn, et al.,*

---

*Sean Paul Reyes*
*November 8, 2023*

---

*Schelli Reporting Service, Ltd.*
*info@schellireporting.com*
*(312) 558-1113*

Original File 110823PMREYES.txt
Min-U-Script® with Word Index

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4

5   SEAN PAUL REYES,          )
                Plaintiff,    )
6        vs.                  )   No. 22 CV 7339
    RICHARD VOLANTI, DETECTIVE )
7   MONACO, OFFICER GHILONI,  )
    RUTH SIABA Green,         )
8   individually, and the CITY )
    OF BERWYN, a municipal    )
9   corporation,              )
                Defendants.   )
10

11       The deposition of SEAN PAUL REYES called

12   for examination pursuant to Notice and the Rules

13   of Civil Procedure for the United States

14   District Courts pertaining to the taking of

15   depositions, taken before Jamye Giamarusti, a

16   Certified Shorthand Reporter, within and for the

17   County of Cook and State of Illinois, at 111

18   North Wabash, Suite 908, Chicago, Illinois, on

19   November 8, 2023, at the hour of 2:00 p.m.

20

21

22

23   Reported by:  Jamye Giamarusti, CSR

24   License No.:  084-004183

Page 2

1   APPEARANCES:

2

3       GREGORY E. KULIS & ASSOCIATES, by

4       MR. GREGORY E. KULIS

5       134 North LaSalle Street, Suite 444

6       Chicago, Illinois  60602

7       (312) 580-1830

8       gkulis@kulislawltd.com

9              Representing the Plaintiff;

10

11      DEL GALDO LAW GROUP, LLC, by

12      MS. CYNTHIA GRANDFIELD

13      111 North Wabash, Suite 908

14      Chicago, Illinois  60602

15      (708) 222-7000

16      grandfield@dlglawgroup.com

17             Representing the Defendants.

18

19

20

21

22

23

24

Page 3

1                 I N D E X

2   WITNESS                          EXAMINATION

3   SEAN PAUL REYES

4     By Ms. Grandfield........................5

5

6

7

8

9

10           INDEX OF EXHIBITS

11   EXHIBIT     DESCRIPTION              PAGE

12   Exhibit 1   Letter of Intent...............93

13   Exhibit 2   FOIA Request..................104

14

15

16

17

18

19

20

21

22

23

24

Page 4

1        (Witness sworn.)

2    MS. GRANDFIELD: Good afternoon, Mr. Reyes.

3     Is that how you pronounce your name or

4  do you say it differently?

5    THE WITNESS: Reyes.

6    MS. GRANDFIELD: Okay.  And, Mr. Reyes, if at

7  any time you need to take a break, hopefully we

8  won't be here terribly long, but if at any time

9  you need to take a break, please let me know and

10  I will do that.

11       The only thing I ask is that you try to

12  ask any pending questions prior to take a break.

13  Okay?

14    THE WITNESS: Okay.

15    MS. GRANDFIELD: And I have this lovely woman

16  to my left, who is taking down everything we say

17  here today.

18       So I have a bad habit of saying this

19  myself, where I say uh-huh and uh-uh, so if you

20  could try to say yes or no just so it's clear on

21  the record, if it is, in fact, a yes or no

22  answer, that would be appreciated.  Okay?

23    THE WITNESS: Okay.

24    MS. GRANDFIELD: If at any time you don't

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 5

1 understand a question that I am asking you,
2 please let me know, and I will attempt to
3 rephrase it in a way that you understand.
4 However, if you answer the question as
5 asked, I will presume that you understood it.
6 Okay?
7 THE WITNESS: Okay.
8 SEAN PAUL REYES,
9 called as a witness herein, having been first
10 duly sworn, was examined and testified as
11 follows:
12 EXAMINATION
13 BY MS. GRANDFIELD:
14 Q. All right. Just some preliminary
15 questions here.
16 Mr. Reyes, what is your highest level
17 of education?
18 A. High school.
19 Q. When did you graduate from high school?
20 A. 2009.
21 Q. Do you hold any licensures or
22 certifications?
23 A. I do not.
24 Q. Okay. Have you taken any medication

Page 6

1 today that would affect your ability to testify?
2 A. I have not.
3 Q. Have you been convicted of any crimes
4 of dishonesty, such as perjury?
5 A. No, I have not.
6 Q. Okay. I just want to make sure this is
7 clear for the record.
8 You're not yourself recording this in
9 any way, right?
10 A. I am not.
11 Q. And you run certain social media
12 accounts; is that correct?
13 A. That's correct.
14 Q. And can you tell me the social media
15 accounts that you run?
16 A. So my company is named Long Island
17 Audit, Inc. --
18 Q. Okay.
19 A. -- and it's run through various social
20 media. My private website; YouTube; Facebook;
21 TikTok; Instagram; Twitter, now known as X; and
22 I believe that would be all the platforms.
23 Q. Okay. And is your handle on all of
24 those Long Island Audit, or is it something

Page 7

1 different?
2 A. They're all at Long Island Audit.
3 Q. And have you ever run any social media
4 accounts that have any other handle related to
5 the Long Island Audit?
6 A. No, not that I recall.
7 Q. And you said your private website.
8 What is your private website?
9 A. It is longislandaudit.com.
10 Q. And is that generally accessible to the
11 public?
12 A. That is correct.
13 Q. So there is no sort of, like, special
14 subscription or something that someone would
15 have where they would only be able to access
16 certain things if they were a subscriber?
17 A. Not on my website.
18 Q. When you say not on your website, are
19 there any social media accounts that you run
20 where it's a subscription service where there's
21 things that they can only have access to if they
22 have a subscription?
23 A. On some social media platforms, there
24 are subscriptions that people can receive. For

Page 8

1 example, on YouTube, you can subscribe and get
2 different badges next to your name, have access
3 to different emojis in the comments section.
4 All of my videos and content are not behind any
5 pay wall.
6 THE COURT REPORTER: Behind any --
7 THE WITNESS: Pay wall.
8 BY MS. GRANDFIELD:
9 Q. Oh, okay. All right.
10 And what is your primary source of
11 income?
12 A. It would be social media.
13 Q. Okay. So you don't hold any other
14 employment other than your Long Island Audit
15 company, as you called it?
16 A. Long Island Audit, Inc. Correct, yeah.
17 Q. Okay. And I believe that the case
18 we're on here today occurred in 2021, looks like
19 on or about November of 2021.
20 Was Long Island Audit, Inc. your
21 primary source of income on or about November
22 of 2021 as well?
23 A. That's correct.
24 Q. And other than the city of Berwyn,

Page 9

1  there's been -- it's my understanding that there
2  have been other municipalities or units of
3  government that you've gone to and used your
4  phone or other things to record.
5       Is that a fair statement?
6   A.  That's correct.
7   Q.  Okay.  And other than the city of
8  Berwyn, have there been any other locations in
9  the Chicago or surrounding area that you've done
10 that at?
11  A.  I'm sure there have.  I don't
12 remember -- I don't recall exactly where, but
13 I'm sure in the Chicago area.
14  Q.  Okay.  And what is the basis for your
15 belief that you're sure that you have?
16  A.  Just because I would -- when I, like,
17 come to an area, I don't normally just record in
18 one specific area -- I mean, one specific
19 location.  I branch out to other locations,
20 other government and municipality.
21  Q.  Okay.  And on or around November
22 of 2021, do you recall going to any other
23 locations other than the city of Berwyn?
24  A.  I don't recall anything specifically,

Page 10

1  no.
2   Q.  Okay.  And it's my understanding that
3  you live in New York; is that correct?
4   A.  That's correct.
5   Q.  Okay.  And so what caused you to travel
6  to the city of Berwyn in November of 2021?
7   A.  So my company works off of tips.  So
8  from my viewership, I received a tip that the
9  city of Berwyn had some signage on their door
10 that prevented people from exercising their
11 First Amendment right to record the government
12 officials in the course of their duty, and I
13 went there to investigate that.
14  Q.  And who did you receive that tip from?
15  A.  I don't recall.
16  Q.  Where would you have received that tip?
17  A.  I believe it was an e-mail.
18  Q.  And so that would be something that
19 your counsel would be able to produce to me?
20  A.  If I still have it, yes.
21  Q.  And what would be the reason that you
22 would not still have it?
23  A.  I've run out of storage and things go
24 automatically.  This happened two years ago, and

Page 11

1  sometimes it gets deleted automatically, so I
2  couldn't -- I just don't want to promise you
3  something I don't have.
4   Q.  Okay.  Do you understand that you have
5  a duty as a litigant to retain any and all
6  documentation related to this lawsuit?
7   A.  I did not know that, no.
8   Q.  Did you still possess this e-mail as of
9  August 16th, 2022, do you know?
10  A.  I don't know.
11  Q.  Okay.  And other than this e-mail, do
12 you recall if there was any other tips or any
13 other reason that you came to the city of Berwyn
14 in November of 2021?
15  A.  No.
16  Q.  And how did you travel to the city of
17 Berwyn?  Did you take a flight?  Did you drive?
18 What did you do?
19  A.  I drove.
20  Q.  And you drove from New York?
21  A.  That's correct.
22  Q.  Okay.  And once you arrived in the city
23 of Berwyn, prior to going to Berwyn City Hall,
24 did you communicate with either any City of

Page 12

1  Berwyn employees or officials or any city of
2  Berwyn residents?
3   A.  No.
4   Q.  And approximately what time in November
5  of 2021 did you arrive at Berwyn City Hall?
6   A.  I believe it was November 7th.
7   Q.  And do you recall what time of day it
8  was?
9   A.  That I arrived?
10  Q.  Yeah.
11  A.  To the City Hall?
12  Q.  Yes.
13  A.  It was November 8th I arrived to the
14 City Hall.  I arrived to Chicago November 7th.
15  Q.  Oh, I see.  Okay.  Sorry.  It was a
16 poor question.
17       So, November 7th of 2021 was when you
18 arrived in the Chicago area?
19  A.  Yes.
20  Q.  And then November 8th of 2021 was when
21 you arrived at Berwyn City Hall?
22  A.  That's correct, ma'am.
23  Q.  And do you recall what time of day it
24 was that you arrived at Berwyn City Hall?

Page 13

1    A.  I believe it was around lunchtime.
2    Q.  And I know this sounds like -- these
3  all sound like obvious questions, but since I
4  wasn't there, I'm just asking.
5        So, did you park with your vehicle
6  somewhere in Berwyn City Hall?
7    A.  That's correct.
8    Q.  Okay.  And other than yourself, was
9  there anyone else that was accompanying you to
10  this?
11    A.  No.
12    Q.  And did you speak to anyone outside of
13  Berwyn City Hall prior to going into Berwyn City
14  Hall?
15    A.  I did not.
16    Q.  And you had a phone on you at that
17  time; is that correct?
18    A.  That's correct.
19    Q.  And other than your phone, did you have
20  any other equipment with you that could lead you
21  to record or otherwise video?
22    A.  I believe it was just my phone.
23    Q.  And do you recall what model of phone
24  you had at the time?

Page 14

1    A.  I believe it was a Samsung Galaxy
2  smartphone.  I'm not sure exactly what model it
3  was.
4    Q.  Okay.
5    A.  And now that I'm thinking of the model,
6  I actually did have a GoPro, I believe, at the
7  time.
8    Q.  Okay.  And where was that GoPro located
9  on your person?
10    A.  I believe it was strapped to my person.
11    Q.  Okay.  Like, to your chest maybe?
12    A.  Yeah.  Right.
13    Q.  And was that visible on you, like, on
14  the outside of you?
15    A.  Yes, it was.
16    Q.  So, you went up the steps to Berwyn
17  City Hall, and then what do you next recall
18  occurring?
19    A.  I began to record, take a look around
20  at the public signage around.  The first thing I
21  did was record the sign that says members of the
22  public aren't permitted to record without prior
23  permission, and there was a statute below that
24  sign.  I went inside.  I was recording

Page 15

1  different -- just different signage, the layout
2  of what was going on there on the first floor.
3    Q.  And do you recall if there were any
4  employees on the first floor?
5    A.  Oh, yeah.
6    Q.  Okay.  So, you were recording.
7        Do you recall the names of any of those
8  employees?
9    A.  I do not.
10    Q.  And, to your knowledge, did those
11  employees appear to be just, like, regular
12  office workers?
13    A.  Yes.
14    Q.  And when you were recording this, were
15  you live streaming that?
16    A.  I was not.
17    Q.  And did you speak to anyone on the
18  first floor?
19    A.  I believe someone, a woman from behind
20  the counter, spoke to me and said that I wasn't
21  permitted to record and referenced the sign that
22  was also posted inside of the lobby area.
23    Q.  And did you know the name of this woman
24  at all?

Page 16

1    A.  I did not know the name of her.
2    Q.  And do you recall what her appearance
3  was?  What color hair, height, anything like
4  that?  I guess ethnicity?
5    A.  I do not.  I believe she was a
6  Caucasian woman.
7    Q.  Okay.
8    A.  Black hair.
9    Q.  Okay.  And what, if anything, did you
10  say in response to that?
11    A.  I believe I told her that the sign that
12  she was referencing was unconstitutional.
13    Q.  And we just talked about -- you're not
14  a lawyer, right?
15    A.  I am not.
16    Q.  Okay.  And what was the basis for your
17  statement that it was unconstitutional?
18    A.  Well, there have been some court
19  rulings, Glik v. Cunniffe, for example --
20      THE COURT REPORTER: I'm sorry.  What?
21      THE WITNESS: Glik v. Cunniffe, for example,
22  that have said -- that have given that the
23  district -- I forgot what district it was, but
24  they had said you have the right to record

Page 17

1  government employees in the course of their
2  duty. So that's where I was getting that
3  information from.
4  BY MS. GRANDFIELD:
5    Q. Okay. So it's your understanding that,
6  constitutionally, you're allowed to just record
7  regular office workers at a city hall?
8    A. Well, based on my understanding of the
9  case law -- again, I could be wrong because I'm
10  not an attorney.
11      But based on my understanding of the
12  case law, government officials would include
13  secretaries -- and also, you know, not only
14  would it be unconstitutional, I think I believe
15  I said it was just for transparency purposes.
16  It's important to document your experiences with
17  people that receive taxpayer-funded checks.
18    Q. Okay. Is it also important that people
19  feel safe in their own workplace?
20    A. I would say that would be important,
21  but I think that would be more of somebody's own
22  personal feelings, and I couldn't control
23  somebody's personal feelings.
24    Q. Okay. And do you think it would be

Page 18

1  appropriate to have a regular office worker be
2  posted on your website?
3    A. Well, there is no expectation of
4  privacy in public, ma'am. There's cameras
5  everywhere, everywhere we go. Especially inside
6  of City Hall, there are many cameras.
7    Q. That wasn't my question.
8      Do you think it would be appropriate --
9    A. Well, I was trying to answer it.
10    Q. Okay.
11    A. So there are a lot of cameras in City
12  Hall. And, again, the reason for that is there
13  is no expectation of privacy in public. They
14  don't ask members of the public for their
15  permission to record them, so I would think it's
16  reasonable to document your experiences and
17  bring that experience with the public servant
18  that receive taxpayer dollars and disseminate
19  that information to the public.
20    Q. You're not a taxpayer in the city of
21  Berwyn or the state of Illinois, right?
22    A. Well, I pay federal taxes, and I'm sure
23  the city of Berwyn receives federal tax dollars,
24  ma'am.

Page 19

1    Q. But you're not a taxpayer of the city
2  of Berwyn or the state of Illinois?
3    A. Well, again, ma'am --
4      MR. KULIS: Just answer the question.
5      THE WITNESS: I just -- I'm confused. I
6  don't know if my tax dollars go directly to
7  Berwyn or not. I know they received federal
8  funding.
9  BY MS. GRANDFIELD:
10    Q. I'm asking if you directly pay the city
11  of Berwyn --
12    A. No. I --
13    Q. -- or the state of Illinois taxes --
14      THE COURT REPORTER: Hold one. One second.
15  Just one at a time before you --
16      THE WITNESS: I'm sorry.
17      MS. GRANDFIELD: Yeah.
18      THE COURT REPORTER: Can you state your
19  question again for me?
20  BY MS. GRANDFIELD:
21    Q. You don't directly pay city of Berwyn
22  or state of Illinois taxes, right?
23    A. No, ma'am. I do not.
24    Q. And you don't pay any sort of property

Page 20

1  taxes for either of those municipalities --
2    A. No --
3    Q. -- units of government? Excuse me.
4    A. No, ma'am. I do not.
5    Q. Okay. And you stated that this Long
6  Island Audit is your primary source of income,
7  correct?
8    A. That's correct.
9    Q. Okay. And how much money do you make
10  off of your Long Island Audit then?
11      MR. KULIS: Objection; parameters.
12      MS. GRANDFIELD: Objection what?
13      MR. KULIS: Parameters.
14      When? I mean, this year, last year,
15  2021?
16      MS. GRANDFIELD: Okay. Sure. I can limit
17  it.
18  BY MS. GRANDFIELD:
19    Q. How much income did you make off of
20  Long Island Audit in 2020?
21    A. In 2020, I believe the company made --
22  how much money did I receive personally, ma'am,
23  or how much money did my company bring in?
24    Q. I can ask it in two parts.

Page 21

1    How much money did the company bring in
2  in 2020?
3    A.  I would have to refer to my tax
4  documents.  But, to the best of my knowledge,
5  the year 2020, I would say --
6    MR. KULIS: Don't guess if you don't know.
7    THE WITNESS: I don't recall.  I don't know
8  exactly how much I made in 2020.  I would have
9  to refer to my tax documents.
10  BY MS. GRANDFIELD:
11    Q.  So you can produce those then?
12    MR. KULIS: The company is not a party, so
13  it's kind of irrelevant how much the company
14  makes.  How much he makes may be relevant.
15    MS. GRANDFIELD: I would ask that they be
16  produced.
17  BY MS. GRANDFIELD:
18    Q.  Now, with respect to yourself,
19  how much did you make in 2020?
20    A.  Again, I would have to refer to my tax
21  documents.
22    Q.  Could you tell me if it was more or
23  less than $1 million?
24    A.  Less than $1 million.

Page 22

1    Q.  More or less than $500,000?
2    A.  Less than $500,000.
3    Q.  More or less than $250,000?
4    A.  Less than $250,000.
5    Q.  Okay.  We can keep going this way, or
6  is there any sort of approximation that you can
7  provide me that you believe without referring to
8  your tax documents?
9    A.  I was told by counsel not to give an
10  answer unless I knew it.  I don't know it.  And
11  I need to refer to my tax documents for an exact
12  answer.
13    MR. KULIS: You can give her a range, if you
14  have an idea.
15    THE WITNESS: I believe, in 2020, between 50
16  and $100,000.
17  BY MS. GRANDFIELD:
18    Q.  And same question with respect to 2021.
19    A.  Again, I would have to refer to my tax
20  documents.
21    Q.  Okay.  Would the range of 50 to 100K be
22  about the same range, or would it have differed?
23    A.  It would have differed.  It went up.
24    Q.  It went up.  Okay.

Page 23

1    And do you know if it went up to more
2  or less than 250K?
3    A.  I would say it was less.  Again, I
4  would have to refer for an exact number.  But I
5  would say it was up to 200.  It was between 100
6  and $200,000.
7    Q.  Okay.  Do you know why it went up?
8    A.  Well, the way my company works, ma'am,
9  is that it's -- it's like any other news media
10  company.  So, the more people that watch you --
11  for example, CNN runs off of news
12  advertisements, MSNBC.  My company also runs off
13  of news advertisements.
14    So, the more people that are watching
15  my content and are receiving the content means
16  the more ad revenue money that I receive.  So, I
17  would assume that the reason why it went up is
18  because my viewership went up on my company.
19    Q.  Do you also sell merchandise in
20  relation to your company?
21    A.  I do.
22    Q.  And do you know if you sold more
23  merchandise in 2021?
24    A.  Than 2020?

Page 24

1    Q.  Yes.  Because, you know, you were
2  saying it went up, so --
3    A.  Yeah.  I would assume so, ma'am.
4    Q.  Okay.  And because both of 2020 and
5  2021 were years of the pandemic, was there any
6  significant change in your income in 2021
7  versus, say, prepandemic, 2018 or 2019.
8    A.  Prepandemic, I was not -- Long Island
9  Audit did not exist.
10    Q.  Oh.  Well, that's the question I should
11  have asked to begin with.  Sorry.
12    A.  Yeah.
13    Q.  How long have you had Long Island Audit
14  as a company?
15    A.  Since 2020.
16    Q.  Oh, okay.  And prior to 2020, did you
17  do something else for employment?
18    A.  I was a logistics director.
19    Q.  And where were you a logistics director
20  at?
21    A.  At Pretty Woman.
22    Q.  And where is that at?
23    A.  Holtsville.
24    Q.  Where is that?

Page 25

1  A.  New York.
2  Q.  And how long did you do that for?
3  A.  I would say around four years.
4  Q.  And what was the reason you stopped
5  doing that?
6  A.  I was furloughed because of the
7  pandemic.
8  Q.  And other than the case that we're on
9  here today, have you filed any other lawsuits
10  against units of local government related to
11  your First Amendment rights?
12  A.  I have.
13  Q.  What other lawsuits have you filed?
14  A.  I've filed a lawsuit against Danbury
15  Connecticut, City of Danbury.  I've also filed a
16  lawsuit against the City of New York.  And I
17  believe that's all the lawsuits that I have
18  filed currently.
19  Q.  And are both of those lawsuits still
20  pending, or have they reached a conclusion?
21  A.  They're both still pending.  Actually,
22  the Danbury lawsuit was dismissed for a
23  technical error.
24  Q.  And when you say dismissed for a

Page 26

1  technical error, I presume that's your
2  understanding, right?
3  A.  Well, yeah.  Again, I'm not an
4  attorney.
5  Q.  Right.  I understand.  Okay.
6       And the New York City one remains
7  pending?
8  A.  Correct.  We just had an injunction
9  hearing, and that was granted.
10  Q.  And have you sent any notices of intent
11  to sue to any municipalities other than the City
12  of Berwyn?
13  A.  Not that I recall.
14  Q.  Is there anything that would refresh
15  your recollection?
16  A.  No, ma'am.
17  Q.  Have you received any funds in
18  settlement for or in relation to your First
19  Amendment claims?
20  A.  I have.
21  Q.  Who have you received those from?
22  A.  The City of Hagerstown, Maryland.
23  Q.  Okay.
24  A.  The City of Hagerstown and Baltimore

Page 27

1  County, Maryland.
2  Q.  And how much did you receive from
3  Hagerstown?
4  A.  I believe it was $10,000.
5  Q.  And how much did you receive from
6  Baltimore County?
7  A.  Around the same.
8  Q.  And would there be anything that could
9  refresh your recollection as to that?
10  A.  I would have to reference the videos I
11  made.
12  Q.  Okay.  And with respect to each of
13  these units of government, you did not sue these
14  units of government, correct?
15  A.  I did not.
16  Q.  And when you say you did not, was there
17  someone that did?
18  A.  I did not.
19  Q.  So how did you come to obtain $10,000
20  from Hagerstown if you didn't sue them?
21  A.  My attorney reached out to their
22  attorney.
23  Q.  Okay.  And when was that?
24  A.  I would say -- I don't recall.  I

Page 28

1  would -- I just don't want to provide you with
2  any wrong information.  I would have to check my
3  records.
4  Q.  But it would have to be sometime after
5  2020, right?
6  A.  Yes.
7  Q.  Okay.  And then do you know if that was
8  before or after you filed the lawsuit that we're
9  here about today?
10  A.  I'm not exactly sure when the lawsuit
11  was exactly filed.
12  Q.  Do you know if it was before or after
13  2022?
14  A.  I believe it was after 2022.
15  Q.  Okay.
16  A.  Maybe it was sometime in 2022.
17  Q.  Okay.  I know.  I can't believe 2023 is
18  almost over with.
19       Okay.  And then Baltimore County,
20  Maryland, how did you end up obtaining money
21  from Baltimore County?
22  A.  The same way.  My attorney reached out.
23  Q.  Okay.  And was that the same attorney
24  in both instances?

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 29

1    A.  It was.
2    Q.  And do you recall the name of that
3  attorney?
4    A.  His name is Matthew Bennett.
5    Q.  And where does he practice out of?
6    A.  Silver Spring, Maryland.
7    Q.  And, to your knowledge, are you under
8  any sort of criminal investigation by any law
9  enforcement agency?
10   A.  To my knowledge, no.
11   Q.  Have you ever had a search warrant by
12 any law enforcement agency executed on you with
13 respect to any of your activities as the Long
14 Island Audit?
15   A.  I believe there was a search warrant
16 issued for my phone.
17   Q.  Who issued that search warrant?
18   A.  Danbury, Connecticut Police Department.
19   Q.  And other than that, any other law
20 enforcement agencies that you're aware of?
21   A.  Not that I recall, no.
22   Q.  And have you ever been criminally
23 prosecuted in relation to your activities for
24 the Long Island Audit?

Page 30

1    A.  I have.
2    Q.  And who did that?  Who
3  criminally prosecuted -- I should say, excluding
4  the case that we're here on today, who
5  criminally prosecuted you?
6    A.  Excluding this case that we're --
7    Q.  Yes.  Yes.
8    A.  Okay.  The first one would be Harford
9  County, Maryland.
10   MR. KULIS: Hartford?
11   THE WITNESS: Harford.  No T.
12 BY MS. GRANDFIELD:
13   Q.  Okay.  And when did that occur?
14   A.  May, 2020.
15   Q.  And what were the nature of the
16 allegations against you, if you recall?
17   A.  Hindering was the charge.
18   Q.  And do you know whether that was
19 misdemeanor, felony, what level of crime that
20 was?
21   A.  Misdemeanor.
22   Q.  Okay.  And do you know what class?
23   A.  I do not.
24   Q.  And what happened with that case?

Page 31

1    A.  It was dismissed.
2    Q.  And when was it dismissed?
3    A.  That same year. I'm not exactly sure.
4    Q.  Sometime in 2020?
5    A.  Yes, ma'am.
6    Q.  And do you have any understanding --
7  let me just ask what is your understanding as to
8  why it was dismissed?
9    A.  It was part of a diversion agreement.
10   Q.  Okay.  And what, if anything, do you
11 recall the diversion agreement consisted of?
12   A.  The diversion agreement consisted of
13 eight hours of community service as well as a
14 letter to the deputy stating that it was never
15 my intention for him to go -- he received --
16 because of the social media, he had received a
17 lot of criticism for his actions that day, and
18 that wasn't my intention.
19   Q.  Okay.  When you say criticism for his
20 actions, what do you mean by that?
21   A.  I guess the general -- I don't know.  I
22 didn't criticize him.  I didn't send him any
23 criticisms, and I've never seen those
24 criticisms.  So, I don't know exactly what they

Page 32

1  were.
2    Q.  Oh, okay.  So you have no knowledge as
3  to what the criticisms were?
4    A.  Not specifically.
5    Q.  Okay.  You said not specifically.
6       What was your general understanding?
7    A.  My general understanding is that the
8  public wasn't happy with his actions that day.
9    Q.  In the case that we're here on today,
10 have you tagged certain employees and officials
11 of the City of Berwyn?
12   A.  What do you mean by tagged, ma'am?
13   Q.  Well, I'm not very tech-savvy.
14      Have you tagged someone on social media
15 or, like, mentioned them by name as a City of
16 Berwyn employee or official?
17   A.  Okay.  Because tagged, to me -- I have
18 a little bit more probably social media
19 expertise.
20   Q.  I'm sure.
21   A.  And that's why I want to be clear.
22      Tag is when you actually put somebody's
23 name and associate that name with their profile.
24 You're tagging their social media.

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 33

1    Q.  Okay.
2    A.  You're tagging their Instagram account,
3  their Facebook account.  And then that person
4  can click on the name, and it will go to their
5  social media account.
6        So, I think the word you're looking for
7  is mentioned.
8    Q.  Okay.  Have you mentioned any City of
9  Berwyn employees or officials by their name in
10  your social media postings?
11   A.  I have.
12   Q.  And which ones have you mentioned?
13   A.  Mayor Robert Lovero, City Administrator
14  Ruth Siaba Green; her husband, David Green,
15  division commander of the Berwyn Police
16  Department.  I believe that's all the -- to my
17  knowledge, that's the only people from the City
18  of Berwyn that I've ever talked about in this
19  case.
20   Q.  Okay.  And why do you know who Ruth
21  Siaba is married to?
22   A.  He's the division commander of the
23  Berwyn Police Department, and it came to my
24  knowledge during my investigation of the City of

Page 34

1  Berwyn that he has multiple lawsuits against him
2  that have been settled out for excessive force.
3  So, it's part of my job to know why.
4        But not only that, he was promoted from
5  the rank of officer to sergeant and now to
6  division commander despite these multiple
7  lawsuits for excessive force, accosting a
8  resident of Berwyn.
9        So, I was investigating that story --
10   Q.  If you could just listen to my
11  question.
12       How did you come to know that he was
13  married to Ms. Green?
14   A.  Oh, I'm sorry, ma'am.  I believe I saw
15  a social media post about it, an activist group
16  mentioned that there was nepotism inside of the
17  Berwyn City Hall.  So, I investigated it.  Ruth
18  Siaba Green, David Green.
19   Q.  And what activist group was this?
20   A.  I don't know the name.  I can get you
21  the change.org petition.  I believe that's what
22  it was that I saw.  People were asking -- the
23  residents of Berwyn were starting a petition, to
24  my knowledge.

Page 35

1    Q.  What residents?
2    A.  Again, an activist group that I don't
3  currently have the name for.
4    Q.  And did you speak to any of these
5  individuals that you have just identified as
6  this activist group?
7    A.  I spoke to one at a protest that I held
8  outside of City Hall.
9    Q.  And who was it that you spoke to?
10   A.  I don't recall their name.
11   Q.  And when did you hold this protest
12  outside of City Hall?
13   A.  I don't recall.  It was probably within
14  a few weeks or a month after I was arrested.
15  Again, I'm not exactly sure, but I can get you
16  that date.
17   Q.  And how did you organize this protest?
18   A.  Through my company's social media.
19   Q.  And what do you mean by that?
20   A.  I made a post, and I talked about
21  holding a peaceful protest.
22   Q.  Did you communicate with any city of
23  Berwyn residents or anyone else in the
24  Chicagoland area about this protest other than

Page 36

1  via this post?
2    A.  Just the post.
3    Q.  Okay.  And when you say investigation,
4  you're not a member of any law enforcement
5  agency, right?
6    A.  No.  I'm an investigative journalist.
7    Q.  Okay.  And you're also not a member of
8  any regulatory agency, right?
9    A.  I'm not, ma'am.
10   Q.  When you say you're an investigative
11  journalist, do you have any training in
12  journalism?
13   A.  Well, no.  I don't have any formal
14  training, no.
15   Q.  Okay.  And when did this protest occur?
16   A.  I believe you asked that question
17  already.  And the answer is, I don't know
18  exactly when it was.
19   Q.  Okay.  I did ask.
20       And what do you recall about this
21  protest?
22   A.  I recall it being peaceful.  I recall
23  probably 40 to 50 people showing up, residents
24  of Berwyn.

Page 37

1  Q. How did you know they were residents of
2  Berwyn?
3  A. They told me, some of them.
4  Q. But you don't recall any of their
5  names?
6  A. I do not, ma'am.
7  Q. And what do you recall occurring then?
8  A. So, we had -- there were signs. We
9  were all outside. The mayor came outside, Mayor
10 Robert Lovero. He came outside and I -- he came
11 up to me and spoke with me and he told me that
12 he was going to take down the signs, and he
13 ripped down the signs on the live stream.
14      Oh, it was live streamed. It wasn't a
15 static video. It was live streamed.
16      So those signs that I was referencing
17 to earlier and the reason why I went to Berwyn,
18 he ripped down all the signs.
19 Q. Okay. How do you know that that was
20 Mayor Lovero?
21 A. Because he told me his name.
22 Q. He introduced himself as Mayor Lovero?
23 A. Yeah. To the best of my knowledge,
24 yeah. Because at first -- yes. I didn't know

Page 38

1  who he was at first. I thought he was just
2  somebody who came to protest.
3  Q. Okay. When you say to the best of my
4  knowledge, do you mean that you don't recall if
5  he said that or not, or that he said that and
6  that's, to the best of your knowledge, that he
7  was telling the truth?
8  A. I remember not knowing -- I remember a
9  man speaking to me, and I remember not knowing
10 who he was.
11 Q. Okay.
12 A. And I believe he said, "I'm the mayor."
13      And then I said, "Nice to meet you,
14 Mr. Mayor." I believe that's exactly what
15 happened because I remember I did not know who
16 he was at first when he came up to me. And then
17 I would only assume that somebody who is able to
18 have the power to rip down signs from the City
19 Hall would be some sort of government official.
20 Q. Okay. And where did you come across a
21 police commander by the name of Michael Ochsner?
22      I'll spell his name because it's not
23 how I would pronounce it. But it's spelled
24 O-C-H-S-N-E-R.

Page 39

1  A. I don't. It sounds familiar. Not the
2  way you said it, but the spelling sounds
3  familiar.
4      Is he a division commander with the
5  Berwyn Police Department?
6  Q. He is.
7  A. I believe I met him outside of the
8  police department.
9  Q. Okay. And do you recall when you met
10 him outside the police department?
11 A. I went there to follow up with internal
12 affairs. I had made an internal affairs
13 complaint regarding the excessive force used by
14 Detective Monaco, and that's why I was there.
15 And I believe I met him there while I was trying
16 to speak with somebody from internal affairs.
17 Q. Okay. And what do you recall him
18 saying to you, and what did you say to him?
19 A. Again, if it's the same person -- I'm
20 not exactly 100 percent sure. I don't remember
21 his name. I only dealt with him that one day.
22      But if it's the same person I remember,
23 he said that I needed to make an appointment and
24 call and make an appointment and that everybody

Page 40

1  in internal affairs was busy and that no one
2  could speak to me right now.
3      And he pushed me. I remember him
4  pushing me. Or, not pushing me. I remember him
5  ushering me, I guess is the better word, out of
6  the precinct and closing the door.
7  Q. Okay. I think it's only one police
8  department. So when you say precinct, I think
9  of, like, multiple.
10      But would this have been, like, the
11 lobby of the police department?
12 A. Right. The lobby.
13 Q. Okay. And were you video recording
14 this at all?
15 A. I was. I video recorded it.
16 Q. Did you post that to your website?
17 A. I did.
18 Q. And did you mention --
19 A. Not to my website.
20 Q. Okay. Where did you post it?
21 A. I posted it to YouTube, Facebook,
22 Twitter, Instagram, probably clips.
23 Q. Okay. And did you mention Commander
24 Ochsner by name, do you recall?

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 41

1  A. I don't recall.
2  Q. And did you at any point become aware
3 that the City of Berwyn Police Department's 911
4 number was becoming flooded with calls?
5  A. No. I did not become aware of that.
6 I'm pretty sure that no one -- the 911 and the
7 main line, if I'm not mistaken, are two
8 different lines.
9  Q. Correct.
10  A. So I don't recall people, you know --
11 because, as you know, if somebody hit 911 from
12 New York, they're not going to get to the Berwyn
13 Police Department. And I doubt enough Berwyn
14 residents were dialing 911. So, I don't know
15 that, no, ma'am. I'm sorry.
16  Q. Did you at any time become aware that
17 supporters or followers of you were calling the
18 City of Berwyn's general number to the point
19 where there were 2,000 calls?
20  A. No. I did not know that. I did not
21 know that specific number. I would assume that,
22 after watching the video, that people would
23 peacefully petition their government for
24 redress. That's what I advocate for.

Page 42

1       And now that you mention that, I do
2 remember the division commander saying that I
3 instructed people to go shoot up the police
4 precinct, and I thought that was interesting
5 because I would never do such a thing.
6  Q. Did you become aware at any point that
7 the City of Berwyn Police Department received a
8 series of threats from various members of the
9 public related to your post?
10  A. All I know is that what I was told that
11 day was that you are instructing -- I'm
12 paraphrasing here. I don't remember exactly.
13 It's on video. But he was insinuating that I
14 told people to shoot up the Berwyn Police
15 Department, which never happened.
16       But I don't know any of the specific
17 threats other than what he's saying, which,
18 obviously, that's not true.
19  Q. Okay. Did you become aware at any
20 point other than that that any supporters or
21 followers of you were calling the Berwyn Police
22 Department and suggesting that physical harm
23 should come to them or their family members?
24  A. No. I'm not aware of that, ma'am.

Page 43

1  Q. Okay. Do you have any sort of comments
2 on any of your social media by your supporters
3 or followers suggesting that physical or other
4 harm should come to the Berwyn Police Department
5 or any other employees or officials?
6  A. Not that I've seen, ma'am. But, again,
7 I also receive tens of thousands of comments on
8 all of my social medias on a weekly basis. I
9 haven't seen any direct threats.
10       And YouTube is -- all social medias are
11 pretty good at taking those down if somebody
12 were to enter in some type of threat.
13  Q. Do you know an individual by the name
14 of Shannon Reberski?
15  A. No. I do not know her.
16  Q. Okay. If I told you that she was a
17 city of Berwyn employee, would you have --
18    MR. KULIS: I'm sorry. What was the name?
19    THE WITNESS: Reberski. It's spelled
20 R-E-B-E-R-S-K-I.
21 BY MS. GRANDFIELD:
22  Q. If I told you that she was a City of
23 Berwyn employee, would you have any reason to
24 dispute that?

Page 44

1  A. Can you repeat the name?
2  Q. Sure. It's Shannon Reberski.
3  A. No. I would not have any -- no reason
4 to doubt you, no.
5  Q. Okay. Do you know an individual by the
6 name of Tricia Powers?
7  A. No, I do not.
8  Q. If I told you that she was a City of
9 Berwyn employee, would you have any reason to
10 doubts that?
11  A. No, ma'am.
12  Q. Okay. Other than the November of 2021
13 incident that occurred when these signs were up,
14 was there a time prior to that where you had
15 come to Berwyn City Hall and made any sort of
16 video recordings?
17  A. No, ma'am. That was my first time ever
18 visiting City Hall.
19  Q. Okay. And when you were speaking -- at
20 any point, did you speak to anybody other than
21 this Caucasian woman with the dark hair that we
22 talked about earlier while you were on the first
23 floor?
24  A. Not that I recall. I would have to

Page 45

1  reference the video.
2  Q. Do you believe that individual to be
3  Ruth Siaba Green?
4  A. On the first floor, ma'am?
5  Q. Yes.
6  A. No, ma'am.
7  Q. Okay. And --
8  A. And if I could clarify something.
9  The City of Berwyn, it kind of -- as
10 soon as you open -- as soon as you walk in, I
11 believe there's stairs that go down and stairs
12 that go up.
13 Q. Okay.
14 A. So, if we're talking about the lower
15 level, then that's where I had that conversation
16 with the unidentified. If you take the stairs
17 up, the upper level would be where I had a
18 conversation with City Administrator Ruth Siaba
19 Green.
20 Q. Okay. And you discussed the fact that
21 this individual that you spoke with on the lower
22 level said that you were not allowed to video
23 record, right?
24 A. Right.

Page 46

1  Q. Okay. Was there anyone else other than
2  this individual that you spoke to or that you
3  video recorded?
4  A. Well, I video recorded everywhere that
5  was publicly accessible, so I'm sure there was
6  other people on the video. After I spoke with
7  Ms. Siaba Green, I did go downstairs to file a
8  FOIA request, and I did speak with the city
9  clerk.
10 Q. Okay. Do you recall -- I don't
11 know who the city clerk was at that time.
12 Do you recall the name of the city
13 clerk?
14 A. I don't recall her name.
15 Q. Okay. And this individual that told
16 you you weren't allowed to record, she also
17 indicated that she did not wish to be recorded,
18 right?
19 A. Not that I recall, ma'am.
20 Q. Oh, okay. So you thought she was just
21 fine with that?
22 A. Well, she told me to stop recording.
23 Something to that effect. So, she wasn't okay
24 with it. But she referenced the signage that

Page 47

1  was on the window.
2  Q. But she did ask you to stop?
3  A. Yes, ma'am.
4  Q. And she appeared to be a regular office
5  worker?
6  A. Government official. Yes, ma'am.
7  Q. Nope. What makes you think she was a
8  government official?
9  A. Well, I use the term government
10 official because they work for the government.
11 Q. That's a term of -- I'm just telling
12 you that's a term of art. An official is a term
13 of art.
14 So, she was just a regular office
15 worker at the City of Berwyn, right?
16 MR. KULIS: Based on what you know.
17 THE WITNESS: Well, she was a tax -- she
18 collected taxpayer money for her check. She's a
19 public servant. I guess I see it as government
20 official, based on my knowledge.
21 BY MS. GRANDFIELD:
22 Q. What is your understanding or
23 definition as to what a government official is?
24 A. Somebody that works for the government

Page 48

1  and receives taxpayer money and is a public
2  servant.
3  Q. Okay. What is your understanding or
4  definition of a public servant?
5  A. Someone who takes the noble job of
6  serving the public and provides services to the
7  public and receives in exchange taxpayer
8  benefits such as a salary, healthcare, things of
9  that nature.
10 Q. Okay. And with respect to those
11 employees, I'm going call them, because they're
12 not officials in my work, do you believe that
13 those employees sacrificed their rights to
14 privacy?
15 MR. KULIS: Calls for a legal conclusion.
16 If you can answer. I mean, I don't
17 know what --
18 THE WITNESS: Can you repeat the question,
19 ma'am?
20 BY MS. GRANDFIELD:
21 Q. Do you believe those employees
22 sacrificed their right to privacy?
23 A. To the best of my knowledge, no one has
24 any right to privacy while they're in public,

Page 49

1   ma'am.  So, I don't think they're sacrificing
2   anything, whether they're a government official,
3   an employee, a clerical worker.  If you're in
4   public, you don't have a right to privacy.
5   That's my understanding.
6     Q.  Okay.  So, is it your understanding
7   that, regardless of whether I wanted you to or
8   not, you could just, at the end of this
9   deposition, follow me outside the deposition and
10  video record me whether I told you to or not?
11    MR. KULIS: Objection; calls for a legal
12  conclusion and is also quite argumentative.  It
13  also is an improper -- what's the word I'm
14  looking for?
15    MS. GRANDFIELD: I don't know.
16    MR. KULIS: Example or improper --
17    MS. GRANDFIELD: Incomplete hypothetical?
18    MR. KULIS: Improper hypothetical.
19  BY MS. GRANDFIELD:
20    Q.  I'm going to ask you to go ahead and
21  answer to the extent you can.
22    MR. KULIS: Answer as best you can, if you
23  can.
24    THE WITNESS: Okay.  Can you repeat the

Page 50

1   question?
2     MS. GRANDFIELD: I'll just have the court
3   reporter repeat it because it's a long-winded
4   question.  I don't know if I can say it the same
5   twice.
6         (WHEREUPON, said Record was
7           read as requested.)
8     THE WITNESS: Again, to the best of my
9   knowledge, I'm not an attorney, but, to the best
10  of my knowledge, no one -- you're not a
11  government official, a clerk, or anything like
12  that.
13        To the best of my knowledge, you don't
14  receive taxpayer-funded -- your check is not
15  funded by the taxpayers other than your check
16  from Berwyn.
17        But I would say no one has a right to
18  privacy in public legally.  So, I would be
19  within my legal rights if I chose to do so.
20  BY MS. GRANDFIELD:
21    Q.  Okay.  And then you could post my image
22  on a website of that video recording and make a
23  profit off of it if you wanted to?
24    A.  I'm not an attorney.  I don't know.  I

Page 51

1   don't know if that's...
2     Q.  I know.  I'm not asking under the law.
3         I'm asking what your understanding or
4   belief is because --
5     A.  Okay.  My understanding is that, yes, I
6   can do that because you have no right to -- to
7   my understanding, you have no right to privacy
8   when you're out in public.
9     Q.  And that would be -- the same would
10  hold true even if I told you to stop recording
11  me?
12    MR. KULIS: Calls for a legal conclusion.
13    MS. GRANDFIELD: Again, I'm just asking based
14  on his understanding or beliefs.
15    THE WITNESS: Based on my understanding, you
16  have no right to expectation of privacy in
17  public, ma'am.
18  BY MS. GRANDFIELD:
19    Q.  Okay.  And I could do the same thing to
20  you?
21    A.  Correct.
22    Q.  Okay.  Now, going back to November
23  of 2021, you were on the first floor.  You spoke
24  to someone who asked you to stop recording and

Page 52

1   referenced the signs -- I'm not trying to
2   restate what was said.
3         But then after that, what happened?
4     A.  I went upstairs.  And I was recording,
5   documenting all the publicly -- in the publicly
6   accessible hallway there on the second floor.  I
7   was about to go take a look at the counsel
8   chambers for my viewers and document that, and
9   that's when Ruth Siaba Green came up to me, and
10  she called out, "Sir, what are you doing?"  And
11  she confronted me.
12    Q.  Okay.  And when you say it was publicly
13  accessible, what do you mean by publicly
14  accessible?
15    A.  Well, to me, publicly accessible is
16  anywhere that's publicly accessible.  So, if I
17  can get there without any obstacles and it's a
18  public building and -- you know, somebody's
19  private office I wouldn't consider publicly
20  accessible.
21    Q.  Okay.  That's what I mean.  Because
22  it's not, you know, clear.
23        Okay.  And so would it be fair to say
24  that because there was no, like, rope or locked

Sean Paul Reyes vs
City Of Berwyn, et al.,

Page 53

1  door or something like that to go to the second
2  floor, that's why you deemed it was, in your
3  words, publicly accessible?
4      A.   Right.  No signage that would say,
5  restricted area, you know, employees only, like
6  you said, a rope, some type of barrier that
7  prevents someone from walking up there.
8      Q.   And was it while you were still on the
9  stairs or once you got to the second floor that
10  you spoke to Ms. Green?
11      A.   So, you go up the stairs, I walk down
12  this hallway, and as I was about to enter into
13  the city counsel's -- right in front -- straight
14  ahead is the city counsel room, the chamber
15  where they hold, I guess, like, public meetings.
16          So, I went to go in there, and as I was
17  about to go in, to the right of me was the city
18  administrator's office.  And that's when
19  Ms. Siaba Green came and confronted me and when
20  I turned my camera towards her.
21      Q.   Okay.  And do you have any knowledge or
22  understanding as to where the city
23  administrator's office is in relation to the
24  mayor's office?

Page 54

1      A.   Yes.  I believe it is -- it's to the
2  left of the mayor's office.  So, the mayor's --
3  you go up the stairs.  You pass the mayor's
4  office.  There's another office in between
5  theirs, and then there's Ms. Siaba Green's
6  office at the end.
7      Q.   Okay.  And do you have any knowledge or
8  understanding as to if the city administrator's
9  office has access to the mayor's office?
10      A.   I believe I seen a pass-through.  I
11  think there is one.  I'm not sure.
12      Q.   And what did Ms. Green say to you, and
13  what did you say to her?
14      A.   Again, this is all in recording, so if
15  we get specific -- but, to the best of my
16  knowledge of what was said, she confronted me
17  and said, "Sir, are you recording?"
18          I said, "Yes, ma'am.  I'm recording."
19          She said, "Well, you're not allowed to
20  record in here without our permission."
21          I said, "Whose permission is that?  I
22  don't need permission to record in public.
23  You're a government official."
24          And she says, "I'm not elected."

Page 55

1          And I told her that doesn't matter that
2  she's elected or not.  And I believe that's when
3  Detective Monaco, who was with her at the
4  time...
5      Q.   And why do you think it doesn't matter?
6      A.   Why do I think what doesn't matter.
7      Q.   Whether she's elected or not.
8      A.   Because, like I stated earlier, ma'am,
9  if you're receiving taxpayer-funded money and
10  you work for the government, you should be able
11  to be held accountable.
12      Q.   Accountable for what?
13      A.   Well, just in the daily goings of what
14  is going on in the government.
15      Q.   Okay.  And --
16      A.   Not in a legal view.  My view, ma'am.
17      Q.   Well, I was just asking why you said it
18  didn't matter.  So, I don't really think that's
19  responsive to my question.  But moving on.
20          What do you recall next saying?
21      THE COURT REPORTER: I'm sorry.  What do you
22  recall who?
23      MS. GRANDFIELD: Next saying.
24

Page 56

1  BY MS. GRANDFIELD:
2      Q.   You said Detective Monaco -- I think
3  it's Monaco --
4      A.   I believe he repeated -- again, this is
5  all memorialized on video.  But I believe he
6  said something like, you know, "You're not
7  allowed to record in here without their
8  permission."
9          And I'm assuming he means their, the
10  powers that be, if you will, of City Hall, and
11  government officials, public servants, whatever
12  you want to call them.
13          And I tried to explain to him that I
14  have a right to record government officials in
15  the course of their duty -- and, again, that's
16  based on my legal knowledge and my understanding
17  of certain case law -- and I thought the sign
18  was unconstitutional.
19          And I believe he took me -- he said,
20  "Well, come" -- "let's talk outside," or
21  something of that nature.  We moved from -- I
22  told Ms. Siaba Green to have a nice day.  And we
23  moved on to -- we went downstairs.  I believe I
24  asked to speak to a supervisor as well.

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 57

1    Q.   Okay.  And when you say we moved on to
2  downstairs, you mean Detective Monaco and you?
3    A.   That's correct.
4    Q.   Okay.
5    A.   And I said good-bye.
6    Q.   All right.  Was Detective Monaco
7  wearing a police uniform at the time, do you
8  recall?
9    A.   He was, ma'am.
10    Q.   Okay.  Do you recall if he had any sort
11  of, like, recording device on him?
12    A.   It looked to me as if he had -- yes.  I
13  believe he had a body camera on.  I've not been
14  able to FOIA request that.  They've denied that.
15  They said that doesn't exist.  But according to
16  the video, I believe he had a body camera on,
17  yes, ma'am.
18    Q.   So then you went downstairs -- down the
19  stairs, I guess, I should say.
20    A.   Down the stairs.
21    Q.   And then did you exit City Hall?
22    A.   I did not.
23    Q.   Did you guys stand there on the
24  landing?

Page 58

1    A.   I think so.  Again, it's all on video.
2  But I believe so.  I believe another officer
3  arrived on scene.  I explained to them that I
4  also wanted to do -- and then the sergeant --
5  and I started talking about my FOIA request that
6  I wanted to submit to the city.
7         And then I remember the sergeant
8  saying, you know, "People don't want to be
9  recorded."  And he pointed to a gentleman, a
10  random gentleman that was there.  A citizen, not
11  a public servant or government official, if you
12  will.  And he said, "Sir, do you want to be
13  recorded by the man?"
14         And I remember the person said, "I
15  don't care."
16         And I said, "Well, see?  Nobody -- it's
17  not a big deal.  There's cameras all around us."
18         And I believe that's when we went
19  outside.  He wanted to show -- Sergeant Volanti
20  wanted -- I did my FOIA request, and then I
21  believe Sergeant Volanti wanted to show me that
22  signage with the statute below it.
23    Q.   And what is the basis for your
24  understanding that Mr. Volanti was a Sergeant?

Page 59

1  Was he wearing a uniform that said Sergeant?
2    A.   He had a white shirt.  A white shirt
3  usually indicates some sort of supervisor, to my
4  knowledge.
5    Q.   Okay.  So he was wearing a police
6  uniform as well, and he had a white shirt?
7    A.   Right.  I don't think Detective Monaco
8  was wearing a uniform per se, but he did have on
9  a vest, a bulletproof vest, over, like, a dress
10  shirt that said police on it.
11    Q.   All right.  Yeah.  That's why I was
12  asking.
13    A.   Not necessarily a uniform, but some
14  sort of indicator that he was law enforcement.
15    Q.   And then what happened with -- I'm just
16  going to call him Officer Volanti because,
17  honestly, I don't know what his rank is.
18         What happened with Officer Volanti?
19    A.   So we went outside.  He showed me the
20  sign that I had already seen that members of the
21  public are prohibited from recording without
22  prior permission, and then it has a statute.
23         And so I told him, "What's the statute?
24  What law is that?"

Page 60

1         And he left and went to go look.  He
2  said, "I'm going to" -- I remember him going on
3  his phone trying to pull up the statute.  And I
4  think it was the felony eavesdropping statute
5  that was already ruled unconstitutional in that
6  type of implementation.  I forget the case.
7         But he had looked it up, looked up the
8  statute.  And he kept leaving.  He kept, like,
9  going to, like, the parking lot, talking on the
10  phone with I don't know who.
11         As all that was happening, I was
12  outside of City Hall at this point, and I was
13  recording the conversation.  And then Detective
14  Monaco says, "Well, I don't want you recording
15  me."
16         And I said, "Well, sir.  You're law
17  enforcement, and I have a right to record you.
18  We're outside.  We're in public."
19         And he says, "No.  I have a right not
20  to be recorded."  And then he goes and he grabs
21  my camera, and then, like, my hand.
22    Q.   Okay.  When you say your camera --
23  because you said you had a GoPro as well as your
24  phone.

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 61

1    Which one did you use?
2    A.  The camera that was attached to my
3  hand.  I call it a camera because -- it isn't a
4  camera, but I use it as a camera.
5    Q.  I know.  So your phone that has a
6  camera?
7    A.  It is a phone.  But I use it for the
8  purposes of a camera.
9    Q.  Okay.  But not your GoPro?
10   A.  Not my GoPro.  He grabbed my camera
11  phone.
12   Q.  Okay.  There we go.  All right.
13    And I guess I should have asked this to
14  begin with.
15    Did you have your camera phone on,
16  like, any sort of stick or anything like that?
17   A.  I believe so.  I'm not sure.
18   Q.  Okay.
19   A.  I don't recall.
20   Q.  All right.  So he grabbed the camera
21  phone and the stick thing that it was attached
22  to?
23   A.  Yeah.  And I just pulled it back, and I
24  said, "Hey, what are you doing?"

Page 62

1    He said, "I have a right not to be
2  recorded."
3    I was like, "Don't touch me."
4    I said, "See?  This is the problem."
5  This officer is seeing him, you know, assault
6  me, grab my stuff, put his hands on me, and he's
7  not doing anything about it.  I think Officer
8  Ghiloni is his name.  And I pointed that out.
9    And we just stood there while the
10  sergeant went back and forth and back and forth,
11  and eventually I was placed under arrest.
12   Q.  Okay.  And why do you believe that it
13  was Officer Ghiloni that was also there?
14   A.  Because --
15   Q.  In other words, did you see it on his
16  uniform or --
17   A.  I think I saw it on his uniform.
18  Again, I'm not sure.  It's all on the recording.
19  But normally, when I speak with law enforcement,
20  I always politely ask that they identify
21  themselves by name and badge number.
22   Q.  Okay.  And you said at some point your
23  phone was taken away, so that we don't have a
24  recording.

Page 63

1    What do you next recall happening?
2    A.  So I was placed under arrest.
3    Q.  Okay.  And how were you -- again, I
4  know it's a really obvious question.
5    How were you placed under arrest?
6    A.  Sergeant Volanti said, "You're under
7  arrest."  And I said, "For what?"
8    And I don't believe he answered me.
9  And I was assuming it was that statute that was
10  under the sign, the statute.
11    He said that they want to sign
12  complaints.  And, now, I'm assuming that was
13  Ruth Siaba Green.  At the time, I did not know
14  that.  They wanted to sign complaints, and I
15  believe he did mention the -- I don't know.
16    I don't recall, but I think it was for
17  that statute, the felony eavesdropping.  I think
18  ultimately they decided to change their minds on
19  that.
20    But I put my hands behind my back.  My
21  phone -- he said, "You can keep the phone."
22    And I said, "Okay."  And then I put my
23  hands behind my back, and that was it.  I had
24  the phone in my hand, but they eventually took

Page 64

1  the phone from me and took my GoPro off of me
2  and all that.
3    Q.  And when you say eventually, was this,
4  like, while you were there?
5    A.  It happened all at once.
6    Q.  All right.  And when you say you put
7  your hands behind your back, did they, in fact,
8  handcuff you?
9    A.  Yes, ma'am.
10   Q.  And then they put you in a police car?
11   A.  Yes, ma'am.
12   Q.  Once they put you in a police car, what
13  happened next?
14   A.  I was taken to the precinct, to the
15  police station.
16   Q.  Thank you.
17    And what happened?  How long did it
18  take you to get there?  Like, a minute, two
19  minutes, a couple minutes?
20   A.  It was quick.  A couple minutes.
21   Q.  And then once you got there, what do
22  you recall next happening?
23   A.  So, I was placed in a cell.  I was in a
24  cell.  I remember the officer talking.  There

Page 65

1 was an officer, a different officer that I
2 guess, you know, works in processing. And he
3 was telling me that -- I asked him what the
4 charge was, and he told me felony eavesdropping.
5 And then I said, What's -- it was
6 taking, you know, a long time. I don't know
7 typically what's the process in Berwyn.
8 But he said, "Well, they're trying to
9 figure out what they're trying to charge you
10 with." And, eventually, I guess they settled on
11 disorderly conduct. Because they said -- I
12 remember it was a big question at the time
13 because it was -- if I was being charged with a
14 felony, I would have to stay overnight. If
15 you're being charged with something else, it's
16 different.
17 So he was like, "You're probably going
18 to be here overnight. You're being charged with
19 a felony." It was a felony eavesdropping
20 statute that was on the sign.
21 I was like, "Okay."
22 And eventually -- they kept going back
23 and forth, and eventually they just wrote a
24 simple misdemeanor warrant, a misdemeanor charge

Page 66

1 for me, and I was released.
2 I think I was in the cell -- every
3 minute of the cell feels like an eternity. It's
4 a horrible experience. I think it was around
5 four to six hours. Around there. I'm not
6 exactly sure.
7 Q. Was there anyone else in there with
8 you?
9 A. No, ma'am. I was in the cell by
10 myself.
11 Q. And were the handcuffs taken off at
12 some point?
13 A. They were taken off when I was being
14 put in the cell, ma'am.
15 Q. Okay. And did you have to post any
16 form of bond or anything like that?
17 A. I believe I did. It was $100 bond.
18 Q. Okay. And other than that, was there
19 any sort of bond posting or anything else that
20 you had to do?
21 A. Just the $100.
22 Q. Okay. And at some point, you retained
23 a criminal defense attorney in relation to the
24 misdemeanor?

Page 67

1 A. That's correct, ma'am.
2 Q. And how much did you pay that criminal
3 defense attorney?
4 A. His name is Jim Jenks, and he saw the
5 video and reached -- he saw the video and saw
6 what was happening, and he offered to take the
7 case pro bono.
8 Q. Okay. And what is your understanding
9 of what pro bono is?
10 A. My understanding is that he does the
11 work for free for me, without charging me.
12 Q. Do you have any sort of agreement or
13 understanding with Mr. Jenks that he would be
14 entitled to a share of any compensation you
15 would receive in relation to this lawsuit?
16 A. No.
17 Q. Okay. What is your understanding as to
18 what happened with the misdemeanor case that was
19 filed against you?
20 A. So we had multiple court dates. Again,
21 I'm not sure -- I can definitely -- I'm sure you
22 have access to that information.
23 There was multiple court dates to go
24 back and forth from New York to Berwyn to Cook

Page 68

1 County courthouse. Excuse me. A lot of it was
2 done via Zoom.
3 Q. I was just going to say. That was my
4 confusion.
5 A. No. It was done via Zoom. Thankfully.
6 It was done via Zoom.
7 So, the way it just -- you know, like
8 all court cases, it just all takes time. And it
9 went through the process. We were ready to go
10 to trial. I believe they made an offer of some
11 sort to me, probation or something, suspended
12 sentence. I don't recall. But I refused that,
13 and we were ready to go to trial.
14 On the day of trial, the mayor was
15 there, Mayor Robert Lovero; Ruth Siaba Green,
16 the city administrator; everybody was there.
17 The state's attorney's office, the judge.
18 I had made a petition to the Court to
19 record -- well, a third-party actually made a
20 petition to the Court to record the proceedings,
21 the trial. And the judge -- the state attorney,
22 supervising state attorney objected vehemently.
23 He was very upset by this request. He did not
24 want to be recorded, didn't want these

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 69

1 government officials, public servants, recorded.
2       And the judge stated that, I don't mind
3 if he makes a record of these proceedings. You
4 know, No cameras in the courtroom was designed
5 to protect the defendant's rights, not to
6 protect government officials, state's attorneys,
7 things like that.
8       So, he was going to allow the
9 proceedings to be recorded over the objection of
10 the state's attorney, supervising state's
11 attorney. When that happened, the state's
12 attorney decided to dismiss the charges.
13 BY MS. GRANDFIELD:
14   Q.  Okay. Are you aware of any Illinois
15 state laws or rules about when a court
16 proceeding can be recorded?
17   A.  I believe it's up to a judge.
18   Q.  That's your understanding?
19   A.  Right.
20   Q.  Are you aware of any Cook County
21 courtrooms that prohibit members of the public
22 from bringing in cameras or video cameras?
23   A.  I'm not. Any laws? No, ma'am.
24   Q.  Right. Or any sort of --

Page 70

1   A.  I'm not aware of those. I'm not an
2 attorney.
3   Q.  Okay. Are you aware of instances in
4 Cook County where members of the public have
5 brought in cameras and then threatened various
6 individuals based on their testimony and perhaps
7 street gang affiliation?
8   A.  Am I aware of anybody with street gang
9 affiliation?
10   Q.  No, no. It was a long question. Let
11 me try it again.
12   A.  Please.
13   Q.  Are you aware that Cook County has had
14 instances of members of the public bringing in
15 cameras and recording proceedings and that
16 various witnesses have been threatened as a
17 result of that?
18     MR. KULIS: Objection to irrelevant material.
19     THE WITNESS: No.
20 BY MS. GRANDFIELD:
21   Q.  So you're not aware of that?
22   A.  I'm not aware of that.
23   Q.  Okay. And at some point in your
24 criminal case, a motion to dismiss was filed by

Page 71

1 your attorney. Do you recall that?
2   A.  Yes, ma'am.
3   Q.  And that motion was denied; is that
4 correct?
5   A.  Right.
6   Q.  And other than Danbury, Connecticut, I
7 believe, if I recall correctly, have there been
8 any other instances where you have -- I can
9 already tell this is a terrible question.
10     Other than the City of Berwyn charging
11 you with a misdemeanor and Danbury, Connecticut,
12 have there been any other instances where you've
13 been charged with a crime in relation to your
14 Long Island Audit activities?
15   A.  That's correct.
16   Q.  Those are the only ones?
17   A.  No. There's been other instances.
18   Q.  Okay. What are the other instances?
19   A.  So I mentioned previously the Harford
20 County, Maryland incident. Also, there was
21 Waterbury, Connecticut.
22   Q.  And in Hartford County, what --
23   A.  Harford. No T.
24   Q.  Oh, Harford County.

Page 72

1     What were you charged with there?
2   A.  I already told you all this.
3     But hindering, ma'am.
4   Q.  And what happened with that charge?
5   A.  Again, it was dismissed because of a
6 diversion.
7   Q.  I thought you told me that in relation
8 to Danbury.
9   A.  No, no. Harford. If you want to check
10 your notes. Harford County, Maryland.
11   Q.  Okay. So what happened in relation to
12 Danbury, then?
13   A.  Danbury, there was -- you asked me if
14 there was any federal lawsuits that I filed.
15 And I told you I did file a federal lawsuit in
16 Danbury, and it was dismissed for a technical
17 error.
18   Q.  Okay. So Danbury, you didn't have any
19 criminal charges?
20   A.  I did.
21   Q.  What happened to the criminal charges
22 in Danbury?
23   A.  They were -- the criminal charges were
24 dropped by the state's attorney.

Page 73

1  Q.  And what were the charges?
2  A.  Criminal trespassing, breach of the
3  peace, and, I believe, criminal trespassing.
4  Two degrees of criminal trespassing and a breach
5  of the peace were the criminal charges against
6  me.
7  Q.  And did those charges get dropped
8  before or after you filed a lawsuit against
9  Danbury?
10  A.  Before.
11  Q.  Okay.  So Danbury, Harford.  I don't
12  have anything in my notes about Waterbury.
13       What happened in Waterbury?
14  A.  So Waterbury, Connecticut, I was
15  arrested for criminal trespassing.
16  Q.  And what happened with that?
17  A.  I represented myself pro se.  I filed a
18  motion to dismiss.  I won my motion.  The case
19  was dismissed.
20  Q.  Okay.  Other than that, are there any
21  other instances where you -- and I won't go
22  through the whole list.
23       Other than what we just talked about,
24  were there any other instances where you've been

Page 74

1  criminally charged in relation --
2  A.  Oh, Hagerstown, Maryland.
3  Q.  Okay.  And what were the charges in
4  Hagerstown?
5  A.  Failure to obey, criminal trespass.
6  Q.  And what happened with respect to those
7  charges?
8  A.  The state's attorney declined to
9  prosecute those charges, and they were
10  dismissed.
11  Q.  And was that before or after your
12  attorney reached out to them?
13  A.  That was before, ma'am.
14  Q.  Okay.  And then Baltimore County,
15  Maryland, was -- okay.
16       Other than that, any other places that
17  you've been criminally charged?
18  A.  New York City.
19  Q.  Okay.
20  A.  It's unfortunately a little longer of a
21  list.  New York City, ma'am.
22  Q.  Okay.  And what --
23  A.  61st Precinct.
24  Q.  See, there's a precinct.

Page 75

1       And what were you charged with there?
2  A.  I was charged with criminal trespassing
3  and simple trespass.
4  Q.  Okay.  And what happened with those
5  charges?
6  A.  Dismissed.
7  Q.  Do you have any recollection as to when
8  that was?
9  A.  That was -- the 61st Precinct, I
10  believe, was April of this year.
11  Q.  Okay.  Any other places?
12  A.  75th Precinct of the NYPD.
13  MR. KULIS: What precinct?
14  THE WITNESS: 75th, sir.
15  BY MS. GRANDFIELD:
16  Q.  Okay.  And what were the charges there?
17  A.  Obstructing governmental
18  administration, criminal trespass, simple
19  trespass.
20  Q.  And what happened with those charges?
21  A.  We are currently awaiting the judge's
22  motion on a motion to dismiss in that case.
23  Q.  Are you representing yourself in that
24  matter, or do you have an attorney representing

Page 76

1  you?
2  A.  I have an attorney.
3  Q.  And when were those charges filed, if
4  you know?
5  A.  I believe June.
6  Q.  Of this year?
7  A.  Of this year, yeah.
8  Q.  Other than all these that we've
9  discussed, any other criminal charges?
10  A.  Nassau County, New York.
11  Q.  New York.  Okay.  I was hoping for you
12  it was the Bahamas.
13       And what were the charges there?
14  A.  Criminal trespass, third degree, two
15  times.
16  Q.  And what happened to those charges?
17  A.  Those charges are still pending.
18  Q.  And do you know when that was filed?
19  A.  August.
20  Q.  Of this year?
21  A.  Of this year.
22  Q.  Okay.  Anywhere else?
23  A.  No, ma'am.  I believe that's all.
24  Q.  Okay.  Going back to your social media,

Page 77

1  you get a source of revenue based on how many
2  clicks you get on something?
3      A.  How many views.
4      Q.  How many views you get on something.
5  Okay.
6          So, would it be something that you
7  would be able to do, to track how much income
8  you got off of the views of the videos that you
9  posted in relation to the City of Berwyn?
10     A.  Is it something that I could track?
11     Q.  Yes.
12     A.  I believe so.
13     Q.  Okay.  Do you know what your
14 highest-viewed videos are?
15     A.  I believe my highest-viewed video is on
16 Facebook.
17     Q.  And do you know what video that is?
18     A.  My first ever video that I posted.
19     Q.  Okay.  And where was that at?  Do you
20 recall?
21     A.  Suffolk County, New York.
22     Q.  And with respect to the City of Berwyn,
23 other than this November of 2021 incident that
24 we're here on today, we talked earlier about you

Page 78

1  talking with Commander Ochsner.  Do you recall
2  that?
3      A.  Yes, ma'am.
4      Q.  And that was at a later date; is that a
5  fair statement?
6      A.  Yes, ma'am.
7      Q.  And if I said that was in 2022, would
8  you have a reason to disagree with that?
9      A.  No.
10     Q.  Okay.  And other than that interaction
11 that you had with Commander Ochsner, were there
12 any other occasions that you've gone to the city
13 of Berwyn?
14     A.  The protest.
15     Q.  Oh, right.  The protest.
16         Other than that?
17     A.  Not that I recall.
18     Q.  Okay.  And did you go to the city of
19 Berwyn yesterday?
20     A.  I did, ma'am.
21     Q.  Okay.  And did you ask to speak to
22 Ms. Siaba Green?
23     A.  I did not.
24     Q.  Did you ask to speak to anyone?

Page 79

1      A.  I tried making an appointment with the
2  mayor.  I believe what happened was -- I was
3  upstairs.  An employee, a public servant, I
4  don't know her name.  I believe she's one of
5  Ms. Siaba Green's secretaries.  I'm not sure of
6  her name.
7          But she came up to me and said, "Oh, do
8  you need any help?"  And she realized who I was,
9  and she said "Hi, how are you?  Nice to see you
10 again."
11         "Nice to see you too, ma'am."  And then
12 she went about -- went to the office.
13         I went to go see if the mayor's
14 secretary was in to make an appointment to speak
15 with him.  She, that same woman, came and said,
16 "Are you" -- "do you need help with anything?"
17         I said, "Yeah.  I was looking to make
18 an appointment to speak with the mayor."
19         She said, "Oh, Virginia is not in."  I
20 guess that's the mayor's secretary.  And she
21 says, "Well, you can make an appointment when
22 she gets back.  You just wait here."
23         And I said, "Okay."
24         But the mayor had come out of the

Page 80

1  office, and I had direct line of sight of him,
2  so I asked him questions as part of my story
3  that I'm working on.
4      Q.  Okay.  And what was the purpose of you
5  going to speak to the mayor of Berwyn?
6      A.  Well, it kind of happened as a side
7  effect of why I was there.  I was there to file
8  some FOIL -- FOIA requests.  Excuse me.  It's
9  FOIL in New York.  FOIA requests.  That was my
10 main purpose was to file some FOIA requests.
11     Q.  Okay.  But if you could just answer my
12 question.  Maybe we're misunderstanding each
13 other.
14     A.  I think so.
15     Q.  What was your purpose in speaking to
16 the mayor?
17     A.  To ask him questions about my story.  I
18 answered that question.
19     Q.  No, I don't think you did.
20         What is your -- what story?
21     A.  I'm working on a story -- as I stated
22 earlier, ma'am, I'm working on a story about
23 nepotism, corruption in regards to the City of
24 Berwyn regarding Ruth Siaba Green's husband,

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 81

1 Division Commander David Green, being promoted
2 despite his multiple excessive force lawsuits
3 and costing the city residents thousands of
4 dollars in lawsuit settlements.
5      So, I'm trying to get to the bottom of
6 that and see why is that happening to report on
7 it.
8   Q.  Okay.  So, you wanted to ask the mayor
9 about Ruth Siaba Green's husband?
10  A.  I wanted to ask the mayor why, as the
11 leader, the elected leader of that city, why
12 Ruth Siaba Green's husband continually be
13 promoted despite having a disciplinary record
14 that's full of excessive force and lawsuit
15 settlements regarding his behavior.
16  Q.  What disciplinary record are you
17 referring to?
18  A.  I misspoke.  I'm talking about the
19 lawsuits for excessive force that were filed
20 against him.
21  Q.  Okay.  Are you aware of any verdicts
22 that have been entered against Commander Green?
23  A.  No.  I believe I FOIA requested that
24 information.  I'm not sure.  But I don't think

Page 82

1 they've been responsive.
2   Q.  I'll just say, side note, that that's
3 not the right way to go about it.  It's a court
4 record.  But anyway, moving on.
5      MR. KULIS:  It's public record, actually.
6      MS. GRANDFIELD:  Yeah.  So you would not get
7 it from the City.  You would get it from the
8 court.  So, anyway --
9      MR. KULIS:  I mean, I don't know if that's a
10 question.
11      MS. GRANDFIELD:  It's not a question.  I'm
12 just saying.
13      MR. KULIS:  But that is not actually true
14 because any settlement would be --
15      MS. GRANDFIELD:  No, no, no.  Not a
16 settlement.  I'm saying a verdict.  That's what
17 I'm saying.
18 BY MS. GRANDFIELD:
19  Q.  So, if you're looking for a verdict,
20 you got to go to the court.
21  A.  What verdict am I looking for, ma'am?
22  Q.  I just asked you if there were any
23 verdicts against Mr. Green that you are aware
24 of.  And you said, "No.  I've tried to FOIA

Page 83

1 that, and I haven't gotten any response."
2   A.  I thought we were talking about
3 disciplinary verdicts.
4   Q.  No.  I was asking about court verdicts.
5   A.  Oh.  Then we had a misunderstanding.  I
6 thought you were talking about, like, internal
7 affairs complaints.  That's what I was referring
8 to, not criminal.
9      To my knowledge, David Green hasn't
10 been charged criminally with anything.
11  Q.  No, no.
12      MR. KULIS:  You guys are speaking different
13 languages.
14      MS. GRANDFIELD:  Yeah.
15 BY MS. GRANDFIELD:
16  Q.  Are you aware of any civil or criminal
17 verdicts against Commander Green?
18  A.  No.
19  Q.  Okay.
20      MR. KULIS:  That's good.  You answered the
21 question.
22 BY MS. GRANDFIELD:
23  Q.  Okay.  And when you said you FOIA'd
24 stuff in relation to Commander Green, you're

Page 84

1 saying you FOIA'd to see if he had any sustained
2 findings or something of that nature with
3 respect to internal affairs?
4   A.  Correct, ma'am.
5   Q.  And in relation to that, did you
6 receive a response?
7   A.  Not that I recall, no.
8   Q.  So, as you sit here today, is it your
9 contention that those were unresponded to or
10 that they responded and said there were none?
11      What is your understanding?
12  A.  To the best of my knowledge, I believe
13 that they denied the request.  I'm not exactly
14 sure why.  I would have to get those records.
15  Q.  Okay.  So they denied it based on some
16 exemption?
17  A.  To my understanding, yeah.
18  Q.  Okay.  But if I asked for that, you
19 could provide that to your attorney?
20  A.  Well, I'm sure I could just FOIA the
21 FOIA request.
22  Q.  Well, I mean, you have them in your
23 possession?  You have the FOIA --
24  A.  The FOIA request?  I'm not sure,

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 85

1  honestly, if I have the exact FOIA request
2  still.
3     Q.  Okay.  And what, other than Commander
4  Green, are you investigating at the City of
5  Berwyn?
6     A.  That would be it right now, as of right
7  now.
8     Q.  And what caused you to investigate
9  Commander Green?
10    A.  Oh, I'm so sorry, ma'am.  I also filed
11 a request for the internal affairs against
12 Detective Monaco and Sergeant Volanti that I
13 filed.  I've never been contacted by internal
14 affairs.  So when I went there, I asked the
15 mayor, the leader of the city.
16        I said, "Hey, do you know if it's
17 normal practice that internal affairs doesn't
18 speak with somebody who has filed a complaint
19 against an officer?  Doesn't reach out, doesn't
20 respond to any of my, you know, phone calls or
21 messages that I leave to set up an appointment
22 as the division commander instructed me to make
23 an appointment?"
24    Q.  Okay.  Other than that, is there

Page 86

1  anything else that you're investigating at the
2  City of Berwyn?
3     A.  No, ma'am.
4     Q.  What caused you to investigate
5  Commander Green?
6     A.  Like I stated earlier, an activist
7  group reached out to me and told me -- because
8  they've seen my videos, they told me about
9  Commander Green's -- the lawsuit settlements
10 that were settled in relation to these lawsuits
11 that were filed against him for excessive force.
12    Q.  Okay.  And with respect to this
13 activist group, what activist group are you
14 talking about?
15    A.  Like I said earlier, I don't recall the
16 name of the activist group.
17    Q.  Okay.  And why do you believe them to
18 be in your definition of an activist group?
19    A.  Because I remember them telling me a
20 name.  I remember a name.  I just don't remember
21 the specific name.  I know they're a part of
22 something.
23    Q.  And how did they reach out to you?
24    A.  They were at the protest, ma'am.

Page 87

1     Q.  Okay.  And did they reach out to you in
2  any other form, text, e-mail, whatever type of
3  messaging is available on social media that I
4  definitely don't know?
5     A.  Not that I recall.
6     Q.  Okay.  And we just went through a
7  series of --
8        MR. KULIS: Can we take, like, a two-minute
9  break?
10        MS. GRANDFIELD: Oh, sure.
11        MR. KULIS: I think I will take you up on
12 that water.
13            (WHEREUPON, a short break was
14            taken.)
15        MS. GRANDFIELD: We can go back on the
16 record.  If you can just tell me what the last
17 question was.
18            (WHEREUPON, said Record was
19            read as requested.)
20 BY MS. GRANDFIELD:
21    Q.  Okay.  We just went through a series of
22 instances where you indicated that criminal
23 charges had been filed against you.
24        Do you recall discussing that,

Page 88

1  generally?
2     A.  Yes, ma'am.
3     Q.  And you would agree with me that those
4  criminal charges that did not result in a
5  conviction, you would agree with me that those
6  criminal charges that were dismissed also means
7  that you did not commit those criminal offenses;
8  is that correct?
9        MR. KULIS: It's a compound question.
10        If you understand the question, go
11 ahead.
12        THE WITNESS: I would agree that if you're
13 not convicted of a crime then you did not commit
14 the crime or you're not legally responsible for
15 the crime.  There is such thing as jury
16 nullification, so...
17        THE COURT REPORTER: I'm sorry?
18        THE WITNESS: There is such thing as jury
19 nullification, so...
20 BY MS. GRANDFIELD:
21    Q.  Okay.  And do you have knowledge if any
22 other officers in the City of Berwyn are named
23 in lawsuits?
24    A.  Do I have information --

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 89

1    Q.  Yeah.  Knowledge.  I said knowledge.
2    A.  Oh, knowledge.  Sorry.  Do I have
3  knowledge of what?
4    Q.  Any other Berwyn officers that are
5  named as defendants in lawsuits.
6      MR. KULIS: In lawsuits anywhere or
7  lawsuits --
8      MS. GRANDFIELD: Well, anywhere, yeah.  We
9  can narrow it down if it's a really long answer.
10  But I'm assuming he can self-narrow by
11  answering.
12      THE WITNESS: One more time, please.
13  BY MS. GRANDFIELD:
14    Q.  Are you aware of any other Berwyn
15  officers that named as defendants in any
16  lawsuits?
17    A.  No, I am not.
18    Q.  Okay.  These activists, have these
19  activists identified any other officers that
20  were named in any other lawsuits?
21    A.  Not that I recall.
22    Q.  Okay.  Did you receive a copy of any or
23  otherwise have a copy of any pleadings where
24  Officer Green is named in any lawsuits?

Page 90

1    A.  I believe they have it -- they had
2  those copies on their website.
3    Q.  Who is they?
4    A.  This activist group.  They made, like,
5  a change.org petition.  Stop Promoting Bad
6  Behavior, I think, was the name of it.
7    Q.  Okay.  And other than that, do you have
8  any information or knowledge as to what lawsuits
9  Commander Green would have been named in?
10    A.  No.
11    Q.  Okay.  And other than the -- you said
12  it seemed like forever, but whatever the time
13  frame was that you were in the city lockup, was
14  there any other time that you spent in any sort
15  of lockup, jail, prison, whatever you want to
16  call it, in relation to the charges that were
17  brought against you by the City of Berwyn?
18    A.  No.
19    Q.  Okay.  And you said that you had
20  several court appearances.
21      Were there any court appearances for
22  the criminal misdemeanor that was brought by
23  Berwyn that you had to appear in person for?
24    A.  The trial.

Page 91

1    Q.  Your criminal trial, you had to appear
2  in person?
3    A.  That's correct.
4    Q.  It wasn't via Zoom?
5    A.  No, ma'am.
6    Q.  And where did you appear for that?
7    A.  Cook County.  The Maywood Courthouse.
8    Q.  And do you recall the name of the judge
9  that you appeared before?
10    A.  I do not.  It was an African American
11  male judge.
12    Q.  Okay.  At any time did you participate
13  in hearings or statuses related to your criminal
14  case that were via Zoom?
15    A.  Yes, ma'am.
16    Q.  And was there an instance that you --
17  that someone other than the county recorded
18  those proceedings?
19    A.  Yes, ma'am.
20    Q.  And who was that?
21    A.  I don't know.
22    Q.  Why do you have knowledge of it?
23    A.  Because I received them.
24    Q.  And who did you receive them from?

Page 92

1    A.  From another -- I believe I received it
2  from an anonymous e-mail, a Proton e-mail
3  address.
4    Q.  What's a Proton e-mail address?
5    A.  It's just like a Gmail, but it's called
6  Proton.  I believe so.
7    Q.  And what did you do with that
8  recording?
9    A.  I disseminated it to the public.
10    Q.  Okay.  And at the beginning of Cook
11  County Zoom hearings, there is usually a warning
12  that says that you're not to record those
13  proceedings yourself or otherwise disseminate
14  them.  Do you recall that occurring?
15    A.  I don't recall that specific warning,
16  no.
17    Q.  Okay.  And when you say you
18  disseminated it, what do you mean you
19  disseminated it?
20    A.  Published it.
21    Q.  Okay.  Where did you publish it at?
22    A.  YouTube, Facebook, social media.
23    Q.  At some point, did someone tell you or
24  request that you take that down?

Page 93

1    A.  Not that I recall.
2    Q.  Is it still up on your website?
3    A.  I believe so.  I'll have to check.
4    Q.  Okay.  So you're not aware of the fact
5  that you are not allowed to record certain
6  proceedings in Cook County?
7    A.  No.
8    Q.  Okay.  You're not allowed to record
9  Cook County Zoom recordings.
10            (WHEREUPON, Exhibit No. 1 was
11        marked for identification.)
12  BY MS. GRANDFIELD:
13    Q.  I'm going to show you what I will have
14  marked as Exhibit 1.
15        Do you recognize this document?
16    A.  Yes.
17    Q.  Okay.  And it says:  Effective date
18  August 16th.
19        And what is this document, just for the
20  record?
21    A.  A letter of intent to sue.
22    Q.  Okay.  And on this document, it says:
23  Effective date August 16th, 2022.
24        Do you see that?

Page 94

1    A.  Yes.
2    Q.  Is that the date that you sent the
3  letter?
4    A.  I believe I personally handed it to the
5  mayor.
6    Q.  Okay.  And is that the date that you
7  personally handed it to him?
8    A.  I believe so.
9    Q.  Okay.
10    A.  I'm not sure.
11    Q.  Other than personally handing it to the
12  mayor, was there anybody else that you
13  distributed this to at the City of Berwyn?
14    A.  Not that I recall.
15    Q.  Okay.  You didn't, like, e-mail it or
16  anything like that?
17    A.  Not that I recall, no.
18    Q.  Did you publish this letter in any way?
19    A.  I did.
20    Q.  How did you publish it?
21    A.  I published it on my social media, my
22  platforms.
23    Q.  Okay.  And is that post still up on
24  your social media platforms?

Page 95

1    A.  I believe so.
2    Q.  Okay.  And are there comments in
3  relation to this published correspondence?
4    A.  There's comments on every video, so,
5  yes, ma'am.
6    Q.  And have you maintained those comments?
7        In other words, you haven't deleted
8  them or done anything with them yourself?
9    A.  Myself, no.
10    Q.  Okay.  And when you say yourself, is
11  there some information or knowledge that you
12  have that other people have done something to
13  those comments?
14    A.  I have no knowledge that anyone has
15  done anything to the comment section, no.
16    Q.  0kay.  Or that any social media company
17  has deleted or otherwise modified these
18  comments?
19    A.  I wouldn't know.  It's YouTube's
20  platform, Facebook's platform.  They can delete
21  comments without my permission.
22    Q.  Okay.  And by posting this to social
23  media, that in itself would give you views,
24  correct?

Page 96

1    A.  Correct.
2    Q.  So you would get income from posting
3  this notice of intent to sue, right?
4    A.  Correct.
5    Q.  Okay.  And with respect to this letter
6  of intent to sue, did any attorney assist you in
7  drafting this letter?
8    A.  No.  I believe I just used a form,
9  like, a standard form that you can find online.
10    Q.  Okay.  And did you post all of these
11  attachments to this letter on your social media?
12    A.  I'm not sure.
13    Q.  Okay.  Would you be able to go back and
14  look at your posts and see if you had?
15    A.  I'm sure I could, yeah.
16    Q.  Okay.  What caused you to write this
17  letter of intent to sue?
18    A.  Because I planned on filing a lawsuit.
19    Q.  Okay.  And what was the purpose of
20  sending this letter?
21    A.  To put them on notice that I was
22  intending to file a lawsuit.
23    Q.  Was there any other purpose?
24    A.  Just to put them on notice that I'm

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 97

1  intending to file a lawsuit.
2      Q.  Okay.  And with respect to the -- what
3  is a public apology letter?
4      MR. KULIS: What is the question?
5      MS. GRANDFIELD: It says in here a public
6  apology letter.  So I'm just asking him what do
7  you mean by that?
8      THE WITNESS: I believe I meant for the City
9  to write an apology for unlawfully arresting me,
10  violating my rights, et cetera.
11  BY MS. GRANDFIELD:
12      Q.  Okay.  But you didn't have anything
13  specific in mind?
14          You're just saying you just need a
15  public apology letter?
16      A.  I just said specifically for unlawfully
17  arresting me.
18      Q.  I know, but that's what I'm saying.
19          Was there something specific that you
20  had in mind with respect to the public apology
21  letter?
22          And then you just said from the City.
23          Like, you know, who?
24      A.  A representative of the City.

Page 98

1      Q.  Okay.  And then you say First Amendment
2  training.
3          Is there some sort of specific First
4  Amendment training that you had in mind?
5      A.  Generally.  Just general training on
6  First Amendment-protected activities.
7      Q.  Okay.  And then you demand $75,000; is
8  that correct?
9      A.  That's correct.
10      Q.  Okay.  And what is the basis for the
11  $75,000, if anything?
12      A.  Honestly, I just wrote that number
13  there.  It just -- you know, I didn't really
14  think about it too much.  It was more just --
15  like I said, it was a form, like, a template.
16      Q.  So was this 75,000 in the template?
17      A.  No, it wasn't in the template.  But the
18  letter was in the template.  I just picked a
19  number.
20      Q.  Okay.  So there is no correlation to
21  the amount of money that you believe you were
22  harmed or anything like that?
23      A.  Well, I believe that I was harmed.  I
24  just didn't know -- I'm not an attorney.  That's

Page 99

1  why I hired an attorney.
2      Q.  I understand.  But I'm just trying to
3  figure out if there was any reason as to why you
4  selected the number 75,000?
5      A.  No.  It was a long time ago.  There
6  wasn't any specific reason that I can recall.
7      Q.  Okay.  And what are the damages that
8  you're claiming in this case?
9      A.  I believe whatever a judge or jury
10  finds fair.
11      Q.  What is the specific categories and
12  amounts of damages that you are seeking?
13      A.  I'm not seeking any specific amount.
14  Whatever a judge and a jury decides what's fair.
15      Q.  What do you believe, if anything, that
16  you are entitled to in compensation?
17      A.  I believe that would be up to a judge
18  or a jury to decide what's fair.
19      Q.  So you have no opinion or otherwise as
20  to what amount you would be entitled to in
21  compensation?
22      A.  Whatever a jury decides and a judge.
23      Q.  Okay.  Are you claiming punitive
24  damages in this case?  Do you know what I mean

Page 100

1  when I say punitive damages?
2      A.  I'm not an attorney.  I would have to
3  reference you to my attorney.
4      Q.  Okay.  So you don't know what punitive
5  damage are?
6      A.  No.
7      Q.  Okay.  That's fine.  I am just asking.
8          Do you have any opinion as to what you
9  would be entitled to in compensatory damages?
10      MR. KULIS: This has been asked and answered
11  three times.  But go ahead.
12      THE WITNESS: I would say the same answer:
13  Whatever a judge or jury finds what's fair for
14  this case, for my rights being violated.
15      THE COURT REPORTER: I'm sorry?
16      THE WITNESS: For my rights being violated.
17  BY MS. GRANDFIELD:
18      Q.  And do you have any understanding about
19  the city of Berwyn's demographics?
20      A.  I have no understanding of their
21  demographics, no.
22      Q.  Okay.  So you don't know anything about
23  their, like, per capita income, how much there
24  is per household, anything like that?

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 101

1   A. I do not.
2   Q. Okay. And you have no understanding as
3  to the racial makeup of the city of Berwyn; is
4  that correct?
5   A. That's correct.
6   Q. And do you have any understanding as to
7  where the funds for any verdict or settlement
8  would come from in relation to this lawsuit?
9   A. I have no idea, ma'am.
10   Q. Okay. And with respect to this letter
11  of intent to sue, are there any other units of
12  government other than the City of Berwyn that
13  you sent this form letter to?
14   A. No, ma'am.
15   Q. Do you have any other understanding as
16  to when you filed your lawsuit in relation to
17  when you provided this letter to the mayor?
18   A. I'm not sure, ma'am.
19   Q. Okay. So you couldn't tell me if it
20  was, like, two months after that, or anything
21  like that?
22   A. No. It was sometime after that.
23   Q. Okay. Could you tell me in relation to
24  when you provided this letter to the mayor -- I

Page 102

1  don't want to know anything you talked about --
2  but when you retained an attorney?
3   A. Can you repeat the question?
4   Q. Sure. In relation to handing this
5  letter to the mayor, can you, as you sit here
6  today, recall any date that -- again, I don't
7  want to know anything about what you talked
8  about -- but that you retained an attorney?
9   A. I don't recall an exact date, ma'am.
10   Q. Could you approximate it in any
11  respect?
12   A. Sometime after this letter of intent
13  was drafted.
14   Q. Okay. Let's see.
15     And you indicated earlier that you
16  believed that, I think, Officer Monaco used
17  excessive force against you?
18   A. Yes, ma'am.
19   Q. Okay. And what is the basis for your
20  claim that Officer Monaco used excessive force
21  against you? As you understand it. I'm not
22  asking for a legal conclusion.
23   A. Yes, ma'am. As I understand it, no
24  other man or woman or police officer should be

Page 103

1  putting their hands on people just because they
2  want to or just because they misunderstand that
3  individual's rights. I would classify that as
4  excessive force.
5   Q. Okay. Anything other than that?
6   A. No, ma'am.
7   Q. Did you suffer any physical injuries as
8  a result of Officer Monaco putting his hands on
9  you, in your description?
10   A. No, ma'am.
11   Q. And in relation to the incident in
12  November of 2021, did you suffer any physical
13  injury at all?
14   A. No, ma'am.
15   Q. And why was part of your settlement
16  demand making a demand for Ms. Green's
17  termination?
18   A. Because I believe that she filed a
19  false police report. So I think that is grounds
20  for her termination.
21   Q. Okay. Anything else?
22   A. No, ma'am.
23     MS. GRANDFIELD: Okay. Let's mark this as
24  Exhibit 2.

Page 104

1       (WHEREUPON, Exhibit No. 2 was
2       marked for identification.)
3  BY MS. GRANDFIELD:
4   Q. I'm showing you what has been marked as
5  Exhibit 2. Can you tell me what this is?
6   A. A FOIA request.
7   Q. Okay. And this was made yesterday at
8  City Hall; is that correct?
9   A. Correct, ma'am.
10   Q. And this is asking for invoices in
11  relation to my law firm, right?
12   A. Yes, ma'am.
13   Q. Okay. And what was the purpose of
14  making this FOIA request?
15   A. I believe that the public has the right
16  to know. I have requested public documents as I
17  believe the public has the right to know how
18  much the City of Berwyn is paying with taxpayer
19  money to your law firm, ma'am.
20   Q. And what caused you to make that FOIA
21  request yesterday in?
22   A. I was just in town.
23   Q. Okay. Were you aware that I had
24  engaged in a communication with your counsel

Page 105

1  yesterday?
2    A.  That you had engaged in -- could you
3  repeat the question?
4    Q.  Were you aware that I had engaged in
5  communications with your counsel yesterday?
6    A.  I believe he had mentioned it to me,
7  yes.
8    Q.  And was it before or after he mentioned
9  that that you made a FOIA request for the
10 invoices of my law firm?
11   MR. KULIS: Objection.  You're dealing with
12 attorney-client privilege.  I'm instructing him
13 not to answer.  Don't answer.
14 BY MS. GRANDFIELD:
15   Q.  You understand that any communications
16 you have with your attorney are privileged,
17 right?
18   A.  Yes.
19   Q.  Do you also understand that any
20 communications that I have with the City of
21 Berwyn employees and officials are also
22 privileged?
23   MR. KULIS: Communications, yes.  Bills and
24 records, no.

Page 106

1        I'll object to the form of that
2  question because that's not true at all because
3  I FOIA request all the time from
4  municipalities --
5    MS. GRANDFIELD: Neat.  We'll swear you in
6  later.
7  BY MS. GRANDFIELD:
8    Q.  Are you aware of that?
9    MR. KULIS: I mean, you're stating a fact.
10 Are you asking --
11   MS. GRANDFIELD: I'm asking him if he's aware
12 that communications between me and the City of
13 Berwyn that are within the -- I'm not going to
14 get too technical -- but City of Berwyn
15 officials are privileged.
16 BY MS. GRANDFIELD:
17   Q.  That's what I'm asking you.
18   A.  Your communications between yourself
19 and government officials of Berwyn?
20   Q.  Yes.
21   A.  Yes.  Your communications, I would
22 assume, are privileged information, sure.
23   Q.  Okay.  So, if you were to obtain
24 documents in relation to this FOIA request, what

Page 107

1  would you like to do with those documents?
2    A.  Publish them.
3    Q.  Okay.  Am I a public official?
4    A.  You're receiving taxpayer money, ma'am.
5    Q.  Am I a public official?
6    A.  No, ma'am.
7    Q.  Okay.  So the purpose of this, really,
8  was to intimidate and harass me; is that
9  correct?
10   MR. KULIS: Objection.  Argumentative.
11 Clearly argumentative.
12   MS. GRANDFIELD: He can say yes or no.
13   THE WITNESS: No.  Absolutely not.
14 BY MS. GRANDFIELD:
15   Q.  Okay.  Was the purpose to intimidate or
16 harass my law firm?
17   A.  Absolutely not.
18   Q.  Do you have an ability to get insight
19 or other information in relation to our defense
20 strategy?
21   A.  No.
22   Q.  Do you not think that invoices that
23 contain narratives might give you insight into
24 how we are handling the defense of your lawsuit?

Page 108

1    MR. KULIS: Objection.  Calls for legal
2  conclusion.  Answer, if you can.
3    THE WITNESS: I wasn't aware that your
4  strategies are on invoices, ma'am.  So, no, I'm
5  not aware.
6  BY MS. GRANDFIELD:
7    Q.  Have you ever FOIA'd attorney invoices
8  in any instance?
9    A.  Not that I recall, no.
10   Q.  And when did you first become aware
11 that Del Galdo Law Group was representing the
12 City of Berwyn in this case?
13   A.  I think that would fall under
14 attorney-client privilege.
15   Q.  Nope.  I'm not asking for
16 communications.
17        All I'm asking is when you first became
18 aware that Del Galdo Law Group was representing
19 the City of Berwyn in this case?
20   MR. KULIS: The question is when.
21   THE WITNESS: When?
22 BY MS. GRANDFIELD:
23   Q.  Yes.
24   A.  I believe it was two days ago, if I

Sean Paul Reyes vs
City Of Berwyn, et al.,

Sean Paul Reyes
November 8, 2023

Page 109

1 recall correctly. It could be a little earlier
2 than that.
3    Q. Okay. Are you aware that members of
4 Del Galdo Law Group have received multiple
5 threats for their physical safety through the
6 representation of their clients?
7    A. Absolutely not.
8    Q. And do you understand that in certain
9 instances a motion for a protective order can be
10 filed in the federal court system?
11    A. I'm not an attorney, ma'am. No.
12    Q. Okay. And you would agree with me that
13 this FOIA request has nothing to do with the
14 prosecution of your lawsuit, right?
15    A. I believe it has to do with the story
16 that I'm working on to publish to the public.
17 So, no.
18    Q. The story that you're working on?
19    A. Yes.
20    Q. What story are you working on that has
21 to do with Del Galdo Law Group?
22    A. How much the City -- I requested the
23 invoices, ma'am, to publish that information to
24 the public and the city and the residents of

Page 110

1 Berwyn to see how much the City of Berwyn is
2 paying your law firm in order to defend this
3 case. That's a matter of public interest, in my
4 opinion, ma'am.
5    Q. Please listen to my question.
6    A. Sure.
7    Q. What is the story you're working on in
8 relation to Del Galdo Law Group?
9    A. I think we're misunderstanding each
10 other, ma'am. I said that I was -- my story is
11 to publish that information for matters of
12 public interest because people would want to
13 know that, in my opinion. That's the story:
14 How much the city pays to defend themselves from
15 a lawsuit.
16    Q. Are you aware that the City of Berwyn's
17 budget is published annually?
18    A. I'm sure it is.
19    Q. But you're not personally aware of that
20 as you sit here today?
21    THE COURT REPORTER: I'm sorry. But you're
22 not personally --
23    MS. GRANDFIELD: Aware of that as you sit
24 here today.

Page 111

1    THE WITNESS: I'm sure it's published
2 annually, sure.
3 BY MS. GRANDFIELD:
4    Q. You didn't seek it out or see if you
5 could find it anywhere?
6    A. I haven't sought it out yet, no.
7    Q. And I would assume that you're also not
8 aware that contained within that budget is a
9 line item that identifies how much is spent for
10 legal services?
11    A. I am not personally aware that that
12 would be the case. But even if it was, it
13 wouldn't be specifically for lawsuits. I don't
14 know, ma'am, To be honest with you.
15    I don't know if it's specifically for
16 how much they're spending for lawsuits, how much
17 they're spending for other legal fees that they
18 might incur. I don't know, ma'am.
19    Q. Okay. And, again, you haven't sought
20 that information --
21    A. Not yet.
22    Q. -- to see if it's publicly available,
23 right?
24    A. Not yet, ma'am.

Page 112

1    Q. Okay. And you have no knowledge or
2 other training or experience that would lead you
3 to be able to deduce what invoices for a
4 specific lawsuit contain privileged information?
5    MR. KULIS: I'll object to the form of the
6 question. And, in fact, in FOIA requests,
7 things are redacted all the time.
8    MS. GRANDFIELD: Thank you. We'll, once
9 again, swear you in later.
10 BY MS. GRANDFIELD:
11    Q. I'm asking you if you have any
12 knowledge, experience, or education.
13    A. Can you repeat the question, ma'am?
14    Q. Sure.
15    Do you have any knowledge, experience,
16 or education as to if any narratives or other
17 information in an attorney bill would be
18 privileged?
19    A. No, I don't have any knowledge of that.
20    Q. Okay.
21    A. I wasn't aware that was the case.
22    Q. Okay. Well, I just want to make it
23 clear: I'm not intimidated, and I'm not
24 threatened.

Page 113

1    Do you understand that?
2    A.  No one is intimidating you, ma'am.
3    Q.  You plan to publish legal bills in
4  relation to your own lawsuit and naming the
5  attorneys. Sir, what other purpose is that?
6    A.  Transparency for the people, ma'am.
7    Q.  Oh, please.
8    A.  Are you --
9    Q.  Please.
10    MR. KULIS: Objection. Argumentative.
11    If you want to ask a question, you can
12  ask a question.
13    MS. GRANDFIELD: Please.
14    MR. KULIS: Because I have done it in civil
15  lawsuits, so...
16    MS. GRANDFIELD: And posted it on a blog?
17    MR. KULIS: ABC News. And there's a TV
18  article about it.
19    MS. GRANDFIELD: At the time the lawsuit was
20  pending?
21    MR. KULIS: Yes. Absolutely.
22    MS. GRANDFIELD: Okay. Great.
23    MR. KULIS: I mean, I didn't do it. They did
24  it. ABC News discussed the amount of money

Page 114

1  being spent in cases.
2    MS. GRANDFIELD: Right. So they FOIA'd it?
3    MR. KULIS: We FOIA'd the information.
4    MS. GRANDFIELD: Okay.
5    MR. KULIS: And invoices were obtained. We
6  do it with the City of Chicago all the time.
7    MS. GRANDFIELD: Great.
8    MR. KULIS: And they tender it pursuant to
9  the law. They tender the amount of money spent
10  on a lawsuit.
11    MS. GRANDFIELD: Okay. We'll swear you in
12  later. Cool.
13  BY MS. GRANDFIELD:
14    Q.  What transparency are you concerned
15  about?
16    A.  How much the City of Berwyn is paying
17  your law firm to defend itself in a lawsuit and
18  how much they've paid you in general.
19    Q.  Okay. Anything else?
20    A.  No. I think the taxpayers have a right
21  to know where that money is going or how much
22  money it is.
23    Q.  Don't the taxpayers have that
24  information by the publishing of a budget that

Page 115

1  they're required to follow?
2    A.  So it shouldn't be an issue, right?
3    Q.  I just want to make it clear that I am
4  asking you on the record to withdraw this FOIA
5  request.
6    And, in addition to that, I am also
7  stating that you do not have my permission to
8  mention my name or any other names of the people
9  at Del Galdo Law Group, and let me tell you why.
10    I, along with several other attorneys,
11  have received threats to our personal safety in
12  relation to our representation of governments.
13  Not necessarily the city of Berwyn, but just
14  over the years.
15    So I would request that, whatever you
16  are seeking or receiving, that you not publish
17  our names because of that. We had some issues
18  in the past.
19    Okay?
20    MR. KULIS: Is that a question?
21    MS. GRANDFIELD: Yeah. I'm just saying. I
22  just said --
23    MR. KULIS: Is that a question or is it a --
24    MS. GRANDFIELD: I'm just requesting it.

Page 116

1  Okay?
2    MR. KULIS: Okay. So it's not a question.
3  It's a statement. So should we swear you in,
4  too? I mean, it's a statement. This is a
5  deposition.
6    MS. GRANDFIELD: I am objecting to the
7  narrative.
8    MR. KULIS: Okay. So there is no question
9  pending, then.
10  BY MS. GRANDFIELD:
11    Q.  Do you understand that request?
12    A.  Can you repeat the request, please?
13    Q.  Sure.
14    Do you understand that I am not
15  agreeing to, and, in fact, would ask that you
16  not specifically mention the names of any of the
17  attorneys at our law firm in relation to any
18  bills that you have FOIA'd or requested for
19  personal safety reasons?
20    A.  I would just like to say that my
21  intention is not to intimidate as you've stated.
22  My intention -- I have no ill will towards this
23  law firm, and I don't want this law firm to
24  receive any sort of threats of any nature.

Page 117

1    That has never been what I've promoted
2  in my entire career of activism and journalism.
3  I've never promoted anybody to receive death
4  threats. That's all I'll say on that.
5    I understand your request, ma'am. Yes,
6  I do.
7   Q. And do you intend to abide by that
8  request?
9    MR. KULIS: That's --
10 BY MS. GRANDFIELD:
11   Q. Do you intend to agree to that request?
12   MR. KULIS: I'm going to object to that form
13 of the question.
14   MS. GRANDFIELD: I just want to know because
15 I --
16   MR. KULIS: Could I make my objection, damn
17 it? Please?
18   MS. GRANDFIELD: You cannot curse. I think
19 we need to, like, take a little break.
20   MR. KULIS: Yeah. Because you just yelled at
21 me about the fourth time already.
22   MS. GRANDFIELD: I think we need to take a
23 break because I'm not going to be cursed at on
24 the record.

Page 118

1    MR. KULIS: Okay. I didn't curse at you.
2    MS. GRANDFIELD: Damn it isn't cursing?
3    MR. KULIS: You swear at me. You swore at
4  me. Well, you didn't swear at me. But you
5  raised your voice. All I'm saying --
6    MS. GRANDFIELD: I haven't raised my voice at
7  all.
8    MR. KULIS: I think you have.
9    MS. GRANDFIELD: All right. Let's take a
10 break because I'm not going to have curse words
11 said to me. So, let's take a break. We'll be
12 back here in five minutes. Okay?
13   MR. KULIS: Okay. Sure.
14   MS. GRANDFIELD: I would like you guys to
15 please leave the room and take a five-minute
16 break.
17   MR. KULIS: If you want us to leave the room,
18 we're leaving the deposition. We're here for a
19 deposition. If you want to leave the room, you
20 can leave the room.
21     We're here for a deposition. You want
22 to ask questions, you can ask questions. If you
23 don't want to ask questions, tell me you have
24 nothing else, and we will leave.

Page 119

1    If you want to take a break -- we're
2  ready to go forward. If you want to take a
3  break, we can take a break. But, I mean, we're
4  here for a deposition, so --
5    MS. GRANDFIELD: Okay. I'm going to take a
6  break, and then if there's any curse words that
7  are said to me, I'm going to discontinue -- when
8  we come back or any other testimony by the
9  attorney, then I'll discontinue it, and I'll
10 file a motion about it.
11   MR. KULIS: I would welcome it.
12     (WHEREUPON, a short break was
13     taken.)
14   MS. GRANDFIELD: All right. We're back.
15   THE COURT REPORTER: Do you want the last
16 question?
17   MS. GRANDFIELD: Yeah. Could you tell me
18 what the last question was?
19     (WHEREUPON, said Record was
20     read as requested.)
21 BY MS. GRANDFIELD:
22   Q. You probably don't remember what I was
23 going to ask you for.
24     Okay. Are there any other law firm

Page 120

1  bills other than our law firm bills that you
2  have FOIA'd from the City of Berwyn?
3   A. Not at this time.
4   Q. Okay. Is there any other law firm
5  bills that you've ever FOIA'd from any other
6  unit of government that you can recall as you
7  sit here today?
8   A. Not that I recall, no.
9   Q. Okay. And as a result of the criminal
10 proceedings that were brought against you by the
11 City of Berwyn, do you believe that you lost any
12 income as a result of that?
13   A. No.
14   Q. Okay. I think I'm getting to the end
15 of my very exciting deposition for you, I'm
16 sure.
17     In this notice of intent to sue that I
18 think I marked as Exhibit 1, it looks like you
19 attached, at least in this copy, police reports.
20     I don't know if that -- did you attach
21 all of that when you gave this to the mayor?
22   A. No. I think whenever I gave this to
23 you, I attached it.
24   Q. Okay. That was my confusion. I

Sean Paul Reyes vs
City Of Berwyn, et al.,

Page 121

1 couldn't tell by the file. Okay.
2 You made several postings about the
3 City of Berwyn on your website, right?
4 A. Right.
5 Q. Okay. And I note that in one of those
6 reports it indicates that through these videos
7 you've called for retaliation against various
8 employees and officials of the City of Berwyn.
9 A. Never.
10 Q. Okay. What, if anything, have you said
11 when making these postings?
12 A. I never made those postings.
13 Q. So, you never made postings on
14 April 14th, 2022?
15 A. I don't recall. Is there a page you
16 want me to look at?
17 Q. Sure. It's this one right here. I'm
18 just going through --
19 A. What page is it? I think it's this
20 one.
21 MR. KULIS: What page?
22 THE WITNESS: I think it says 2 of 4, but
23 they're separate.
24

Page 122

1 BY MS. GRANDFIELD:
2 Q. Yeah, I know. It's not --
3 A. So, I'm looking for April --
4 Q. Yeah. So the dates of those postings
5 are as follows --
6 A. Okay. Yeah, yeah.
7 Q. It's, like, the third full paragraph,
8 second sentence.
9 A. No. That never happened on any of
10 those dates.
11 Q. Okay. But did you make postings on
12 those dates?
13 A. I'm sure.
14 Q. Okay.
15 A. I don't recall.
16 Q. Okay. We're unintentionally talking
17 over each other.
18 Do you have any recollection of what
19 those postings were?
20 A. No, ma'am. I don't.
21 Q. Okay. And did anyone ever advise you
22 of the fact that this caused the police
23 department to get flooded with hundreds of
24 calls?

Page 123

1 A. No one's ever told me that, no.
2 Q. Okay.
3 A. I was only told that -- to my
4 recollection, I was only told that I told people
5 to shoot up the police department. That's what
6 I was told by Commander Ochsner.
7 Q. But other than that, no one has --
8 other than your counsel -- but no one has
9 advised you that this caused the influx of calls
10 to increase by this amount or --
11 A. No. Not that I recall, no.
12 Q. Did you ever FOIA this police report?
13 A. No, ma'am.
14 Q. Okay.
15 A. It's the first time I'm seeing it.
16 Q. Okay. Other than yourself and the
17 individuals that you've interacted with at the
18 City of Berwyn, would there be any other
19 individuals that you believe would have
20 information about this lawsuit?
21 A. My lawsuit against the City of Berwyn?
22 Q. Yeah. Excluding your attorney.
23 A. No, not that I'm aware of.
24 Q. Was there anybody else present other

Page 124

1 than the City of Berwyn employees and police
2 officers in November of 2021?
3 A. November 8th of 2021?
4 Q. Yes.
5 A. Okay. No. It was just myself.
6 Q. Okay. So, in other words, there
7 weren't any, like, Berwyn residents that were
8 standing there that you recall or believe to be
9 a Berwyn resident?
10 A. I'm sure there were residents there.
11 Q. Right.
12 A. I'm just not sure -- I don't recall
13 anybody specifically. I would just assume that
14 City Hall would have residents in it.
15 Q. Okay. Were there any Berwyn residents
16 that were present on November 8th of 2021 that
17 you have a belief were a member of or associated
18 with what you termed the activist group?
19 A. No, not to my knowledge.
20 Q. Did you sign a retention agreement with
21 Mr. Jenks?
22 A. Yes.
23 Q. And did that retention agreement
24 acknowledge that he was providing his services

**Sean Paul Reyes vs**
**City Of Berwyn, et al.,**

Page 125

1  free of charge?
2    A.  I'm sure it did.
3    Q.  Do you still have a copy of that
4  retention agreement?
5    A.  I could get it.
6    Q.  So when you say you could get it, you
7  mean you would have to request it from
8  Mr. Jenks?
9    A.  Yes.
10    Q.  So you haven't retained that?
11    A.  No.
12    Q.  Are you aware that in your complaint
13  you allege that you've retained counsel for that
14  criminal case?
15    A.  In this federal -- in the lawsuit
16  complaint that I retained counsel?
17    Q.  Yes.  Are you aware that in your
18  federal lawsuit against the City of Berwyn that
19  one of the allegations of your complaint is that
20  you retained criminal defense counsel?
21    A.  I'm it says it, yes, I retained
22  whoever --
23    Q.  Okay.  No.  I'm asking if you're aware
24  of that, that that allegation was made?

Page 126

1    A.  That I retained counsel --
2    Q.  Yes.
3    A.  -- which means that we came to an
4  agreement and I signed a retainer?
5    Q.  Yes.
6    A.  Yes.  Okay.  Yeah.
7    Q.  Do you have an understanding that you
8  have a duty to preserve and retain documents
9  related to your own lawsuit?
10    A.  I think I answered this question
11  earlier.  I wasn't aware that I had an
12  obligation to retain that document, no.
13    MS. GRANDFIELD: All right.  I think I am
14  finally done with my questions.  I don't know if
15  your own counsel has any questions.
16    MR. KULIS: No.  None.
17    MS. GRANDFIELD: Do you want to waive or
18  reserve signature?
19    MR. KULIS: We'll waive.
20    MS. GRANDFIELD: Okay.  We will go off the
21  record.
22    THE COURT REPORTER: If we could get on the
23  record if anyone is ordering the transcript
24  today.

Page 127

1    MS. GRANDFIELD: I will order a copy, please.
2    THE COURT REPORTER: The original?
3    MS. GRANDFIELD: Yeah, yeah.  I'll just take
4  a pdf.
5    THE COURT REPORTER: Mr Kulis, copy for you?
6    MR. KULIS: Not yet.  I'll notify you
7  shortly.
8    THE COURT REPORTER: Thank you.
9      (Whereupon, the deposition
10      was concluded at 4:38 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 128

1  STATE OF ILLINOIS)
2            ) SS:
3  COUNTY OF C O O K)
4      I, Jamye Giamarusti, a certified
5  shorthand reporter, within and for the County of
6  Cook and State of Illinois, do hereby certify
7  that heretofore, to-wit, on November 8, 2023,
8  personally appeared before me, at 111 North
9  Wabash, Suite 908, Chicago, Illinois, SEAN PAUL
10  REYES, in a cause now pending and undetermined
11  in the United States District Court of Illinois,
12  wherein SEAN PAUL REYES is the Plaintiff and
13  RICHARD VOLANTI, DETECTIVE MONACO, OFFICER
14  GHILONI, RUTH SIABA GREEN, individually, and the
15  CITY OF BERWYN, a municipal corporation, are the
16  Defendants.
17      I further certify that the said witness
18  was first duly sworn to testify the truth, the
19  whole truth and nothing but the truth in the
20  cause aforesaid; that the testimony then given
21  by said witness was reported stenographically by
22  me in the presence of the said witness, and
23  afterwards reduced to typewriting by
24  Computer-Aided Transcription, and the foregoing

Page 129

```
 1   is a true and correct transcript of the
 2   testimony so given by said witness as aforesaid.
 3        I further certify that the signature to
 4   the foregoing deposition was waived by counsel
 5   for the respective parties.
 6        I further certify that the taking of this
 7   deposition was pursuant to Notice, and that
 8   there were present at the deposition the
 9   attorneys hereinbefore mentioned.
10        I further certify that I am not counsel
11   for nor in any way related to the parties to
12   this suit, nor am I in any way interested in the
13   outcome thereof.
14        IN TESTIMONY WHEREOF:  I have hereunto
15   set my hand this 29th day of November, 2023.
16
17
18
19        Jamye Giamarusti, CSR #084.004183
20           CERTIFIED SHORTHAND REPORTER
21
22
23
24
```

# Exhibit 10

District 4

## Case Summary

### Case No. 21400313501

| People of the State of Illinois vs. SEANPAUL REYES | § | | |
|---|---|---|---|
| | § | Location: | **District 4** |
| | § | Judicial Officer: | **District 4, Room 102** |
| | § | Filed on: | **11/09/2021** |
| | § | Case Number History: | **PREFILE030096199** |
| | § | Record Division Number: | **21-10215** |
| | § | Internal Case Identifier (T&I Only): | **IL016090021-10215** |
| | § | Central Booking Number/Document Control Number: | **030096199** |
| | § | IR Number: | **2451909** |

---

## Case Information

| Offense | Statute | Degree | Offense Date | Filed Date | | |
|---|---|---|---|---|---|---|
| | | | | | Case Type: | Misdemeanor |
| | | | | | Case Status: | **08/10/2022 Case Disposed** |
| Jurisdiction: **Berwyn** | | | | | | |
| 1.  DISORDERLY CONDUCT - BREACH OF | 720 ILCS 5.0/26-1-A-1 | MC | 01/01/1900 | 11/09/2021 | | |

Arrest
   Date:  11/08/2021
   Agency:   IL016090 - Berwyn
DCN:   030096199   Sequence:  001

### Statistical Closures

08/10/2022  S.O.L.

---

## Assignment Information

**Current Case Assignment**
Case Number       21400313501
Court             District 4
Date Assigned     11/12/2021
Judicial Officer  District 4, Room 102

---

## Party Information

*Lead Attorneys*

**Defendant**  **REYES, SEANPAUL**
              66 South VILLAGE DR
              BELLPORT, NY 11713
              White
              Male
              DOB:  03/28/1991
              Other Agency Number:   2451909 IR Number

**Pro Se**
66 South VILLAGE DR
BELLPORT, NY 11713

---

## Events and Orders of the Court

08/10/2022   **Disposition** (Judicial Officer: Hill, Stanley L)
     1. DISORDERLY CONDUCT - BREACH OF

District 4

## Case Summary

### Case No. 21400313501

Stricken Off - Leave Reinstate
DCN:   030096199
Sequence:   001

| | |
|---|---|
| 08/10/2022 | Motion Filed |
| | *States Motion to Exclude Defendant's Video DENIED* |
| 08/10/2022 |  |
| | Order Entered   (Judicial Officer: Hill, Stanley L) |
| | *Cameras are permitted to be brought into court today for trial...(See Order)* |
| 08/10/2022 | Defendant Demand For Trial   (Judicial Officer: Hill, Stanley L) |
| 08/10/2022 |  |
| | Courtsheet |
| 08/10/2022 | **Motion Defendant**  (9:00 AM)   (Judicial Officer: Hill, Stanley L) |
| | Resource: Location CR0472 D4, Courtroom 102 |
| | Resource: Location D4ADDR 1500 Maybrook Avenue, Maywood, IL 60153 |
| 06/08/2022 | Hearing by ZOOM |
| 06/08/2022 |  |
| | Courtsheet |
| 06/08/2022 | **By Agreement**  (9:00 AM)   (Judicial Officer: Mays, Celestia L) |
| | Resource: Location CR0472 D4, Courtroom 102 |
| | Resource: Location D4ADDR 1500 Maybrook Avenue, Maywood, IL 60153 |
| 05/11/2022 | Motion-Denied   (Judicial Officer: Mays, Celestia L) |
| 05/11/2022 | Courtsheet |
| 05/11/2022 | Defendant In Court   (Judicial Officer: Mays, Celestia L) |
| 05/11/2022 | Hearing by ZOOM |
| 05/11/2022 | Hearing by ZOOM |
| 05/11/2022 | Motion-Granted   (Judicial Officer: Mays, Celestia L) |
| 05/11/2022 |  |
| | Courtsheet |
| 05/11/2022 | Defendant In Court   (Judicial Officer: Mays, Celestia L) |
| 05/11/2022 | **By Agreement**  (9:00 AM)   (Judicial Officer: Mays, Celestia L) |
| | Resource: Location CR0472 D4, Courtroom 102 |
| | Resource: Location D4ADDR 1500 Maybrook Avenue, Maywood, IL 60153 |
| 04/13/2022 | Defendant In Court   (Judicial Officer: Wilson, John Wellington) |
| 04/13/2022 |  |
| | Courtsheet |
| 04/13/2022 | Hearing by ZOOM |
| 04/13/2022 | **Hearing**  (9:00 AM)   (Judicial Officer: Wilson, John Wellington) |
| | Resource: Location CR0472 D4, Courtroom 102 |
| | Resource: Location D4ADDR 1500 Maybrook Avenue, Maywood, IL 60153 |
| 04/13/2022 | **By Agreement**  (9:00 AM)   (Judicial Officer: Henry, Sheree D.) |
| | Resource: Location CR0472 D4, Courtroom 102 |
| | Resource: Location D4ADDR 1500 Maybrook Avenue, Maywood, IL 60153 |
| 03/10/2022 | Defendant Not In Court   (Judicial Officer: Ciaccia-Lezza, Elizabeth) |
| 03/10/2022 |  |
| | Motion Deft - Continuance   (Judicial Officer: Ciaccia-Lezza, Elizabeth) |
| 03/10/2022 | Motion Filed |
| | Party:   Defendant REYES, SEANPAUL |
| 03/10/2022 | **Motion**  (9:00 AM)   (Judicial Officer: Ciaccia-Lezza, Elizabeth) |
| | Resource: Location CR0472 D4, Courtroom 102 |

## Case Summary

**Case No. 21400313501**

Resource: Location D4ADDR 1500 Maybrook Avenue, Maywood, IL 60153

| | |
|---|---|
| 02/23/2022 | Hearing by ZOOM |
| 02/23/2022 | Defendant In Court     (Judicial Officer: Henry, Sheree D.) |
| 02/23/2022 | Courtsheet |
| 02/23/2022 | **By Agreement**   (9:00 AM)   (Judicial Officer: Henry, Sheree D.)<br>Resource: Location CR0472 D4, Courtroom 102<br>Resource: Location D4ADDR 1500 Maybrook Avenue, Maywood, IL 60153 |
| 01/26/2022 | Courtsheet |
| 01/26/2022 | **By Agreement**   (9:00 AM)   (Judicial Officer: Henry, Sheree D.)<br>Resource: Location CR0472 D4, Courtroom 102<br>Resource: Location D4ADDR 1500 Maybrook Avenue, Maywood, IL 60153 |
| 01/04/2022 | Motion To Dismiss Charges - Filed |
| 12/22/2021 | Special Conditions Of Bail Ordered     (Judicial Officer: Henry, Sheree D.) |
| 12/22/2021 | Defendant In Court     (Judicial Officer: Henry, Sheree D.) |
| 12/22/2021 | Hearing by ZOOM |
| 12/22/2021 | Courtsheet |
| 12/22/2021 | **Bond Set By Rule of Court**   (9:00 AM)   (Judicial Officer: Henry, Sheree D.)<br>Resource: Location CR0472 D4, Courtroom 102<br>Resource: Location D4ADDR 1500 Maybrook Avenue, Maywood, IL 60153 |
| 11/12/2021 | Defendant Released On Cash Or Deposit Bond |
| 11/12/2021 | Case Filed |